Stephanie B. Garlock (*pro hac vice* application forthcoming)
Allison M. Zieve (*pro hac vice* application forthcoming)
Wendy Liu (*pro hac vice* application forthcoming)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC  20009-1001
Telephone:     (202) 588-1000
Email:          sgarlock@citizen.org
                azieve@citizen.org
                wliu@citizen.org

Michael W. Bien – 096891
Gay Crosthwait Grunfeld – 121944
Van Swearingen – 259809
Adrienne Spiegel – 330482
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:          mbien@rbgg.com
                ggrunfeld@rbgg.com
                vswearingen@rbgg.com
                aspiegel@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RISE ECONOMY; NATIONAL COMMUNITY REINVESTMENT COALITION; and WOODSTOCK INSTITUTE, | Case No. 25-10481 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau; and CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Defendants. | |

**INTRODUCTION**

1.      In the wake of the 2008 financial crisis, Congress created the Consumer Financial Protection Bureau (CFPB) as a centralized hub of consumer protection work in the federal government.  Congress transferred to the CFPB authority to enforce more than a dozen statutes, and it assigned the new agency the power and responsibility to supervise the nation's largest financial institutions for compliance with their obligations under consumer protection laws.

2.      In the decade and a half since its creation, the CFPB has carried out its statutory mandate of ensuring that consumers have access to a "fair, transparent, and competitive" market for financial products and services.  12 U.S.C. § 5511(a).  The CFPB has returned more than $21 billion to consumers, and it has helped set rules of the road for industries with substantial impact on the American economy and American consumers, including the mortgage and credit card industries.[1]

3.      Since taking over as Acting Director of the CFPB in February 2025, Defendant Russell Vought has repeatedly tried to shutter the agency and halt its statutorily mandated consumer protection work.  In mid-October, Vought stated publicly that he intended to close the agency within a few months.

4.       This case challenges Vought's attempt to engineer that shutdown by starving the CFPB of funding.  Vought's maneuver rests on an erroneous interpretation of the statutory provision creating a standing appropriation for the CFPB, which Congress crafted to ensure that the new consumer protection agency had access to a stable funding source.  Specifically, Congress provided that the CFPB will be funded via transfers from the Federal Reserve Board of Governors, out of "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1).

5.      The CFPB has long taken the position that the Federal Reserve System's "combined earnings" are just what they sound like: all the money the various components of the Federal Reserve System take in or generate.  That interpretation—as the CFPB recognized until recently—is consistent with the ordinary meaning of the term "earnings," and it is the only

_____

[1] CFPB, *About Us: The CFPB*, https://www.consumerfinance.gov/about-us/the-bureau/ (last modified Dec. 12, 2024).

1  approach that comports with statutory context and allows the statutory scheme to work as a whole.

2  That interpretation also ensures that the CFPB will be consistently funded, as the Federal Reserve

3  System reliably generates substantial revenue through its ongoing operations.

4        6.      In November 2025, in an abrupt about-face, Defendants Vought and the CFPB

5  reinterpreted the statute's reference to "combined earnings of the Federal Reserve System" in a

6  way that turns that stable source of funding on its head.  Defendants have manufactured a novel

7  meaning for "earnings," contending that the Federal Reserve System has "earnings" only when the

8  System's revenues exceed its interest expenses.  Based on that bespoke definition of "earnings"—

9  and seemingly without considering the current state of the Federal Reserve System's finances—

10  Defendants assert that there are currently no "earnings" available to fund the CFPB for fiscal year

11  2026.  Defendants thus have refused to request funds from the Federal Reserve Board, and they

12  project that they will exhaust the CFPB's reserve funds in just a few weeks' time.  Citing this

13  manufactured fiscal crisis, Defendants have begun to take steps to shut down the agency

14  altogether, including transferring away active litigation and developing plans to furlough staff en

15  masse.

16        7.      Defendants' determination that the CFPB cannot lawfully request funding from the

17  Federal Reserve System is incorrect, and the decision not to request that funding is unlawful.

18  Defendant Vought is required by statute to determine the amount "reasonably necessary" to carry

19  out the CFPB's responsibilities so that the Federal Reserve Board can transfer that amount to the

20  CFPB. The statute gives him no discretion to refuse to make that determination, and certainly not

21  based on his own determination of whether the Federal Reserve has "earnings" to fulfill a request

22  for funding.  Moreover, the Federal Reserve System does have ample earnings available to satisfy

23  any such request.  For one thing, even under the Defendants' own (incorrect) interpretation of the

24  statute, the Federal Reserve System has sufficient "earnings" to support the Bureau's funding

25  needs.  Regardless, Defendants' interpretation of the term "earnings" is not entitled to any

26  deference, and it does not present a plausible—let alone the best—reading of the statutory

27  provision funding the CFPB.

28        8.      Plaintiffs in this suit are nonprofit organizations that rely on the CFPB's work and

will suffer imminent harm following Defendants' refusal to request from the Board of Governors of the Federal Reserve System the funding needed to operate the CFPB. They therefore seek an order requiring Defendants to fulfill their statutory duty to request funding to support the CFPB's operations.

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, namely, the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(C) because Defendants are an officer and an agency of the United States, a plaintiff resides in this district, and no real property is involved in the action.

11.     Rise Economy resides in San Francisco, CA. Accordingly, intradistrict assignment is appropriate in the San Francisco division of this Court.

### PARTIES

12.     Plaintiff Rise Economy is a nonprofit based in San Francisco, California.  Founded in 1986 as the California Reinvestment Coalition, Rise Economy works to aid low-income communities and communities of color in accessing credit, financial services, and investments. Among other things, Rise Economy monitors practices across the financial industry, negotiates with financial institutions to improve practices, and advocates for the adoption of policies that will promote fairness across the economy.  In this work, Rise Economy regularly relies on research, data sets, and other work produced by the CFPB, including data sets that the CFPB administers under the Home Mortgage Disclosure Act (HMDA) and the CFPB's consumer complaint database.  Rise Economy is an association with more than 300 members, including nonprofit community-based organizations and public agencies, that also rely on the CFPB's work and resources, including CFPB data sets, the CFPB's consumer response function, and the CFPB's consumer complaint database.

13.     Plaintiff National Community Reinvestment Coalition (NCRC) is a nonprofit based in Washington, DC. NCRC is an association of more than 600 community-based organizations,

1  including community reinvestment organizations, community development corporations, local and

2  state government agencies, faith-based institutions, community organizing and civil rights groups,

3  minority and women-owned business associations, and social service providers.  NCRC's mission

4  is to help increase the flow of capital into underserved communities.  NCRC engages in research,

5  training, and advocacy on behalf of members; tests, monitors, and challenges discrimination in

6  financial services and housing; and facilitates dialogue between financial institutions and

7  community networks to increase lending in neighborhoods that need it.  In carrying out this work,

8  NCRC uses information that financial institutions report to the CFPB and that the CFPB makes

9  available to the public.  For example, NCRC regularly relies on HMDA data to produce research

10  reports and assist local agencies, cities, and organizations in holding lending institutions

11  accountable for inequitable practices.  NCRC also uses information in the CFPB's consumer

12  complaint database to better understand the risks that consumers face in the marketplace.  In

13  addition, NCRC's members rely on the CFPB's work, including its data sets, consumer response

14  function, and consumer complaint database.

15          14.    Plaintiff Woodstock Institute is a nonprofit research and policy organization based

16  in Chicago, Illinois.  Woodstock Institute works locally and nationally to create a financial system

17  in which lower-wealth individuals and communities of color can safely borrow, save, and build

18  wealth so that they can achieve economic security and community prosperity.  It pursues these

19  goals by conducting research on financial products and practices, promoting effective state and

20  federal policies, convening a coalition of community investment stakeholders working to improve

21  access to credit, and providing technical assistance to financial institutions, nonprofits, and

22  governments.  In this work, Woodstock Institute relies on data and other resources that the CFPB

23  administers, including HMDA data and the CFPB's consumer complaint database.  For example,

24  Woodstock's Community Lending Data Portal aggregates and visualizes information on mortgage

25  and small business lending in Illinois, Indiana, Wisconsin, and Massachusetts, relying in large part

26  on data made available by HMDA. In addition, Woodstock Institute uses data from the CFPB to

27  work with lending institutions on how to better serve the credit needs of low- and moderate-

28  income communities.

15.     Defendant Russell Vought is the Acting Director of the CFPB. He is sued in his official capacity.

16.     Defendant CFPB is an agency of the United States.

**BACKGROUND**

**The CFPB's Mandate**

17.     Congress created the CFPB in the aftermath of the 2008 financial crisis, as part of the package of reforms in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010). In that statute, Congress tasked the CFPB with "ensuring that all consumers have access to markets for consumer financial products" that "are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Congress instructed the CFPB to pursue a variety of objectives, including ensuring that consumers are "protected from unfair, deceptive, or abusive acts and practices and from discrimination," that consumers are given access to "timely and understandable information to make responsible decisions about financial transactions," and that "Federal consumer financial law is enforced consistently." *Id*. § 5511(b).

18.     To help the CFPB achieve those objectives, Congress transferred substantial authorities to the Bureau from several other financial regulators, including the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Federal Trade Commission, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision.  *Id*. § 5581(a)(2), (b).

19.     Following this transfer of authority, the CFPB took over responsibility to supervise the nation's largest banks and credit unions (those with assets of more than $10 billion) for compliance with their obligations under federal consumer financial law.  *Id*. § 5515(a). The CFPB also supervises certain non-depository financial institutions that play a major role in the consumer economy, including mortgage lenders and mortgage servicers.  *Id.* § 5514.

20.     In addition to this supervision authority, Congress authorized the CFPB to issue regulations and guidance to help administer a wide range of consumer protections statutes, *id.* § 5512, and assigned to the CFPB authority to investigate and bring enforcement actions to address violations of those laws, *id.* §§ 5562, 5564.

21.     The Dodd-Frank Act also required the CFPB to set up a process to ensure that consumers can receive timely responses from financial institutions to complaints about a product or service.  *Id.* § 5534.

22.     Congress also tasked the CFPB with helping to implement various statutory mandates to collect, process, and make public information about consumer markets.  *See, e.g.*, *id.* § 5493(b)(1) (requiring establishment of research office and enumerating areas of required research); *id.* § 5496 (requiring congressional reports discussing "the significant problems faced by consumers in shopping for or obtaining consumer financial products or services" and analyzing consumer complaints); *id.* § 2809 (instructing CFPB to provide support for publication of Home Mortgage Disclosure Act data); 15 U.S.C. § 1691c-2 (mandating that CFPB implement the statutory requirement to collect and disseminate data about small-business lending).

23.     Congress housed the new CFPB in the Federal Reserve System, designating it as an "independent bureau" within that system.  12 U.S.C. § 5491(a).

**The CFPB's Funding**

24.     Rather than an annual appropriation, Congress provided the agency with a permanent source of funding through the Federal Reserve System.

25.     Pursuant to the Dodd-Frank Act, the Federal Reserve "Board of Governors shall," on an annual or quarterly basis, "transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" in earlier periods.  *Id*. § 5497(a)(1).

26.     The statute provides only one limitation on the amount that the Federal Reserve Board can transfer to the CFPB: The CFPB Director's request is subject to a statutory cap, based on a percentage of the Federal Reserve System's total operating expenses in 2009, adjusted for inflation.  *Id.* § 5497(a)(2).

27.     Until this year, the CFPB consistently sent the Board quarterly requests setting forth the amount that the Director had determined was reasonably necessary to carry out the

1    CFPB's statutory authorities.[2]

2         28.    If the CFPB Director determines that the amount of funds "sufficient to carry out

3    the authorities" of the CFPB is in excess of the cap, the Director may request additional funding

4    from congressional appropriations committees, accompanied by a report explaining "the extent to

5    which the funding needs of the Bureau are anticipated to exceed the level of the amount set forth"

6    under the statutory cap. *Id.* § 5497(e)(1).

7    **The Federal Reserve System and Its Finances**

8         29.    The Federal Reserve System is the central bank of the United States.  The Federal

9    Reserve System is responsible for conducting the nation's monetary policy, carrying out its dual

10   statutory mandates of promoting maximum employment and stabilizing prices.[3]

11        30.    The Federal Reserve Board of Governors, an agency of the federal government, is

12   the System's primary governing and administrative body.

13        31.    The operating arms of the Federal Reserve System are the twelve regional Federal

14   Reserve Banks, which act in part like private entities and in part like government agencies.  The

15   Banks are responsible for supervising and examining commercial banks within their remit, lending

16   to depository institutions, and providing key financial services that make the nation's payments

17   systems work.  As a condition of membership in the Federal Reserve System, commercial banks

18   must hold stock in their regional Reserve Bank.

19        32.    In carrying out its work, the Federal Reserve System is not funded by annual

20   appropriations.  Instead, the system generates its own income, which it uses to support its

21   operations.  *See* 12 U.S.C. §§ 243, 289(a)(1)(A). The Federal Reserve System's income is largely

22   a byproduct of various activities the system carries out in its role as the nation's central bank,

23

24   _____

25   [2] *See, e.g.*, Letter from Dan Tangherlini & Adewale Adeyemo to William Mitchell, Funds Transfer Request (Sept. 6, 2011), https://files.consumerfinance.gov/f/201109_cfpb_funding_request.pdf;

26   Letter from Rohit Chopra to Jerome Powell, Funds Transfer Request, FY 2025 Quarter 2 (Dec. 19, 2024), https://files.consumerfinance.gov/f/documents/cfpb-12-19-letter-from-cfpb-to-frb_2025-

27   01.pdf.

28   [3] *See The Fed Explained: What the Central Bank Does* 1 (11th ed. Aug. 2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.

including operations targeted at controlling inflation and services provided to commercial financial institutions.  According to their 2024 combined financial statement, the Reserve Banks collectively generated around $160 billion in income last year.[4]

33.     The role of the Federal Reserve Banks in implementing monetary policy requires the Banks to take on substantial liabilities, too.  In 2008, Congress authorized Federal Reserve Banks to pay interest on balances that depository institutions hold at Reserve Banks.[5] The ability to pay interest on reserves was seen as an important new tool for the Federal Reserve's implementation of monetary policy, after many of its traditional tools became less effective following certain economic-stabilization measures it had taken in the early days of the 2008 recession.[6] The interest rate that the Reserve Banks offer on reserve balances now functions as a benchmark for financial institutions in their own lending activities because banks will not lend at a rate below what they could earn by holding those same funds at a Reserve Bank.

34.     Since 2022, as the Federal Reserve raised interest rates in an effort to curb inflation, the Reserve Banks' interest expenses grew substantially.[7] According to their 2024 combined financial statement, the Reserve Banks collectively paid out over $186 billion in 2024 in interest on balances held in reserve.[8]

35.     Unlike a private bank, whether the Federal Reserve Banks' expenses exceed their revenue over a given period does not affect the Banks' ability to operate, and it is not "a sign of mismanagement" of the System.  That is because the Federal Reserve "is not profit-maximizing"

---

[4] Federal Reserve, *Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* 4, https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2024.pdf (2024 FRS Financial Statement).

[5] *See* Financial Services Regulatory Relief Act, Pub. L. No. 109-351, § 201, 120 Stat. 1966, 1968 (Oct. 13, 2006), *codified at* 12 U.S.C. § 461(b)(12)(A); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 128, 122 Stat. 3765, 3796 (Oct. 3, 2008).

[6] *The Fed Explained*, *supra*, at 36; *see also* Cong. Res. Serv., *Introduction to U.S. Economy: Monetary Policy* (Apr. 1, 2025), https://www.congress.gov/crs-product/IF11751.

[7] Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023), https://www.congress.gov/crs-product/IN12081.

[8] 2024 FRS Financial Statement, *supra*, at 4.

but is instead focused on "achieving its statutory mandate of maximum employment and stable prices." And unlike a commercial entity, the Federal Reserve System "does not reduce its capital, become insolvent, or require a capital infusion to maintain solvency in response to losses."[9]

36.     Rather, whether the Banks are operating in the black or in the red, a series of statutory requirements govern how the Federal Reserve System handles its finances: Federal Reserve Banks, "after all [their] necessary expenses … have been paid or provided for," must issue annual dividends to stockholders.  12 U.S.C. § 289(a)(1)(A). After issuing those dividends, if any "net earnings" remain, Banks must place those earnings, up to a cap, in a surplus fund.  *Id.* § 289(a)(2)–(3). And if the Banks have any earnings beyond the statutory limit of their surplus funds, they must transfer those amounts to the Federal Reserve Board, for remittance to the general fund of the Treasury.  *Id.* § 289(a)(3)(B). Under the Federal Reserve's accounting practices, the Banks remit "excess earnings" to the Treasury on a weekly basis.[10]

37.     When, as in recent years, Federal Reserve Banks have not had any surplus funds left over at the end of that process, they cease making any remittances to the Treasury and record their losses as "deferred assets." After the Banks return to profitability, they use any excess earnings to pay down their deferred asset, before beginning to make additional remittances to the Treasury.

38.     On net, the Federal Reserve System has generated a substantial deferred asset over the past three years—more than $243 billion as of December 3, 2025.[11] However, the total size of the deferred asset across the Federal Reserve System has recently begun to shrink—an indication that, on net, the System is generating surplus funds.  Indeed, across four weeks in November and early December, the Federal Reserve Banks generated at least $600 million more than they

---

[9] CRS, *Why Is the Federal Reserve Operating at a Loss?*, *supra*.

[10] Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* 53 (May 2025), https://www.federalreserve.gov/aboutthefed/files/BSTfinaccountingmanual.pdf.

[11] Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1 (Dec. 4, 2025), https://www.federalreserve.gov/releases/h41/20251204/ (Dec. 4 Balance Sheet).

spent.[12]

## FACTUAL ALLEGATIONS

**Defendant Vought's Efforts to Starve the CFPB of Funding**

39.     Russell Vought was appointed Acting Director of the CFPB on the evening of Friday, February 7.

40.     On February 8, Vought sent a letter to Federal Reserve Chair Jerome Powell requesting $0 to fund the Bureau's operations for the third quarter of fiscal year 2025.  In that letter, Vought did not suggest that he was legally barred from asking for funds or that the Federal Reserve System was unable to legally transmit them.  Instead, he stated that the Bureau's "current funds [we]re more than sufficient" to carry out the Bureau's authorities, and that he would use what was in his view an "excessive" "reserve fund for financial contingencies" to support the Bureau's operations.[13]

41.     Since his appointment in February, Defendant Vought has repeatedly expressed his desire to shut down the agency.

42.     In mid-October, Vought stated publicly that his team was working to "close down the agency" and estimated that they would "be successful probably within the next two or three months."[14]

43.     Consistent with that plan to halt the agency's work entirely, Defendant Vought has not transmitted a request for funds from the Federal Reserve, since his request of $0 in February. Since February, the CFPB has continued to operate off its operating reserves.

---

[12] *Compare* Dec. 4 Balance Sheet, *supra* (listing net earnings remittances due to the Treasury as of December 3 as $243.180 billion) *with* Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1 (Nov. 6, 2025), https://www.federalreserve.gov/releases/h41/20251106/ (listing net earnings remittances due to the Treasury four weeks earlier as $243.818 billion).

[13] Letter from Russell Vought to Jerome Powell (Feb. 8, 2025), https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-to-cfpb_2025-02.pdf.

[14] Nandita Bose, Doina Chiacu & Douglas Gillison, *White House budget director plans to shut US consumer finance watchdog within months*, Reuters (Oct. 15, 2025), https://www.reuters.com/business/world-at-work/white-house-budget-director-vought-says-over-10000-federal-workers-could-be-laid-2025-10-15/.

**The Refusal to Request Funds**

44.    Defendants have now announced that, although available funds will run out in early 2026, they will not transmit to the Board of Governors of the Federal Reserve System the determination of the amount of funds reasonably necessary to carry out the CFPB's operations.

45.    On November 10, 2025, Vought and the CFPB filed a notice in a lawsuit challenging Defendant Vought's efforts to shut down the CFPB, stating that the CFPB anticipates exhausting its reserve funds in early 2026 and would not request additional funds from the Board of Governors of the Federal Reserve System.[15] In that notice, the CFPB and Vought announced for the first time a new interpretation of the CFPB's funding statute, which, in their view, means that Vought cannot lawfully request funding from the Federal Reserve under 12 U.S.C. § 5497.  In support, they relied on a new legal opinion the CFPB had requested and received from the Department of Justice's Office of Legal Counsel (OLC).[16]  The OLC Memo interprets the phrase "combined earnings of the Federal Reserve System" in § 5497(a) to "refer[] to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues." Because, according to that memo, the "Federal Reserve currently lacks combined earnings from which the CFPB can draw pursuant to 12 U.S.C. § 5497(a)(1)," the CFPB and Acting Director Vought stated that Vought would not request any funding from the Federal Reserve System.

**OLC's Flawed Analysis of the Federal Reserve's Earnings**

46.    Defendants' refusal to request funding from the Federal Reserve pursuant to 12 U.S.C. § 5497 relies entirely on the OLC Memo and its interpretation of the statutory phrase "combined earnings of the Federal Reserve System." The OLC Memo's interpretation of 12 U.S.C. § 5497 is not entitled to any deference and suffers from several substantial flaws.

47.    To start, the statutory text does not authorize the CFPB Director to make a determination as to the Federal Reserve System's "combined earnings." The text assigns only one

---

[15] *See* Notice of Potential Lapse in Appropriations, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 10, 2025), ECF No. 145.

[16] OLC, *Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at a Loss* (Nov. 7, 2025) (slip op.), https://www.justice.gov/olc/media/1417326/dl.

role to the CFPB Director: To determine the amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." 12 U.S.C. § 5497(a)(1).

48.     Moreover, the best reading of the statute is that "combined earnings of the Federal Reserve System" refers to all the money the system generates, without deducting for expenses. And under that definition, the System has consistently generated hundreds of billions of dollars in earnings to fulfill a request to fund the CFPB's work.  Defendants' proffered reading ignores statutory context and relies on fundamental misunderstandings about the Federal Reserve and its finances.  That interpretation would also make funding for the agency charged with regulating the nation's largest financial institutions unstable—a result directly at odds with the express purpose of Congress in choosing not to make the CFPB subject to annual appropriations.

49.     Finally, the OLC Memo, looking at prior Federal Reserve end-of-year accounting statements, states that "[i]n every year since 2022, the Federal Reserve's costs have exceeded its revenue." The Federal Reserve's weekly balance sheets, however, show that, at least in recent weeks, the System is generating substantially more money than it is spending.  Thus, even under Defendants' own reading of the statute, they cannot now refuse to request funding from the Federal Reserve System.

**Harm to Plaintiffs**

50.     The lapse in funding that Defendants have created, starting in just a few weeks' time, will have immediate and profound effects on several important areas of the CFPB's work, to the direct detriment of Plaintiffs.

51.     A lapse in the funding necessary to carry out the CFPB's work will immediately hamper the agency's consumer complaint function.  Under Dodd-Frank, the CFPB is required by law to "collect[]," "monitor[]," and "respon[d] to consumer complaints regarding consumer financial products or services." 12 U.S.C. § 5493(b)(3)(A). The CFPB is further required to "establish … reasonable procedures to provide a timely response to consumers" for complaints or inquiries.  *Id.* § 5534(a). Under those procedures, the CFPB reviews complaints that individual

consumers make, routes them to the appropriate company, and works to get consumers a timely response from the company.[17] CFPB staff and contractors are essential to ensuring that consumer complaints are routed correctly and that consumers receive timely and helpful responses to their complaints.  The CFPB has estimated that it sends "more than 100,000 complaints about financial products and services" to companies on a weekly basis.[18]

52.    A lapse in the funding necessary to carry out its work will also hamper the CFPB's ability to fulfill its statutory obligation to make public certain information related to consumer complaints.  Dodd-Frank tasks the CFPB Director with presenting an "annual report to Congress … on the complaints received by the Bureau," including "information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints." 12 U.S.C. § 5493(b)(3)(C); *see also* 12 U.S.C. § 5496(c)(4).

53.    In addition, the CFPB publishes, on a daily basis, information about the complaints it receives, scrubbed of any personally identifying information, in an accessible consumer complaint database.[19] That data includes information on, among other things, the relevant product, the issue the consumer faced, and a public summary of the company's response.  Consumers can also voluntarily share additional information, such as whether they are a servicemember or whether they qualify as an "older adult." The complaint database has become a useful tool for researchers, policymakers, and advocates to understand emerging issues and trends.  The CFPB's consumer complaint database cannot remain updated if the CFPB runs out of funding.

54.    A lapse in funding will also prevent the agency from carrying out its duties under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2801 *et seq.*  As a sunshine statute, HMDA requires certain financial institutions to collect, record, and report to federal regulators— for dissemination to the public—specified information about their mortgage lending activity.  *See*

---

[17] CFPB, *Consumer Response Annual Report: January 1 – December 31, 2024* at 6–7 (May 2025), https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2025-05.pdf.

[18] CFPB, *Submit a complaint about a financial product or service*, https://www.consumerfinance.gov/complaint/ (last updated Oct. 15, 2025).

[19] CFPB, *How we share complaint data*, https://www.consumerfinance.gov/complaint/data-use/ (last updated Sept. 12, 2025).

*id.* §§ 2803(f), 2809(a). HMDA data is intended to help the public assess whether financial institutions are meeting the housing needs of their communities, to inform public-sector investment decisions, to identify discriminatory lending patterns, and to aid the enforcement of anti-discrimination statutes. *See* 12 C.F.R. § 1003.1(b). The resulting data set constitutes "the most comprehensive source of publicly available information on the U.S. mortgage market."[20]

55.    The CFPB plays a crucial role in ensuring that HMDA data is submitted, processed, and made available to the public. The CFPB is responsible for collecting data reported by certain financial institutions, on either an annual or quarterly basis. 12 U.S.C. § 2803(h); 12 C.F.R. § 1003.5. The CFPB is also tasked with providing "staff and data processing resources" to the Federal Financial Institutions Examination Council to allow for the compilation and public disclosure of aggregate data. 12 U.S.C. § 2809. In practice, CFPB staff work to ensure that financial institutions are meeting their data-reporting obligations, check reported data for accuracy, and process the data to remove sensitive or private information about borrowers before publication. The CFPB publishes HMDA data on an annual basis, typically by the end of March for data from the previous calendar year.[21] Finally, the statute gives the CFPB authority to enforce the requirements of HMDA, which the CFPB has used to ensure that the data financial institutions submit are accurate.[22] The CFPB cannot fulfill these duties without funding.

56.    In addition, the gap in funding for the CFPB will prevent the agency from carrying out its obligations under Section 1071 of the Dodd-Frank Act, which requires the CFPB to collect and disseminate data about lending to small businesses. *See* 15 U.S.C. § 1691c-2. The information covered by this section was intended to "facilitate enforcement of fair-lending laws and enable communities, governmental entities, and creditors to identify business and community

---

[20] CFPB, *Mortgage Data*, https://www.consumerfinance.gov/data-research/hmda/ (last modified Dec. 13, 2024).

[21] *See, e.g.*, CFPB, *2024 HMDA Data on Mortgage Lending Now Available* (Mar. 31, 2025), https://www.consumerfinance.gov/about-us/newsroom/2024-hmda-data-on-mortgage-lending-now-available/.

[22] *See, e.g.*, Stipulated Final Judgment and Order, *CFPB v. Freedom Mortgage*, No. 9-23-cv-81373 (S.D. Fla. June 26, 2024) (settling enforcement action with injunctive relief to ensure accuracy of HMDA data, including implementing audit, testing, and correction requirements).

development needs and opportunities of women-owned, minority-owned, and small businesses."
15 U.S.C. § 1691c-2(a). But this data cannot be collected or made public without significant CFPB
action.  The May 2023 CFPB rule implementing Section 1071 clarifies what financial institutions
and transactions are covered and what data institutions must compile and report, but it deferred
any final decision on how that data would be made publicly available.[23]

57.     As of January 2025, however, as a result of litigation, those regulations had not yet
gone into effect.[24] And in recent months, the CFPB has pushed back compliance deadlines and
issued a notice of proposed rulemaking to reconsider various aspects of the May 2023 rule.[25] Once
the CFPB runs out of funds to operate, all work to implement Section 1071 and make crucial data
about small business lending available to the public will halt.  The CFPB will not be able to put
out necessary guidance or build out systems to help financial institutions comply with their
obligations under the regulation.  And even if financial institutions are able to submit the required
information to the agency, CFPB staff will not be available to process submitted data, determine
what redactions are necessary to address privacy concerns, and publish information for use by
borrowers, lenders, community groups, and policymakers.

58.     The loss of these CFPB functions will have an immediate impact on the public,

---

[23] *See* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35150 (May 31, 2023).

[24] The CFPB's 1071 Rule had been temporarily enjoined, and compliance dates stayed, by a court in the Southern District of Texas in July 2023, pending the Supreme Court's reversal of the then-binding precedent in *Community Financial Services Association of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022). Following the Supreme Court's decision upholding the constitutionality of the CFPB's funding mechanism in *CFPB v. CFSA*, 601 U.S. 416 (2024), the CFPB issued an interim rule extending compliance dates for its 1071 Rule.  *See* 89 Fed. Reg. 55024 (July 3, 2024). The district court in Texas later rejected any remaining challenges to the regulation on summary judgment.  *See Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-144, 2024 WL 3939598, at *1 (S.D. Tex. Aug. 26, 2024). On appeal, the Fifth Circuit again delayed compliance deadlines in February 2025 after the CFPB dropped its opposition to a stay.  *See* Order, *Tex. Bankers Ass'n v. CFPB*, No. 24-40705 (5th Cir. Feb. 7, 2025).

[25] *See* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B); Extension of Compliance Dates, 90 Fed. Reg. 47514 (Oct. 2, 2025) (pushing out first compliance dates until July 2026); Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 90 Fed. Reg. 50952 (Nov. 13, 2025) (proposing changes to the rule and a new compliance date of January 1, 2028).

1    including the Plaintiffs in this case.

2        59.    Plaintiff Rise Economy will be harmed if the CFPB halts all work after a lapse in

3    funding due to Defendants' refusal to request funds from the Federal Reserve System.  Rise

4    Economy relies on information that the CFPB administers and makes public on a regular basis, to

5    support its work aiding low-income communities and communities of color in accessing credit,

6    financial services, and investments.  For example, Rise Economy works regularly with financial

7    institutions to encourage them to improve lending practices and access to credit, through

8    community benefit agreements that have resulted in tens of billions of dollars of investment in

9    California communities.  Rise Economy relies heavily on HMDA data in these efforts, using

10   information about lending patterns to understand gaps in banks' services, propose implementable

11   reforms, and monitor accountability once a community benefit agreement has been signed.  Rise

12   Economy has also used HMDA data as part of its advocacy work, including in comments to

13   financial regulators about particular banks' practices, in legislative advocacy before the California

14   state legislature, and to support a Department of Housing and Urban Development redlining

15   complaint.  In addition, Rise Economy relies on the CFPB's consumer complaint database to

16   inform its advocacy and understand trends in the issues that consumers are facing.  For example,

17   in comments to federal bank regulators about the risks posed by the potential merger of Capital

18   One and Discover, Rise Economy leveraged consumer complaint data regarding Capital One.  For

19   similar reasons, Rise Economy has long awaited the publication of small business lending data

20   under the CFPB's 1071 Rule.  Rise Economy has long been interested in understanding and

21   advocating for more equitable lending to small businesses, but has been hampered in those efforts

22   by a lack of adequate data.  Further delays in the implementation of the CFPB's obligation to

23   publish small business lending data will make it more difficult for Rise Economy to advocate for

24   changes with financial institutions and policymakers.  Rise Economy relies on up-to-date

25   information about lending in all of this work.  Rise Economy would be substantially hampered in

26   these advocacy efforts if the CFPB were to discontinue its work, including the publication of

27   HMDA data and the consumer complaint database, and ongoing efforts to finally implement rules

28   for the collection and publication of small business lending data.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

60.     Plaintiff NCRC will likewise be injured by the halt in the CFPB's work.  NCRC relies on information that the CFPB produces to support its work with community leaders, policymakers, and financial institutions to champion fairness and end discrimination in lending, housing, and business.  For example, NCRC uses information contained in the CFPB's consumer complaint database to conduct research and publish reports.  NCRC also regularly relies on the CFPB's collection and publication of HMDA data for its research, analyses, and publications, including publications on current trends in mortgage lending and investigations into historic patterns of redlining.  In addition, NCRC uses HMDA data to comment on proposed rulemaking by federal banking regulators, and to assist local agencies, cities, and organizations in holding lending institutions accountable for inequitable practices.  A lack of timely access to HMDA data will harm NCRC's ability to receive grant funding for its activities, as NCRC often highlights, in grant applications, its ability to analyze HMDA data to identify patterns and better target unfair and discriminatory lending.

61.     Plaintiff Woodstock Institute will also be injured once the CFPB halts its work, following the lapse in funding that Defendants have manufactured.  Like Rise Economy and NCRC, Woodstock Institute uses CFPB-produced resources to support its research and advocacy work.  For more than four decades, Woodstock Institute has used HMDA data to publish resources about key financial indicators in markets in Illinois.  Since 2022, Woodstock Institute has maintained a live Community Lending Data Portal, which provides up-to-date information on mortgage lending, community demographics, foreclosure trends, and the activity of top lenders, among other metrics, based in part on HMDA data the CFPB maintains.  Woodstock Institute has worked with partner organizations and local governments to create similar resources in Massachusetts, Milwaukee, and Indianapolis, and it is working to create one for Cincinnati.  In addition, Woodstock Institute has used HMDA data to inform other advocacy and legislative work, including with the City of Chicago and the state of Illinois.  And it relies on HMDA data in its work with lending institutions on how they can better serve the credit needs of low- and moderate-income individuals and communities within safe and sound lending practices.  In all of this work, Woodstock Institute needs up-to-date information and expected to be able to use

updated 2025 HMDA data starting in the spring of next year.  Woodstock Institute will be significantly hampered in its ability to pursue its research and policy agenda without updated HMDA and other data from the CFPB—to the detriment, as well, of various partner organizations, ranging from municipalities and financial institutions to non-profit organizations and regulatory agencies, which have come to rely on Woodstock Institute's work.  In addition, Woodstock Institute will suffer economic harm.  Woodstock has invested substantial resources in creating and maintaining the Community Lending Data Portal, and the value of its investment will be significantly diminished because the Community Lending Data Portal will not be able to serve its core function of providing timely lending data to users.

62.     Absent this Court's intervention, these effects will begin in just a few weeks' time. Although Defendant Vought has reported to the congressional appropriations committees— purportedly pursuant to 12 U.S.C. § 5497(e)(1)—that, in his view, the amounts available under § 5497 will be insufficient to satisfy the CFPB's funding needs in fiscal year 2026,[26] Congress would need to pass a new appropriations law to fix the lapse in funding for the CFPB that Defendants have generated.  Defendants have acknowledged that they do "not know whether and the extent to which Congress will appropriate funding to pay the expenses of the Bureau."[27]

## CLAIM FOR RELIEF
### (Administrative Procedure Act)

63.     The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

64.     Defendants' decision not to request funding from the Federal Reserve Board of Governors based on their determination that the Federal Reserve System does not currently have "combined earnings" is final agency action.

65.     Defendant Vought is required by law to determine the amount of funding

---

[26] Notice of Section 5497(e) Report, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 21, 2025), ECF No. 147.

[27] Notice of Potential Lapse in Appropriations, *supra*, at 1.

reasonably necessary to carry out the CFPB's authorities so that the Board of Governors of the Federal Reserve System can transfer that amount to the CFPB (subject to a cap). 12 U.S.C. § 5497(a)(1). Contrary to that statutory command, Defendant Vought has not determined the amount of funding reasonably necessary to carry out the CFPB's authorities and communicated that determination to the Board of Governors of the Federal Reserve System so that the necessary funds can be transferred to the CFPB.

66.     No statute authorizes Defendants to make determinations about the status of Federal Reserve System finances or the funding available from the Federal Reserve System, or to decline to request funding based on such determinations.

67.     Moreover, Defendants' refusal to request funding from the Federal Reserve System is based on an incorrect interpretation of the term "combined earnings of the Federal Reserve System."

68.     In any event, the Federal Reserve System currently has "combined earnings," even under Defendants' incorrect interpretation of the term.

69.     Defendants' refusal to request from the Board of Governors of the Federal Reserve System funds reasonably necessary to support the CFPB's authorities was thus arbitrary, capricious, and not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.     Declare that Defendants' determination not to request funding from the Federal Reserve Board of Governors is unlawful;

2.     Set aside Defendants' determination not to request funding from the Federal Reserve Board of Governors;

3.     Issue preliminary and permanent relief requiring Defendants to request funding from the Federal Reserve Board of Governors in the amount determined "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)";

4.     Award Plaintiffs their costs and reasonable attorney's fees; and

5.    Grant such other relief as the Court deems necessary, just, and proper.

DATED:  December 5, 2025              Respectfully submitted,

                                      ROSEN BIEN GALVAN & GRUNFELD LLP

                                      By:  */s/ Michael W. Bien*
                                           Michael W. Bien

                                      Attorneys for Plaintiffs