Stephanie B. Garlock (*pro hac vice* application pending)
Allison M. Zieve (*pro hac vice* application pending)
Wendy Liu (*pro hac vice* application pending)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009-1001
Telephone:     (202) 588-1000
Email:         sgarlock@citizen.org
               azieve@citizen.org
               wliu@citizen.org

Michael W. Bien – 096891
Gay Crosthwait Grunfeld – 121944
Van Swearingen – 259809
Adrienne Spiegel – 330482
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:         mbien@rbgg.com
               ggrunfeld@rbgg.com
               vswearingen@rbgg.com
               aspiegel@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RISE ECONOMY; NATIONAL COMMUNITY REINVESTMENT COALITION; and WOODSTOCK INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau; and CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Defendants. | Case No. 5:25-cv-10481-EJD <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: March 5, 2026 <br> Hearing Time: 9:00 AM <br> Judge: Hon. Edward J. Davila <br> Place: San Jose <br><br> Date Filed: December 9, 2025 <br> Trial Date: None set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

NOTICE OF MOTION AND MOTION ..................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................... 3

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT ............................................................................................................................... 8

I.      Plaintiffs have standing. ................................................................................................. 9

II.     Defendants' refusal to request funds from the Federal Reserve under § 5497
        is arbitrary, capricious, and contrary to law. ............................................................. 13

        A.      The Dodd-Frank Act requires the CFPB Director to request funds
                reasonably necessary to carry out the agency's authorities................................ 13

        B.      Even if § 5497 permitted Defendants not to request funding based
                on the Federal Reserve's "combined earnings," Defendants' action
                is not based on the best reading of that statutory term. ...................................... 15

        C.      Defendants' decision not to request funding is arbitrary and
                capricious because it rests on an incorrect factual premise................................. 24

CONCLUSION .......................................................................................................................... 25

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**CASES**

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
   33 F.4th 1202 (9th Cir. 2022)................................................................24

*Center for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018)...............................................................24

*CFPB v. CashCall, Inc.*,
   35 F.4th 734 (9th Cir. 2022)..................................................................17

*CFPB v. Community Financial Services Ass'n of America*,
   601 U.S. 416 (2024) ......................................................................16, 20

*CFPB v. ITT Educational Services, Inc.*,
   219 F. Supp. 3d 878 (S.D. Ind. 2015) ....................................................17

*City of Los Angeles v. Barr*,
   941 F.3d 931 (9th Cir. 2019)............................................................15, 18

*Custodia Bank, Inc. v. Federal Reserve Board of Governors*,
   No. 24-8024, 2025 WL 3039669 (10th Cir. Oct. 31, 2025)......................17

*Hunt v. Wash. State Apple Advertising Commission*,
   432 U.S. 333 (1977) .............................................................................12

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025)............................................................9, 13

*Inland Empire Waterkeeper v. Corona Clay Co.*,
   17 F.4th 825 (9th Cir. 2021)..............................................................9, 10

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .............................................................................15

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983)...............................................................................24

*Munoz v. PHH Corp.*,
   No. 22-15407, 2023 WL 2202228 (9th Cir. Feb. 24, 2023)........................9

*Natural Resources Defense Council, Inc. v. Pritzker*,
   828 F.3d 1125 (9th Cir. 2016).................................................................8

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) .............................................................................17

*Northwest Motorcycle Ass'n v. USDA*,
   18 F.3d 1468 (9th Cir. 1994)...................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Payne Enters., Inc. v. United States,*
    837 F.2d 486 (D.C. Cir. 1988), ................................................................12

*Sierra Club v. Bosworth,*
    510 F.3d 1016 (9th Cir. 2007) ..................................................................8

*TransUnion v. Ramirez,*
    141 S. Ct. 2190 (2021) .............................................................................9

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................................24

*Wilderness Society Inc. v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ..................................................................9

**FEDERAL CASES**

12 U.S.C. § 2801(b) ......................................................................................10

12 U.S.C. § 2803(f) .......................................................................................10

12 U.S.C. § 2809(a) ......................................................................................10

12 U.S.C. § 2809(b) ......................................................................................10

12 U.S.C. § 2809(c) ......................................................................................10

12 U.S.C. § 289(a) ........................................................................................19

12 U.S.C. § 289(a)(1) .....................................................................................5

12 U.S.C. § 289(a)(2) .....................................................................................5

12 U.S.C. § 289(a)(3)(b) .................................................................................5

12 U.S.C. § 461(b)(12)(A) ..............................................................................5

12 U.S.C. § 5390(c)(3)(b)(ii) ........................................................................19

12 U.S.C. § 5390(n)(2). .................................................................................18

12 U.S.C. § 5390(s)(3) ..................................................................................19

12 U.S.C. § 5465(c) ......................................................................................18

12 U.S.C. § 5491(a), ......................................................................................3

12 U.S.C. § 5496(c)(4) ..................................................................................11

12 U.S.C. § 5497 .......................................................................................2, 7

1

12 U.S.C. § 5497(a)(1) ............................................................................................3, 4, 20

12 U.S.C. § 5497(a)(2)(A) ...........................................................................................3, 20

12 U.S.C. § 5497(e)(1) ......................................................................................................3

12 U.S.C. § 5511(a) ...........................................................................................................3

12 U.S.C. § 5515 ...............................................................................................................3

12 U.S.C. § 5534 .............................................................................................................11

12 U.S.C. § 5564 ...............................................................................................................3

12 U.S.C. § 5581 ...............................................................................................................3

12 U.S.C. § 5581(b) ........................................................................................................21

15 U.S.C. § 1691c-2(a) ...................................................................................................11

15 U.S.C. § 1691c-2(f) ....................................................................................................11

15 U.S.C. § 78u-6(g)(5)(D) ............................................................................................18

5 U.S.C. § 706(2)(A) ...................................................................................................8, 14

Dodd-Frank Wall Street Reform and Consumer Protection Act,
     Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010), ...........................................3

Emergency Economic Stabilization Act of 2008,
     Pub. L. No. 110-343, 122 Stat. 3765 (Oct. 3, 2008) .......................................5, 21

One Big Beautiful Bill Act,
     Pub L. No. 119-21, 139 Stat. 126 (July 4, 2025) ................................................23

**STATE CASES**

CBO, Reconciliation Recommendations of the House Committee on Financial Services (May 7,
     2025)......................................................................................................................23

H.R. 4173, 111th Cong. (as introduced in House Dec. 2, 2009).................................22

*Hearing before the Senate Committee On Banking, Housing & Urban Affairs*, *The Semiannual
     Monetary Policy Report to Congress*, 117th Cong. (June 22, 2022) ....................22

*Hearing Before the Senate Committee On Banking, Housing & Urban Affairs*, *The Semiannual
     Monetary Policy Report to the Congress*, 119th Cong. (Feb. 11, 2025)..............14

One Big Beautiful Bill Act,
     Pub L. No. 119-21, 139 Stat. 126 (July 4, 2025) ................................................23

S. 3217, 111th Cong. (as placed on Senate calendar Apr. 15, 2010) ..............................22

S. Rep. No. 111-176 (2010) ...................................................................................20

**OUT OF STATE CASES**

12 C.F.R. § 1003.5 ................................................................................................10

88 Fed. Reg. 35150 (2023) .....................................................................................11

90 Fed. Reg. 50952 (Nov. 13, 2025) .....................................................................11

**FEDERAL STATUTES**

U.S. Const., art. VI, cl. 3 ......................................................................................15

**CONSTITUTIONS**

*Black's Law Dictionary* (9th ed. 2009) ................................................................16

CFPB, *A Beginner's Guide to Accessing and Using Home Mortgage Disclosure Act Data* (June 2022)......................................................................................................11

CFPB, *CFPB Notifies Court it Cannot Lawfully Draw Funds from the Federal Reserve* (Nov. 11, 2025)..................................................................................................................7

CFPB, *Consumer Response Annual Report: January 1-December 31, 2024* (May 1, 2025).....11

Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023)............5, 18

*Earnings*, Webster's New Dictionary (2005)........................................................16

Fed. Reserve, *Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2022 and 2021 and Independent Auditors' Report*...........................23

Fed. Reserve, *Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report*........................4, 18

Fed. Reserve, *Financial Accounting Manual for Federal Reserve Banks* (May 2025) ..........5, 18

Fed. Reserve, *Press Release: Board announces that it will begin to pay interest on depository institutions' required and excess reserve balances* (Oct. 6, 2008) ......................................21

Fed. Reserve, *The Fed Explained: What the Central Bank Does* (11th ed. Aug. 2021). 3, 4, 5, 20

*Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Dec. 4, 2025)6, 25

*Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Nov. 6, 2025)6, 25

*Federal Reserve Bank of Atlanta Financial Statements As of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* ...........................................6

GAO, GAO-02-939, *Federal Reserve System: The Surplus Account* (Sept. 2002) ....................22

GAO, *Principles of Federal Appropriations Law* 2-24 (4th ed. 2016)......................................20

Letter from Patrick McClanahan to Jafnar Gueye (Jan. 2, 2025) ...............................................14

Letter from Russell Vought to Jerome Powell (Feb. 8, 2025) ......................................................6

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2005)........................................................17

Notice of Potential Lapse in Appropriations,
    *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 10, 2025), ECF No. 145 ..............7

Notice of Section 5497(e) Report,
    *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 21, 2025), ECF No. 147 ..............7

OIG, *Coordination of Responsibilities Among the Consumer Financial Protection Bureau and the
    Prudential Regulators—Limited Scope Review* (June 2015) ................................................21

OLC, *Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the
    Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is
    Operating at a Loss* (Nov. 7, 2025) .............................................................................passim

Opp. to Mot. to Dismiss, *CFPB v. Purpose Financial, Inc.*, No. 24-3206 (D.S.C. Oct. 3, 2024),
    ECF 48......................................................................................................................16

Oxford English Dictionary (2d ed. 1989).......................................................................................16

*The American Heritage Dictionary of the English Language* (5th ed. 2016) ............................17

The Charlie Kirk Show, *Vice President Vance and the Trump Admin Honor Charlie* at 1:21:47–
    1:23:00 (Oct. 15, 202....................................................................................................6

*Webster's Third New Int'l* (1993 ed.)..........................................................................................17

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT at 9:00 AM, on March 15, 2026, in Courtroom 4 of the San Jose Courthouse of the U.S. District Court for the Northern District of California, before the Hon. Judge Edward J. Davila, Plaintiffs Rise Economy, National Community Reinvestment Coalition, and Woodstock Institute will, and hereby do, move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on their claim for declaratory and injunctive relief against Defendants Russell Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau (CFPB), and the CFPB. Plaintiffs respectfully request that the Court grant them summary judgment and enter a final order enjoining Defendants to request funding under 12 U.S.C. § 5497 from the Federal Reserve Board of Governors as needed to carry out the CFPB's authorities.[1]

On November 10, 2025, Defendants announced that the CFPB would not request funding from the Federal Reserve pursuant to § 5497, and that the CFPB would soon run out of funds to support its operations. The issue presented by this motion is whether Defendants acted arbitrarily, capriciously, and contrary to law by refusing to request funding from the Federal Reserve, entitling Plaintiffs to a declaration that Defendants have acted unlawfully and an injunction requiring Defendants to request funding from the Federal Reserve. Because this case involves no disputed factual issues, Plaintiffs believe it can be resolved on a summary judgment motion.

Plaintiffs' motion is based on this notice of motion, the accompanying supporting memorandum of points and authorities, the accompanying supporting declarations, the papers, evidence, and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the ten months since becoming Acting Director of the CFPB, Defendant Russell Vought has repeatedly tried to shutter the agency. This case challenges Vought's latest gambit: starving the

---

[1] Plaintiffs intend to file an administrative motion to request an earlier hearing date and expedite consideration of this motion.

1  CFPB of the funds needed to carry out its consumer-protection mission. As a result of his action,

2  Defendants have warned that the CFPB will very soon lack funding to carry out its work.

3      To support Vought's decision to defund the agency, Defendants have advanced an

4  implausible interpretation of the statutory provision that Congress crafted to provide the CFPB with

5  a stable source of funding. In that provision, Congress specified that the CFPB will be funded

6  through the "combined earnings of the Federal Reserve System." Defendants Vought and the CFPB

7  now take the position that the Federal Reserve System has "combined earnings" only when the

8  System is profitable under a creative reading of the statutory text that is inconsistent with the overall

9  statutory scheme. Applying that reading, they declare that the Federal Reserve System does not

10  currently have any "earnings" to transfer to the CFPB and that Defendant Vought is accordingly

11  relieved of the obligation to request funding out of this standing appropriation.

12      Defendants are triply wrong. First, the statutory provision authorizing a standing

13  appropriation for the CFPB, 12 U.S.C. § 5497, requires the CFPB's Director to determine the

14  amount of funding needed to support the CFPB's work so that the Federal Reserve Board can

15  transfer that amount to the CFPB. The statute does not delegate to the Director (or Acting Director)

16  discretion to choose whether to do so. Second, even putting aside their lack of authority, Defendants'

17  interpretation of "earnings" in § 5497 is not entitled to deference and is wrong on the merits.

18  Defendants' approach misreads the statute, is irreconcilable with other aspects of the statutory

19  scheme, and misunderstands the Federal Reserve's structure and finances. Their reading also

20  attributes to Congress an irrational scheme, placing unstated restraints on the Federal Reserve's

21  independence and risking throwing the supervision of our nation's largest financial institutions into

22  chaos. Third, even under Defendants' incorrect interpretation, the Federal Reserve System currently

23  has ample "combined earnings" to fund the CFPB.

24      Plaintiffs are nonprofit organizations that rely on the CFPB's work to conduct research and

25  advocacy work on consumer financial issues critical to the Plaintiffs' missions. Plaintiffs will be

26  injured when the CFPB—as a result of the impending funding crisis that Defendants have

27  manufactured—halts its work, as soon as early January. Because Defendants' refusal to request

28  funds rests on an incorrect reading of the statute, Plaintiffs ask this Court to resolve these pure legal

questions and grant them summary judgment. Plaintiffs respectfully request that the Court declare that Defendants' interpretation of § 5497 is incorrect and order Defendants to comply with that provision by requesting the funding reasonably necessary to support the CFPB's work.

## BACKGROUND

**A.** In the wake of the 2008 financial crisis, Congress created the CFPB and tasked it with "ensuring that all consumers have access to markets for consumer financial products" that "are fair, transparent, and competitive." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1021 & 1011, 124 Stat. 1376, 1964, 1979–80 (July 21, 2010), *codified at* 12 U.S.C. §§ 5491(a), 5511(a). Congress transferred substantial authority to the CFPB from other regulators, including authority to enforce a range of consumer protection statutes and responsibility to supervise compliance by the country's largest banks. *See* 12 U.S.C. §§ 5515, 5564, 5581.

Congress provided the agency with a stable source of funding through the Federal Reserve System. By statute, the Federal Reserve "Board of Governors shall," on an annual or quarterly basis, "transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" in earlier periods. *Id*. § 5497(a)(1). The statute provides only one limitation on the amount that the Federal Reserve Board can transfer to the CFPB: That amount is subject to a statutory cap, based on a percentage of the Federal Reserve System's total operating expenses in 2009, adjusted for inflation. *Id.* § 5497(a)(2)(A). If the amount allowed by that cap is insufficient, the CFPB Director may submit to Congress a request for additional funding, with a report explaining "the extent to which the funding needs of the Bureau are anticipated to exceed the level of the amount" to be provided under the statutory cap. *Id.* § 5497(e)(1)).

**B.** The Federal Reserve System is the central bank of the United States. *See* Ex. A at 1 (Fed. Reserve, *The Fed Explained: What the Central Bank Does* (11th ed. Aug. 2021)).[2] The Federal

---

[2] Citations to exhibits refer to "Ex." refer to the exhibits to the request for judicial notice, filed concurrently herewith.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1   Reserve System is responsible for conducting the nation's monetary policy, carrying out its dual

2   statutory mandates of promoting maximum employment and stabilizing prices. *Id.*

3          Several components of the Federal Reserve System play a role in funding the CFPB. The

4   Federal Reserve Board of Governors, which serves as the System's governing and administrative

5   body, *id.* at 8, receives requests from the CFPB and levies assessments on the Federal Reserve Banks

6   to fulfill those requests. 12 U.S.C. § 5497(a)(1); *see also, e.g.*, Ex. B at 4 (Fed. Reserve, *Federal*

7   *Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2024*

8   *and 2023 and Independent Auditors' Report*). The twelve regional Federal Reserve Banks are the

9   System's primary "operating arms" and—as a byproduct of their work implementing monetary

10  policy—they are the primary income-generating entities within the Federal Reserve System. *See* Ex.

11  A at 5, 8, 36–38. The Reserve Banks use the income they generate to support their own work, and

12  to satisfy assessments that the Federal Reserve Board levies on both its own behalf and the CFPB's.

13  In their combined annual financial statements, the Federal Reserve Banks list among their

14  "operating expenses" assessments for both the CFPB and the Board. *See, e.g.*, Ex. B at 4.

15         The Federal Reserve Banks fund the CFPB from each Bank's income. The largest source of

16  the Banks' income comes from what are known as "open market operations"—a key tool the Federal

17  Reserve has long used to implement monetary policy. As the Federal Reserve has explained, through

18  these operations it can influence interest rates in the economy by buying and selling securities issued

19  or guaranteed by the U.S. Treasury or U.S. government agencies. *See* Ex. A at 4, 36–38. The

20  targeting of interest rates, in turn, helps the Federal Reserve carry out its statutory mandates of

21  maximizing employment and stabilizing prices, as changes in interest rates affect willingness to

22  spend, invest, and save throughout the economy. *See id.* at 21. The Federal Reserve Banks' financial

23  statements demonstrate that they generate substantial revenue each year through open market

24  operations and other sources—totaling more than $160 billion in 2024. *See* Ex. B at 4.

25         The Federal Reserve Banks' role in implementing monetary policy also requires the Banks

26  to take on liabilities, beyond the expenses of funding their own operations and paying assessments

27  to cover Board and CFPB functions. In recent years, the largest category of liabilities has been

28  interest on the balances that financial institutions maintain with Reserve Banks. *See, e.g.*, *id.* Reserve

1   Banks first received statutory authorization to pay interest on reserve balances in 2008. *See* 12

2   U.S.C. § 461(b)(12)(A); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343,

3   § 128, 122 Stat. 3765, 3796 (Oct. 3, 2008). As the Federal Reserve has recognized, the ability to pay

4   interest on reserves was seen as an important new tool for the Federal Reserve's implementation of

5   monetary policy, after many of its traditional tools became less effective following the 2008

6   financial crisis. *See* Ex. A at 36. The interest rate that Reserve Banks offer on reserve balances now

7   functions as a benchmark for financial institutions in their own lending activities, as banks will not

8   lend at a rate below what they could earn by holding those same funds at a Reserve Bank.

9         Starting in late 2022, as the Federal Reserve raised interest rates to combat inflation, the

10  Reserve Banks' expenses began to exceed the funds generated. Ex. C (Cong. Res. Serv., *Why Is the*

11  *Federal Reserve Operating at a Loss?* (Jan. 23, 2023)). This situation, however, was not "a sign of

12  mismanagement," because the Fed "is not profit-maximizing" but instead is focused on "achieving

13  its statutory mandate of maximum employment and stable prices." *Id.* The Federal Reserve does not

14  "become insolvent" following losses. *Id.* Rather, whether the Banks are operating in the black or in

15  the red, a series of statutory requirements govern how the Federal Reserve System handles its

16  finances. Reserve Banks, "after all [their] necessary expenses … have been paid or provided for,"

17  must issue annual dividends to stockholders. 12 U.S.C. § 289(a)(1). After issuing dividends, if "net

18  earnings" remain, Banks must place those earnings, up to a cap, in a surplus fund. *Id.* § 289(a)(2)–

19  (3). And if the Banks have additional net earnings beyond the limit of their surplus funds, they must

20  transfer those amounts to the Federal Reserve Board, for remittance to the Treasury. *Id.*

21  § 289(a)(3)(B). Under Federal Reserve accounting practices, the Banks remit "excess earnings" to

22  the Treasury weekly. Ex. D at 53 (Fed. Reserve, *Financial Accounting Manual for Federal Reserve*

23  *Banks* (May 2025)). And when a Reserve Bank's expenses exceed its income, the Bank stops

24  making remittances and records a "deferred asset." *Id.* at 45, 53. When a Reserve Bank begins

25  earning more money than it spends, it pays down its deferred asset before beginning to remit to the

26  Treasury. *Id.* at 45.

27        The Federal Reserve's balance sheet demonstrates that, since 2022, the Federal Reserve

28  Banks have recorded a combined deferred asset of more than $240 billion. *See* Ex. E (*Federal*

1   *Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Dec. 4, 2025)). That deferred

2   asset has not affected the Banks' ability to operate or pay dividends, and several individual Banks

3   have remitted funds to the Treasury on a regular basis during this period. *See, e.g.*, Ex. G at 58

4   (*Federal Reserve Bank of Atlanta Financial Statements As of and for the Years Ended December

5   31, 2024 and 2023 and Independent Auditors' Report*).

6          Moreover, the total size of the deferred asset across the entire Federal Reserve System has

7   recently begun to shrink—an indication that, overall, the System is generating surplus funds. Indeed,

8   across three weeks in November, the Federal Reserve Banks generated at least $600 million more

9   than they spent. *Compare* Ex. E *with* Ex. F (*Federal Reserve Balance Sheet: Factors Affecting

10  Reserve Balances - H.4.1* (Nov. 6, 2025)).

11         **C.** Russell Vought was appointed CFPB Acting Director on February 7, 2025. On February

12  8, pursuant to § 5497, he sent a letter to Federal Reserve Chair Jerome Powell requesting $0 to fund

13  the CFPB's operations for the third quarter of fiscal year 2025. *See* Ex. H (Letter from Russell

14  Vought to Jerome Powell (Feb. 8, 2025)). In that letter, Vought did not suggest he was prohibited

15  by law from asking for funds. Instead, he stated that the CFPB's "current funds [we]re more than

16  sufficient" to carry out its authorities, and that he would use what was in his view an "excessive"

17  "'reserve fund' for financial contingencies" to support the CFPB's operations. *Id.* During his tenure,

18  Vought has requested no funds from the Federal Reserve, forcing the CFPB to spend down its

19  reserves.

20         In mid-October, Vought stated that his team was working to "close down the agency" and

21  would "be successful" in doing so "probably within the next two or three months." The Charlie Kirk

22  Show, *Vice President Vance and the Trump Admin Honor Charlie* at 1:21:47–1:23:00 (Oct. 15,

23  2025) (statement of Defendant Vought).[3] Then, in November, Defendants announced that, although

24  the CFPB anticipates exhausting its reserves in early 2026, Vought had made a final decision to not

25  transmit to the Board of Governors of the Federal Reserve System any determination of the amount

26  _____

27         [3] https://omny.fm/shows/the-charlie-kirk-show/vice-president-vance-and-the-trump-admin-

28  honor-charlie; *see also* Request for Judicial Notice at 4.

of funds reasonably necessary to carry out the CFPB's work. *See* Ex. I (Notice of Potential Lapse in Appropriations, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 10, 2025), ECF No. 145). Defendants announced a new interpretation of the CFPB's funding statute, 12 U.S.C. § 5497, that, they asserted, precluded Vought from requesting funding from the Federal Reserve.

In so doing, Defendants relied on a legal opinion that the CFPB had requested from the Department of Justice's Office of Legal Counsel (OLC). *See* Ex. J (OLC, *Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at a Loss* (Nov. 7, 2025)) (OLC Memo). The OLC Memo interprets the phrase "combined earnings of the Federal Reserve System" in § 5497(a)(1) to "refer[] to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues." *Id.* at 1. In Defendants' view, because that memo states that the "Federal Reserve currently lacks combined earnings from which the CFPB can draw pursuant to 12 U.S.C. § 5497(a)(1)," they cannot request any funding from the Federal Reserve System. *See* Ex. K (CFPB, *CFPB Notifies Court it Cannot Lawfully Draw Funds from the Federal Reserve* (Nov. 11, 2025)).

Vought has reported to congressional appropriations committees that, in his view, the funds available under § 5497 will be insufficient to satisfy the CFPB's needs in fiscal year 2026. *See* Ex. L (Notice of Section 5497(e) Report, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 21, 2025), ECF No. 147). But Congress would need to pass a new appropriations law to fix the funding lapse that Defendants have manufactured, and Defendants, in a court filing, have acknowledged that they do "not know whether and the extent to which Congress will appropriate funding to pay the expenses of the Bureau." Ex. I at 1. Thus, they have begun to take steps to halt the agency's work altogether. *See id.* (explaining, in Defendants' filing in separate litigation, that the CFPB will not be able to continue work following a lapse in agency funding).

**D.** Defendants' manufactured funding crisis will imminently hamper the CFPB's work, to the detriment of Plaintiffs and others who rely on the agency. Plaintiffs are three nonprofit research and advocacy organizations that rely on the CFPB's work. Plaintiffs rely on a variety of data sets that the CFPB collects and that must be made public by law—including data about mortgage lending

1   under the Home Mortgage Disclosure Act and data from the CFPB's consumer complaint database.

2   *See* Gonzalez-Brito Decl. ¶¶ 5–9; Van Tol Decl. ¶¶ 4–5, 10; Mendez Decl. ¶ 3. Plaintiffs rely on up-

3   to-date information from the CFPB about lending patterns and consumers' experience with financial

4   products and services to support their research and publications; to strengthen their negotiations

5   with financial institutions over potential community-benefits agreements; to inform their advocacy

6   work before regulators and legislators; to secure grant-based funding to engage in all of this work;

7   and, for Plaintiff Woodstock Institute, to realize the value of their investment in its proprietary

8   product analyzing that information. *See* Gonzalez-Brito Decl. ¶¶ 5–10; Van Tol Decl. ¶¶ 6–9;

9   Mendez Decl. ¶¶ 4–12. In addition, Plaintiff Rise Economy's members also rely on CFPB services

10  to provide counseling services and other work critical to their mission. Toriz Decl. ¶¶ 5–7. These

11  effects will reverberate beyond Plaintiffs, as the loss of the CFPB's critical work will leave the

12  nation's largest banks without supervision and the public uninformed about and without tools to

13  address emerging issues in the financial marketplace.

## LEGAL STANDARD

15      Summary judgment is the appropriate standard for resolving cases under the Administrative

16  Procedure Act. *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994). The moving

17  party is entitled to summary judgment where there are no genuine issues of material fact and the

18  moving part is entitled to judgment as a matter of law. *Sierra Club v. Bosworth*, 510 F.3d 1016,

19  1022 (9th Cir. 2007). Under the APA, a reviewing court "shall" "hold unlawful and set aside agency

20  action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or

21  otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In conducting this review, a court

22  "do[es] not rubber-stamp ... administrative decisions that [it] deem[s] inconsistent with a statutory

23  mandate or that frustrate the congressional policy underlying a statute." *Nat. Res. Def. Council, Inc.*

24  *v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (second alteration in original) (citation omitted).

## ARGUMENT

26      Plaintiffs are entitled to summary judgment on their claim that Defendants acted arbitrarily,

27  capriciously, and contrary to law when they refused to request funding to support the CFPB's

28  continued operations, as required by statute. Under § 5497, Defendants must ask the Federal Reserve

1  Board for funds, to be paid out of the Federal Reserve's "combined earnings," that are necessary to

2  carry out the CFPB's authorities to enforce federal consumer financial protection laws. And under

3  § 5497, the Federal Reserve has substantial "combined earnings" available—both as a matter of law

4  and based on the Federal Reserve System's uncontestable financial reports. Defendants thus violated

5  the APA by refusing to request funds to support the CFPB's work and instead manufacturing a fiscal

6  crisis that will shut down the agency in just a few weeks' time. Because Plaintiffs rely on the work

7  of the CFPB and will be injured if its work halts, they are entitled to a declaration that Defendants

8  have acted unlawfully and an order requiring Defendants to request the needed funds.

9  **I.      Plaintiffs have standing.**

10  **A.** The Ninth Circuit has "repeatedly recognized that failure to provide statutorily required

11  information can give rise to Article III injury on the part of private plaintiffs." *Inland Empire*

12  *Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833 (9th Cir. 2021). In particular, "when a statute

13  provides a right to information, the deprivation of which 'result[s] in an informational harm,'

14  violation of the statute gives rise to a cognizable 'informational' injury." *Id.* (quoting *Wilderness*

15  *Soc'y Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010)). Plaintiffs will imminently suffer such an

16  informational injury because, without a funded and operating CFPB, they will soon be deprived of

17  information that they are entitled to by statute and that is essential to carrying out their work. *See*

18  *Munoz v. PHH Corp.*, No. 22-15407, 2023 WL 2202228, at *1 (9th Cir. Feb. 24, 2023) (discussing

19  *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021)); *see also Immigrant Defs. L. Ctr. v. Noem*, 145

20  F.4th 972, 987 (9th Cir. 2025) (affirming that that an organization has standing to sue where "a

21  defendant's actions affected and interfered with [a plaintiff's] core business activities," and

22  "frustrated its mission and caused it to divert resources in response to that frustration of purpose"

23  (citations omitted)).

24  Several statutes give Plaintiffs a right to information within the CFPB's control or authority.

25  First, the Home Mortgage Disclosure Act (HMDA) requires the publication of certain mortgage

26  lending data, to "provide the citizens and public officials of the United States with sufficient

27  information to enable them to determine whether depository institutions are filling their obligations

28  to serve the housing needs of the communities and neighborhoods in which they are located." 12

U.S.C. § 2801(b). HMDA requires covered mortgage lenders to submit data to federal regulators for public disclosure. *See id.* § 2803(f); *id.* § 2809(a), (c). And it requires the CFPB to "provide staff and data processing resources" to support the publication of that data. *Id.* § 2809(b); *see also* 12 C.F.R. § 1003.5 (stating that CFPB will make HMDA data available on its website, after modifying "to protect applicant and borrower privacy").

Plaintiffs rely substantially on HMDA data to carry out their work and further their missions of improving access to credit and encouraging fair lending practices. *See* Gonzalez-Brito Decl. ¶¶ 5–7; Van Tol Decl. ¶¶ 5–9; Mendez Decl. ¶¶ 4–9. For example, Rise Economy works to bring investment to low-income communities and communities of color through negotiating community benefit agreements with financial institutions. *See* Gonzalez-Brito Decl. ¶ 5. Rise Economy uses HMDA data about banks' lending practices to understand patterns of disinvestment, formulate realistic proposals for reform, and monitor compliance once banks have signed an agreement. *Id.* For Rise Economy, then, the loss of timely access to updated HMDA data creates a "genuine threat" of reduced ability to bring benefits to consumers and communities, to the detriment of the organization's mission. *Inland Empire Waterkeeper*, 17 F.4th at 833–34. Likewise, Woodstock Institute, in addition to relying on HMDA data to inform its advocacy work with policymakers and financial institutions, builds its premier proprietary product—the Community Lending Data Portal—using HMDA data. Mendez Decl. ¶¶ 4–9. Indeed, because HMDA data is so central to Woodstock Institute's work, much of the organization's funding assumes that Woodstock Institute will be able to obtain timely access to mortgage lending data from the CFPB. *Id.* ¶ 11. And the value of Woodstock's investment in its Portal will be substantially diminished without that access. *Id.* Woodstock's "interest in accurate information" under HMDA is thus "obvious." *Inland Empire Waterkeeper*, 17 F.4th at 834 (finding injury to a researcher who planned to write a book based in part on information that should have been disclosed by law). Plaintiffs, however, will be unable to access updated information once the CFPB halts its work due to a lapse in funding. CFPB staff and contractors are responsible for collecting HMDA data from lenders, checking for accuracy, and releasing that data to the public after processing to protect borrower and applicant privacy. *See* Ex. M at 5 (CFPB, *A Beginner's Guide to Accessing and Using Home Mortgage Disclosure Act Data*

(June 2022)). The CFPB releases data from the previous year to the public by March 31 of each year, *id.*, but will not be able to do so for 2025 data once the agency's funding runs out.

Second, the Dodd-Frank Act requires that the CFPB maintain and make public certain information from its consumer complaint process, which is separately required by statute, 12 U.S.C. § 5534. In particular, the statute instructs the CFPB to maintain complaints in a "central database" and report to Congress regularly an "analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year." *Id.* § 5496(c)(4). In CFPB staff and contractors are essential to the operation of the consumer complaint database and the publication of required reports. *See, e.g.*, Ex. N at 5–8 (CFPB, *Consumer Response Annual Report: January 1-December 31, 2024* (May 1, 2025)). Plaintiffs Rise Economy and NCRC rely on data from the CFPB's consumer complaint database to understand the risks that consumers are facing and inform their advocacy efforts. For example, Rise Economy relied on data about complaints regarding a bank from the CFPB database in recent comments to federal regulators considering a bank-merger proposal. *See* Gonzalez-Brito Decl. ¶ 8. But these data must be regularly updated for Rise Economy and NCRC to continue effectively advocating in such regulatory proceedings, and they will be unable to do so if the CFPB lacks funding to continue its work. *See* Gonzalez-Brito Decl. ¶ 8; Van Tol Decl. ¶¶ 4, 8.

Third, once the CFPB ceases to operate, Plaintiffs will either face substantial delays in accessing, or lose out altogether on access to, small business lending data promised by Section 1071 of the Dodd-Frank Act. Section 1071 aims to provide the public with crucial information to facilitate fair-lending laws and allow communities, policymakers, and creditors to better address the "needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c-2(a). But the statute required significant action from the CFPB so that the data can be collected and disseminated to the public, *Id.* § 1691c-2(f),  and the CFPB is still in the process of implementing the provision. Although the CFPB issued a regulation implementing Section 1071 in May 2023, 88 Fed. Reg. 35150 (May 31, 2023), the effective dates have been extended several times—at first due to litigation, but more recently by the CFPB itself. *See* 90 Fed. Reg. 50952 (Nov. 13, 2025). If the CFPB ceases operating due to lack of funding, there will be nobody to put out necessary guidance

1   or build out systems to help financial institutions comply, and nobody to process submitted data,

2   determine what redactions are necessary to address privacy concerns, and publish information for

3   use by borrowers, lenders, community groups, and policymakers. Indeed, there is substantial risk

4   that a delay in implementation would cause a loss of this data altogether, as financial institutions

5   will not collect or maintain the information until they receive adequate guidance from the CFPB.

6       Each Plaintiff, though, has made plans to utilize future data about small business lending

7   guaranteed by Section 1071 of Dodd-Frank. *See* Gonzalez-Brito Decl. ¶ 9; Van Tol Decl. ¶ 10;

8   Mendez Decl. ¶ 12. Woodstock Institute, in particular, has invested in planning new functionality

9   for its Community Lending Data Portal to accommodate the new information promised by that

10  statute and the CFPB's implementing regulation. Mendez Decl. ¶ 12. Woodstock will lose the value

11  of that investment if the CFPB ceases its efforts to release small business lending data. And even if

12  Plaintiffs could later access these data, after the CFPB resumes work—something that is far from

13  clear—Plaintiffs will still suffer, both in the meantime and thereafter. Because "stale information is

14  of little value," *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), Plaintiffs

15  will be impeded in their work of improving access to credit and promoting fair lending without

16  access to up-to-date information on which the CFPB would be working in the first months of 2026.

17      **B.** In addition, Rise Economy has standing to sue based on injury to its members. An

18  organization can sue on behalf of its members when (a) its members would have standing to sue in

19  their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and

20  (c) neither the claim asserted nor the relief requested requires the participation of individual

21  members. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Rise Economy

22  meets all three prongs. First, it has members who will be injured by Defendants' manufactured

23  shutdown of the CFPB due to a lapse in funding. For instance, Rise Economy member Haven

24  Services is a financial and housing counseling agency with a mission of improving the financial

25  health and housing security in underserved communities in Los Angeles. Toriz Decl. ¶ 2. Haven

26  provides no-cost counseling to assist clients in managing debt, avoiding foreclosure, and dealing

27  with other consumer issues. *Id.* ¶ 4. In that work, Haven relies on the CFPB's consumer response

28  function—a statutorily mandated part of the CFPB's work, through which the agency secures

substantive responses from financial institutions for consumers facing issues. *Id.* ¶ 6. Without access to this critical tool, Haven will be impeded in its mission of improving financial health and housing security in the communities it serves, and it will have to devote substantial resources to trying to work directly with financial institutions—rather than having the CFPB as a powerful intermediary, required by law to secure responses from the institutions it helps regulate. *Id.* ¶ 7. That type of injury is sufficient to give Haven standing. *See Immigrant Defs. L. Ctr.*, 145 F.4th at 987. The second and third elements of associational standing are also apparent: Bringing this case to keep the CFPB open is germane to Rise Economy's mission of aiding low-income communities and communities of color in accessing credit, financial services, and investments. And participation of Rise Economy's individual members is not needed to resolve this action.

## II.    Defendants' refusal to request funds from the Federal Reserve under § 5497 is arbitrary, capricious, and contrary to law.

For three reasons, Plaintiffs are entitled to summary judgment on their claim that Defendants' final decision to not request funds from the Federal Reserve was unlawful: First, the statute gives no authority to the *CFPB* to determine whether the Federal Reserve System has "earnings." Second, under the best reading of § 5497, the Federal Reserve System has hundreds of billions of dollars in annual earnings. Third, even under Defendants' incorrect interpretation of the statute, the Federal Reserve has "earnings" to fund the CFPB based on the undisputed facts.

### A.    The Dodd-Frank Act requires the CFPB Director to request funds reasonably necessary to carry out the agency's authorities.

Section 5497(a)(1) provides that "the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." The statute thus gives distinct roles to the CFPB and the Federal Reserve: The CFPB Director must determine the amounts reasonably necessary, and the Federal Reserve Board must transfer funds in that amount out of the "combined earnings of the Federal Reserve System." Necessarily, then, the CFPB Director must communicate the determination of the amount reasonably necessary to carry out the CFPB's duty to the Federal Reserve Board, so that the Board

can fulfill its statutory duty to make the transfer. The statute does not contemplate that the CFPB Director could make a determination of the amount of funding needed but lock it in a drawer, making it impossible for the Federal Reserve Board to fulfill its statutory obligation. Any suggestion to the contrary would make the statute nonsensical and would be arbitrary and capricious. Moreover, the statute does not delegate to the CFPB any authority to consider whether "combined earnings" exist. Rather, the CFPB's duty is to determine how much money *the CFPB* has and how much it requires to fulfill its other statutory responsibilities, and to make it possible for the Federal Reserve Board to transfer that amount to the CFPB.

Defendants' contrary position is arbitrary, capricious, and contrary to law. *See* 5 U.S.C. § 706(2)(A). The OLC memo advises that "section 5497 imposes no obligation for the CFPB" to draw funds from the Federal Reserve "after determining that no 'combined earnings' are available," in part based on OLC's understanding that "[o]n its face," the statute does not contain any "instruction … directed at the CFPB." Ex. J, OLC Memo 30–31. To start, that assertion ignores the plain language of the statute. Further, OLC's reading would allow a CFPB Director to refuse to ask for funding for any reason at all, even after determining that funds were both available and necessary. In addition, OLC's conclusion that the CFPB Director may unilaterally determine whether the Federal Reserve System has combined earnings invites conflict with the Federal Reserve. Indeed, the Federal Reserve Board appears to disagree with OLC's interpretation of what constitute the System's "earnings," as the Board has continued to fulfill CFPB funding requests since the System began running a deficit in 2022. *See, e.g.*, Ex. O (Letter from Patrick McClanahan to Jafnar Gueye (Jan. 2, 2025)). And Federal Reserve Chair Jerome Powell has testified that, even when the System is operating at a loss, "it's very clear on the law and the legislative history that we're still required to make those payments" to the CFPB. *See Hr'g Before the S. Comm. On Banking, Housing & Urban Affs., The Semiannual Monetary Policy Report to the Congress* at 1:24:50–1:26:02, 119th Cong. (Feb. 11, 2025) (Testimony of Jerome Powell).[4] Moreover, it would

---

[4]    https://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress; *see also* Request For Judicial Notice at 3–4.

be odd to assign responsibility for monitoring the Federal Reserve System's earnings to the CFPB, when the CFPB has no particular insight into the state of the System's finances. (In this regard, it is noteworthy that, since the beginning of November, the System's weekly financial reports indicate it is generating "earnings" even under Defendants' interpretation. *See infra* at pp.24–25.)

Further, the OLC memo is wrong that asking the Federal Reserve for funds when there are no "combined earnings" raises constitutional concerns under the Oath or Affirmation Clause. *See* Ex. J, OLC Memo 32–34. As OLC recognizes, all executive officers are bound by oath "to support th[e] Constitution." U.S. Const., art. VI, cl. 3. That includes the officers of the Federal Reserve Board. Of course, if the Board could not constitutionally transfer funds, the Board's statutory duty to do so under § 5497 would give way. That theoretical scenario, however, would not excuse Defendant Vought from his independent statutory obligation.

**B. Even if § 5497 permitted Defendants not to request funding based on the Federal Reserve's "combined earnings," Defendants' action is not based on the best reading of that statutory term.**

Defendants' decision not to request funding from the Federal Reserve rests on a second misreading of the term "combined earnings." Putting aside that the statute affords them no role in evaluating the Federal Reserve's finances, Defendants define those "combined earnings" as "profits, calculated by subtracting" a subset of the System's expenses—those related to interest—"from its revenues." Ex. J, OLC Memo 1. That reading of "combined earnings" is not entitled to deference, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), and is wrong. The best interpretation of the term is all the money generated by the Federal Reserve System's components, without reductions for expenses—whether related to interest or otherwise. That definition is consistent with the ordinary meaning of "earnings" and best comports with statutory context and congressional intent. For this reason, even putting aside that the state of the System's earnings does not excuse compliance with § 5497, Defendants' refusal to request funding is arbitrary, capricious, and contrary to law.

**1.** Because Dodd-Frank does not define "combined earnings," the Court must give the term its "ordinary, contemporary, common meaning, and may consult dictionary definitions." *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) (cleaned up). "In construing specific words in a

statute, [the court] must also look to the language and design of the statute as a whole, and read the specific words with a view to their place in the overall statutory scheme." *Id.* (cleaned up). At the time of Dodd-Frank's enactment in 2010, a common, ordinary meaning of the term "earnings" was wages, income, or other revenue generated from labor, services, or investments. *See Earnings*, *Black's Law Dictionary* (9th ed. 2009) ("Revenue gained from labor or services, from the investment of capital, or from assets. *See* INCOME."); *Earnings*, Webster's New Dictionary (2005) (listing first definition as "something (as wages) earned"); *Earning*, Oxford English Dictionary (2d ed. 1989) (defining "earning," in plural, as "[t]he amount of money which a person acquires or becomes entitled to by his labour; also, the income produced by invested capital").

As the CFPB itself recognized just one year ago, that ordinary meaning of earnings— "'revenue or 'income' generated from labor, services, or investments"— "fits this statute to a T." *See* Ex. P at 6 (Opp. to Mot. to Dismiss, *CFPB v. Purpose Financial, Inc.*, No. 24-3206 (D.S.C. Oct. 3, 2024), ECF 48).[5] As the Federal Reserve has explained, the Federal Reserve System generates income from a variety of sources, largely through interest earned on securities it acquires through its open market operations, as well as certain fees for services to depository institutions. *See* Ex. A at 4. The most common-sense definition of the phrase "combined earnings" is the total amount generated by those sources of income, across the entire Federal Reserve System. *See also Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 450 (2024) (Alito, J., dissenting) (observing that the "Federal Reserve Banks' earnings represent interest on and gains derived from the purchase and sale of securities, as well as fees they receive for services provided to depository institutions").

---

[5] After the Supreme Court upheld the constitutionality of the CFPB's statutory funding in *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024), defendants in several CFPB enforcement cases argued that the Federal Reserve's "combined earnings" meant the "excess earnings" the Reserve Banks remitted to the Treasury. The CFPB rejected that reading of the statute and advanced the one that Plaintiffs put forward here. And no court ever adopted that or any other reading of "earnings" that would lead to the defunding of the CFPB. *See* Ex. J, OLC Memo 4–5 (discussing previous litigation).

**b.** Relying on the OLC Memo, Defendants now disagree, citing dictionary definitions and discussions in corporate finance and accounting treatises. OLC, however, misreads its sources and ignores that the Federal Reserve is not analogous to a for-profit, commercial corporation.

As for dictionary definitions, OLC states that "[c]ommon dictionary definitions interpret 'earnings' to describe 'the balance of revenue after deduction of costs and expenses.'" Ex. J, OLC Memo 10 (quoting *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005)). But that definition is not even the one that OLC uses: It defines the Federal Reserve's "earnings" as revenue after deducting *some* cherry-picked expenses. That is not an ordinary definition. Moreover, OLC ignores the *other* definitions that the dictionaries cited by OLC list before OLC's preferred definition—including the definition that supports Plaintiffs' reading (and the CFPB's previous reading). *See, e.g.*, *Earnings*, *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005) (listing first definition as "something (as wages) earned"); *Earnings*, *Webster's Third New Int'l* 714 (1993 ed.) (listing first definition as "something (as wages or dividends) earned as compensation for labor or the use of capital"); *Earnings*, *The American Heritage Dictionary of the English Language* 561 (5th ed. 2016) (listing first definition as "salary or wages").

OLC also cites "technical dictionaries and usage in the business and accounting context," which it says are entitled to "particular weight" because "the Federal Reserve's income is generated by the twelve Reserve Banks and Dodd-Frank was passed specifically to regulate the financial industry." Ex. J, OLC Memo 11. But absent "evidence suggesting otherwise, affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning," rather than a specialized one. *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021). Courts have thus applied ordinary meanings to terms in both the Federal Reserve Act and the portions of Dodd-Frank governing the CFPB. *See CFPB v. CashCall, Inc.*, 35 F.4th 734, 746 (9th Cir. 2022) (applying ordinary meaning to a provision of Dodd-Frank); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 908 (S.D. Ind. 2015) (same); *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 24-8024, 2025 WL 3039669, at *11 (10th Cir. Oct. 31, 2025) (same as to phrase in the Federal Reserve Act).

In fact, there is particularly good reason *not* to apply the business and accounting definitions that OLC cites to determine what makes up the Federal Reserve's "earnings." As the nation's central

bank, the Federal Reserve differs from commercial entities in significant respects. As the Congressional Research Service has explained, the Federal Reserve System is "not profit-maximizing," and any losses are a "byproduct of monetary policy" rather than "a sign … of mismanagement." Ex. C at 3. Because Reserve Banks can record a "deferred asset," "[l]osses do not affect the Fed's ability to honor its liabilities (as with a private company), and its creditors cannot compel it to declare bankruptcy when losses exceed capital." *Id.* at 2. And, unlike a private company, the Federal Reserve Banks are limited by statute in the amount of surplus they can have on hand—forcing the Banks to record deferred assets for the last few years, even though the amount they remitted to the Treasury over the previous decade is expected to "more than offset" their recent lack of excess earnings. *Id.* Recognizing that standard accounting principles are not "appropriate for the nature and function of a central bank," the Federal Reserve has developed its own accounting manual. *See* Ex. D at iii. Those standards, the Federal Reserve recognizes, "differ from accounting principles generally accepted in the United States of America," due to the "unique nature of the Reserve Banks' powers and responsibilities." Ex. B at 9. Context thus militates against applying specialized definitions from the financial sector here.

    **2.** Looking to "the language and design of the statute as a whole, and read[ing] the specific words with a view to their place in the overall statutory scheme," *Los Angeles*, 941 F.3d at 940 (cleaned up), confirms that "earnings" as used in § 5497 means the money taken in or generated by the Federal Reserve System, without reduction for expenses. This definition of "earnings" is consistent with how the term is used throughout the Dodd-Frank Act. For example, one provision of the Act directed the Federal Deposit Insurance Corporation to deposit "[a]mounts received," including "interest and other earnings from investments," into the Orderly Liquidation Fund. *See* 12 U.S.C. § 5390(n)(2). Another authorizes Federal Reserve Banks to "pay earnings on balances maintained by or on behalf of" certain systemically important financial entities. *Id.* § 5465(c). And a third requires the Securities and Exchange Commission to report annually to Congress on the amount of "earnings on investments" made from its Investor Protection Fund. 15 U.S.C. § 78u-6(g)(5)(D).

    Downplaying this consistent statutory usage, OLC asserts that the most "natural[]"

understanding of these references to earnings requires offsetting the cost of the input recovered when cashing in on an investment, and that Plaintiffs' definition (with which the CFPB previously agreed) would not do so. *See* Ex. J, OLC Memo 24. But the ordinary definition discussed above *does* exclude the recovery of the initial cost of an investment from earnings; the interest the Federal Reserve generates on securities it owns already accounts for the cost of those assets. What OLC wants to do instead is offset the income earned from one source (interest generated by securities the Banks own) against the cost of paying out *separate* liabilities (interest owed on deposits the Banks hold). Although OLC correctly observes that the Federal Reserve has both assets and liabilities that involve "interest," that point does not require combining the two for the purposes of calculating "combined earnings."

Citing the "meaningful-variation canon," the OLC memo contends that, because some provisions of the Dodd-Frank Act use the term "revenue," the word "earnings" must mean "profit." *See* Ex. J, OLC Memo 14–15. But the memo overlooks that the Dodd-Frank Act *also* uses the term "profits." *See* 12 U.S.C. § 5390(c)(3)(b)(ii) (excluding "damages for lost profits" from relevant damages calculation); *id.* § 5390(s)(3) (requiring the FDIC to promulgate regulations defining the term "compensation" to include, among other things "any profits realized from the sale of the securities of the covered financial company"). The canon thus does not assist OLC here.

The OLC Memo also points to 12 U.S.C. § 289, which dictates how the Federal Reserve Banks handle their finances: First, they must pay for "all necessary expenses," then provide stockholders dividends, then deposit the "portion of net earnings" that remains into the bank's surplus fund up to a cap, and finally transfer any remaining earnings to the Treasury. *See* 12 U.S.C. § 289(a).OLC assumes that, because the Federal Reserve considers "excess earnings" to be those left at the end of the process, the input at the outset must be the Reserve Bank's "earnings." Ex. J, OLC Memo 17. But that assumption begs the question what constitutes the Reserve Bank's "earnings"—and, crucially, whether interest income must be deducted before the Banks begin making those sequential payments. OLC concludes that interest income must be subtracted before the payments begin under § 289. But that conclusion conflates "operating expenses" and "all necessary expenses," because, under OLC's reading, the Banks would need to deduct interest

expenses at the outset only if "all necessary expenses" taken out during the operation of § 289 were limited to operating expenses. Congress's use of the capacious phrase "all necessary expenses" suggests that, to the contrary, operating expenses are a subset of "all" the "necessary expenses" that the Banks incur. And statutory context confirms that Congress would have understood the System's "operating expenses" to be something different than all its "necessary expenses," as the provision setting up the CFPB's funding mechanism references specifically the "total operating expenses of the Federal Reserve System." 12 U.S.C. § 5497(a)(2)(A). Section 289's reference to "all necessary expenses" thus means exactly what it says: all expenses that are necessary, including interest expenses.

Next, focusing on a difference between the CFPB's and the Federal Reserve Board's funding mechanisms, the OLC Memo notes that the CFPB's funding comes from the "combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1), while the Federal Reserve Board itself is funded through assessments "upon the Federal reserve banks," *id.* § 243. In OLC's telling, with these different provisions, Congress imposed no "limitation" on funding for the Board, but it did limit the CFPB's funding by "provid[ing] that the CFPB's funds must be paid out of a specified source: the 'combined earnings of the Federal Reserve System.'" Ex. J, OLC Memo 19 (quoting 12 U.S.C. § 5497(a)(1)). OLC is wrong, because both provisions plainly identify a source of funding. And there is nothing remarkable about that, because *all* appropriations must "identify a source of public funds … to satisfy the Appropriations Clause." *Cmty. Fin. Servs. Ass'n*, 601 U.S. at 426; *see* GAO, *Principles of Federal Appropriations Law* 2-24 (4th ed. 2016) ("[A] direction to pay without a designation of the source of funds is not an appropriation."). Furthermore, because the Federal Reserve Banks are the primary earnings-generating components of the Federal Reserve System, *see* Ex. A at 5, 8, 36–38, there is little practical difference between funding through the Federal Reserve System and funding through the Federal Reserve Banks.

**3.** The Dodd-Frank Act's history and purpose also contradict Defendants' reading. When it created the CFPB, Congress expressly aimed to establish a steady source of funding, rather than funding through an annual appropriation, because it deemed "the assurance of adequate funding" to be "absolutely essential." S. Rep. No. 111-176, at 163 (2010). That stable funding source would

1   support consumer-protection functions that Congress, legislating in the wake of the 2008 financial

2   crisis, would have understood to be particularly important during times of economic uncertainty.

3         The Dodd-Frank Act transferred enforcement authority for numerous consumer protection

4   statutes from other bank regulators, including the Federal Reserve Board, the Office of the

5   Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance

6   Corporation, and the National Credit Union Administration. *See* 12 U.S.C. § 5581(b). The CFPB

7   thus assumed exclusive responsibility for deposit institutions and credit unions with assets

8   exceeding $10 billion, with respect to more than a dozen statutes, including the Equal Credit

9   Opportunity Act and the Real Estate Settlement Procedures Act. Ex. Q at 2, 13 (OIG, *Coordination*

10  *of Responsibilities Among the Consumer Financial Protection Bureau and the Prudential*

11  *Regulators—Limited Scope Review* (June 2015)). Today, therefore, *only* the CFPB monitors the

12  compliance of our largest financial institutions with numerous federal consumer financial laws, and

13  only the CFPB has either primary or sole enforcement authority with respect to several significant

14  statutes. Yet under OLC's reading of § 5497, enforcement of consumer protection statutes and

15  supervision of our largest financial institutional could start and stop, repeatedly—essentially

16  attributing to Congress a wholly irrational and self-defeating decision.

17        The OLC Memo does not deny that Congress intended to create a stable source of funding.

18  It asserts, though, that legislation does not pursue its stated goals at all costs. *See* Ex. J, OLC Memo

19  24. But that reasoning applies only if there is some evidence in the text or context that Congress has

20  made a tradeoff. There is none. While OLC says that Congress was legislating against the context

21  of stable Federal Reserve profitability for the past century and could not have anticipated that its

22  supposedly chosen source could dry up, *see* Ex. J, OLC Memo 19, OLC misses that Congress had

23  recently authorized Reserve Banks to pay interest on reserves—authority that both Congress and

24  the Federal Reserve recognized would be an important new tool for implementing monetary policy

25  following the 2008 financial crisis. *See* Pub. L. No. 110-343, § 128, 122 Stat. at 3796; Ex. R (Fed.

26  Reserve, *Press Release: Board announces that it will begin to pay interest on depository institutions'*

27  *required and excess reserve balances* (Oct. 6, 2008)). Congress would have been well aware that

28  this change created a new potential for instability in the Federal Reserve's operating results. Besides,

even before that change, there was a known possibility that the Federal Reserve could operate at a shortfall—most of the individual Federal Reserve Banks already had, repeatedly. *See* Ex. S at 11 (GAO, GAO-02-939, *Federal Reserve System: The Surplus Account* (Sept. 2002)) (reporting that, from 1989 to 2001, nearly all Reserve Banks reported some unprofitable weeks).

OLC errs as well in contending that limiting the CFPB's funding mechanism to times when the Federal Reserve is operating at a profit could have been a way to preserve the independence of the Federal Reserve. *See* Ex. J, OLC Memo 20. OLC offers no support for this *ipse dixit*—and for good reason. The existence or size of the Federal Reserve System's losses "play no role in [its] decision making [and] have no effect at all on [the Fed's] ability to conduct monetary policy." Ex. T at 24–25 (*Hr'g before the S. Comm. On Banking, Housing & Urban Affairs: The Semiannual Monetary Policy Report to Congress*, 117th Cong. (June 22, 2022) (testimony of Jerome Powell)). Moreover, OLC's new interpretation would itself intrude on the Fed's independence: Under OLC's reading, Congress has effectively constrained the Federal Reserve's ability to conduct monetary policy by forcing it, in an inflationary crisis, to choose between rapidly raising interest rates or maintaining a source of funding for the CFPB at a time when the agency's work may be most needed.

The OLC Memo's reliance on the statute's drafting history is off base as well. OLC asserts that Congress considered but decided affirmatively against allowing the CFPB to draw funds from the Federal Reserve System's revenue stream. *See* Ex. J, OLC Memo 19. In support, OLC cites the version of the bill introduced in the House of Representatives, which would have required the Board to transfer a flat 10% of the Federal Reserve System's "total system expenses" for the previous year to the CFPB. *See* H.R. 4173, 111th Cong., § 4109 (as introduced in House Dec. 2, 2009). OLC posits that the insertion of the reference to "combined earnings" in the final version of the statute was some intentional choice to limit the availability of funds for the Bureau. But OLC ignores that the funding mechanism that Congress enacted was *not* the proposal in that House bill. Rather, Congress took § 5497 wholesale from the Senate version of the bill. *See* S. 3217, 111th Cong., § 1017 (as placed on Senate calendar Apr. 15, 2010). There is no evidence that Congress intended the term "combined earnings" to convey the limitation that OLC advances.

1   Recent legislative action confirms that Congress continues to understand the phrase
2   "combined earnings" in the CFPB's funding mechanism to refer to all the money the Federal
3   Reserve System takes in, not some metric of the System's profitability. The One Big Beautiful Bill
4   Act, enacted in July of this year, reduced the statutory cap on the amount the CFPB Director can
5   request from the "combined earnings of the Federal Reserve System," from 12% to 6.5% of the
6   System's reported 2009 total operating expenses. *See* Pub L. No. 119-21, § 30001, 139 Stat. 126
7   (July 4, 2025). The bill's supporting material confirms that Congress did *not* agree with Defendants'
8   new reading: The Congressional Budget Office Cost Estimate for the bill recognized that the
9   proposed new cap "would take effect at the beginning of 2026," and that a new, lower maximum
10  transfer for the CFPB would be reflected in the Federal Reserve's finances beginning in 2026—
11  even as it understood that the Federal Reserve System was at the time largely still operating without
12  sufficient excess earnings to send remittances to the Treasury. *See* Ex U at 3–4 (CBO, Reconciliation
13  Recommendations of the House Committee on Financial Services (May 7, 2025)).

14  **4.** Defendants' new reading of the statute is also unworkable. To start, the OLC Memo says
15  that the CFPB may request and receive earnings under § 5497 only when the Federal Reserve
16  System's revenues exceed its interest expenses, but it never clarifies over what time period—
17  whether annual (when the Reserve Banks release their audited financial reports), quarterly (when
18  the CFPB requests funding), or weekly (when each Bank determines whether to remit excess
19  earnings to Treasury). This distinction matters because the System may have temporary periods of
20  unprofitability even as it remains hugely profitable over a longer term. *See, e.g.*, Ex. V at 67–68
21  (Fed. Reserve, *Federal Reserve Banks Combined Financial Statements as of and for the Years*
22  *Ended December 31, 2022 and 2021 and Independent Auditors' Report*) (noting that in 2022, the
23  System sent on net tens of billions in remittances, even as it began recording a deferred asset in the
24  fall). While OLC asserts that weekly remittances and other Fed accounting practices are not
25  "required by statute," Ex. J, OLC Memo 26, that argument is inconsistent with its suggestion
26  elsewhere that Congress was legislating against the backdrop of how the System handles its funds,
27  *id.* at 13, 16.

28  Moreover, depending on what time period the CFPB chooses to look at, Defendants'

approach would put the CFPB (not to mention any reviewing court) in the position of auditor of the Federal Reserve System. Nothing in the statute suggests that the CFPB was charged with that responsibility. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

Finally, again, OLC's reading of the statute would mean funding for the CFPB would turn off and on intermittently, making it impossible for the agency to plan and for financial institutions and the public to count on its work. That outcome would cause substantial disruption for the financial institutions it regulates, the consumers it seeks to protect, and the economy as a whole. That scenario cannot be what Congress intended and is not required by the best reading of the statute.

### C.    Defendants' decision not to request funding is arbitrary and capricious because it rests on an incorrect factual premise.

In any event, even under their definition, Defendants are wrong that the Federal Reserve System currently has no "combined earnings." Under Defendants' definition, the Federal Reserve has "earnings" when its revenues exceed its costs related to interest. In recent weeks, Federal Reserve releases have indicated that the System has generated more in "earnings—as Defendants define it—than the CFPB could even request under § 5497. The Federal Reserve System's financial statements cannot be contested, and they support entry of judgment in Plaintiffs' favor as a matter of law. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (recognizing that agency action can be arbitrary and capricious where the agency ignored available data); *see also Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that agency action is arbitrary and capricious when based on a "clear error of judgment"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1223 (9th Cir. 2022) (holding that an agency action was arbitrary and capricious where it was based on an incorrect assumption).

Although the Federal Reserve releases data that could be used to calculate Defendants' definition of "earnings" only on a quarterly basis, its weekly balance sheet provides insight into the amount of those "earnings." In particular, the balance sheet lists the net amount the System remits to the Treasury each week, and, for the last several years, serves to track the size of the System's "deferred asset." Recent balance sheets show that the Federal Reserve System has begun to pay

down the deferred asset substantially: It dropped from $243.818 billion to $243.180 billion between November 6 and December 4. *Compare* Ex. E *with* Ex. F. That means that the Federal Reserve Banks generated at least $600 million more than they spent in that period. And that number is an undercount of what Defendants would consider to be the System's "combined earnings" because, under 12 U.S.C. § 289, the amount that the deferred asset shrinks is tied to *excess* earnings, after accounting for operating expenses and dividends.

Given the Fed's current reports, Defendants are wrong to "understand that the Federal Reserve currently lacks combined earnings from which the CFPB can draw," Ex. J, OLC Memo 29. Their refusal to request funds from the Fed is thus unlawful, regardless of how "earnings" is defined.

## CONCLUSION

Defendants' decision not to request funds to support the CFPB's operations rests on two incorrect interpretations of law and an incorrect factual premise about the Federal Reserve's finances. Absent this Court's intervention, Defendants will imminently defund and prevent the operation of a federal agency that Congress charged with enforcing more than a dozen consumer protection statutes and supervising the nation's largest financial institutions. For the foregoing reasons, the Court should enter summary judgment in favor of Plaintiffs, declare Defendants' refusal to request funds arbitrary, capricious, and in violation of law, and order Defendants to request needed funds from the Federal Reserve, consistent with their obligations under § 5497.


DATED:  December 9, 2025          Respectfully submitted,

                                  ROSEN BIEN GALVAN & GRUNFELD LLP


                                  By:  */s/ Michael W. Bien*
                                       Michael W. Bien

                                  Attorneys for Plaintiffs