# EXHIBIT N

# Consumer Response Annual Report

January 1 - December 31, 2024



# Table of contents

**Table of contents**............................................................................................2

**Executive summary**.........................................................................................3

**1.  Introduction**..............................................................................................5

**2.  Complaint numbers**...................................................................................9

**3.  Complaint responses**...............................................................................16

**4.  Complaint types**.......................................................................................19

    4.1   Credit or consumer reporting.................................................. 19

    4.2   Debt collection........................................................................ 24

    4.3   Credit card.............................................................................. 32

    4.4   Checking or savings account ................................................. 39

    4.5   Money transfer, money services, and virtual currencies ....................... 45

    4.6   Mortgage.................................................................................51

    4.7   Vehicle loan or lease ............................................................. 57

    4.8   Student loan............................................................................ 62

    4.9   Personal loan .......................................................................... 66

    4.10  Prepaid card............................................................................71

    4.11  Debt or credit management..................................................... 76

    4.12  Payday loan.............................................................................80

    4.13  Title loan .................................................................................83

    4.14  Deposit advance...................................................................... 86

**5.  Conclusion** ..............................................................................................88

# Executive summary

- Pursuant to the Consumer Financial Protection Act of 2010, this annual report analyzes complaints submitted by consumers in 2024. During this period, the Consumer Financial Protection Bureau (CFPB) sent more than 2.8 million complaints to more than 3,600 companies for review and response.

- The CFPB received complaints from all 50 states with the greatest number of complaints per capita coming from consumers in Florida, Georgia, the District of Columbia, Delaware, and Nevada.

- Consistent with recent years, complaints about credit and consumer reporting accounted for 85% of complaints received. Most of these complaints were submitted about the nationwide consumer reporting agencies—Equifax, Experian, and TransUnion. In these complaints, consumers described problems with incorrect information on their reports and improper use of their reports. In response, companies reported providing relief, such as making updates to the consumer's report, in response to more than half of these complaints.

- As discussed in Section 4, the CFPB observed increases in complaints in 2024 compared to the prior two years. For example:

  □ Complaints about credit reporting increased 182%, while complaints about other personal consumer reports increased 124%.

  □ Complaints about debts consumers did not recognize increased 333%, while complaints about other debts increased 54%.

  □ Complaints about general purpose credit cards or charge cards increased 67%.

  □ Complaints about certificates of deposit (CDs) increased 81%.

  □ Complaints about money orders, traveler's checks or cashier's checks increased 56%.

  □ Complaints about federal student loans increased 43% while complaints about private student loans increased 98%.

- One notable exception to this finding is a decline in mortgage complaints—a 10% decrease for VA mortgages and a 12% decrease for conventional mortgages—likely caused at least partially by the slow housing market as buyers wait for interest rates to decrease while sellers are reluctant to give up their existing low rates.

- The CFPB's complaint process is designed to give companies the opportunity to provide complete, accurate, and timely responses to their customers. Responsible companies use complaints not only as an opportunity to engage with consumers, but also as an indicator of potential weaknesses in a particular product, service, function, department, or vendor. Companies are encouraged to consider how best to incorporate complaint information into their institutional processes to help ensure that problems are detected early and addressed quickly.

# 1. Introduction

One of the primary functions of the CFPB is collecting, investigating, and responding to consumer complaints.[1] The Office of Consumer Response (Consumer Response) works to provide timely responses to consumers,[2] in writing, to complaints[3] concerning a covered person.[4] In 2024, the CFPB received approximately 3,187,900 complaints.[5]

## Consumer complaint process

The CFPB accepts complaints from consumers through its website, by telephone, and mail.[6] The CFPB also accepts referrals from the White House, congressional offices, and other federal and state agencies.[7] Consumers submitted 98% of complaints by visiting the CFPB's website and 0.9% by calling the CFPB's toll-free telephone number. The remaining complaints were submitted via postal mail or referral.

---

[1] 12 U.S.C. 5511(c)(2).

[2] 12 U.S.C. 5481(4) ("The term 'consumer' means an individual or an agent, trustee, or representative acting on behalf of an individual.").

[3] Consumer complaints are submissions that express dissatisfaction with, or communicate suspicion of wrongful conduct by, an identifiable entity related to a consumer's personal experience with a financial product or service.

[4] 12 U.S.C. 5534(a).

[5] Complaint data in this report are current as of March. 3, 2025. This report excludes some complaints that the CFPB received, including multiple complaints submitted by a given consumer on the same issue (i.e., duplicates), whistleblower tips, and complaints that the CFPB found to be not actionable. Complaint numbers are rounded throughout the report; therefore, numbers and percentages may not sum to sub-totals or 100%.

[6] 12 U.S.C. 5493(b)(3). In addition to accepting complaints and providing complaint status updates, the CFPB also provides consumers with answers to frequently asked questions about consumer financial products and services over the telephone via a toll-free number. Representatives at the CFPB's U.S.-based contact centers answer consumers' inquiries, providing clear, unbiased answers and pointing them to CFPB-created tools like Ask CFPB. The CFPB provides services to consumers in more than 180 languages and to consumers who are deaf, have hearing loss, or have speech disabilities. In 2024, on average, the CFPB received more than 51,000 telephone calls per month.

[7] The CFPB refers complaints about depositories with $10 billion or less in assets to the appropriate prudential regulator. In turn, prudential regulators refer complaints about depositories with more than $10 billion in assets and non-depositories to the CFPB; however, under certain circumstances, prudential regulators may not refer complaints. This report includes only those complaints referred to the CFPB.

When consumers submit complaints, the CFPB asks them to identify the consumer financial product or service with which they have a problem, the issue that best describes the problem, and the company to which they want to direct their complaint.[8] Consumers describe what happened and their desired resolution using free-form text fields. The complaint form requires users to identify whether they are submitting the complaint for themselves or on behalf of someone else, provide relevant contact information, and affirm the information provided in their complaint is true to the best of their knowledge and belief.[9]

The CFPB encourages consumers to submit complaints through its website whenever possible. The online complaint form helps to ensure completeness of information and enables the CFPB to send the complaint to the named company quickly—typically, in one day or less.[10] The online complaint form also allows consumers to attach supporting documentation to their complaint, which often helps companies assess issues raised by consumers.

Complaints submitted to the CFPB go through several steps to help ensure consumers get timely responses to their issues (Figure 1). The CFPB routes consumers' complaints about consumer financial products and services directly to financial companies, and works to get consumers timely responses, generally within 15 days.[11] Secure, web-based Company and Consumer Portals protect consumer privacy and the confidentiality of companies' responses to consumers.[12] Where appropriate, the CFPB routes complaint referrals to other federal agencies through a secure, web-based Government Portal.[13]

---

[8] *See generally*, Consumer Fin. Prot. Bureau, *Learn how the complaint process works*, https://www.consumerfinance.gov/complaint/process/. In August 2023, the CFPB updated the products, sub-products, issues, and sub-issues on the complaint form based on feedback collected from stakeholders and consumers. *See* Consumer Fin. Prot. Bureau, *Consumer complaint form product and issue options* (Aug. 2023), https://files.consumerfinance.gov/f/documents/cfpb_consumer_complaint_form_product_issue_options_August_2023_FINAL.pdf. The original values selected by consumers are available in the public Consumer Complaint Database. *See infra* note 15.

[9] The complaint form requires that users attest to their submission ("The information given is true to the best of my knowledge and belief. I understand that the CFPB cannot act as my lawyer, a court of law, or a financial advisor.").

[10] The CFPB monitors and takes action to safeguard its systems from complainants who appear to be misusing the complaint process. To aid in these efforts, the CFPB requires complainants to create an account with an email address and password and verify control of the email account.

[11] *See* discussion *infra* Section 3 (Complaint responses).

[12] Companies sign up to respond to complaints in their company's dedicated CFPB Company Portal ("portal"), which is a secure online environment that protects consumer privacy and the confidentiality of company responses and serves as the primary interface between Consumer Response and companies. See Consumer Fin. Prot. Bureau, Consumer Complaint Program, https://www.consumerfinance.gov/compliance/consumer-complaint-program/ .

[13] 12 U.S.C. 5493(b)(3)(A) ("The Director shall coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate.").

**FIGURE 1:** CONSUMER COMPLAINT PROCESS



After a consumer receives the company's response to their complaint, the consumer can provide feedback on the company's response by completing an optional survey.[14] This information is made available to companies via the Company Portal. The CFPB makes a subset of complaint data publicly available in the Consumer Complaint Database on its website.[15]

## How the CFPB uses complaint information

The CFPB has a statutory obligation to monitor consumer complaints.[16] Consumers' complaints and companies' responses provide the CFPB with important information about the types of challenges consumers are experiencing with financial products and services and how companies are responding to consumers' concerns. The CFPB uses this information to monitor risk in financial markets, assess risk at companies, and prioritize agency action.

The CFPB uses a variety of tools and approaches that assist staff in identifying trends and possible consumer harm. Examples include:

- Monitoring complaint volume across categorical variables, such as product, issue, sub-product, sub-issue, company, and company response, among others.

- Analyzing complaint volume across time and by geographic area, as well as by self-identified characteristics, such as servicemember status and age.

- Reviewing cohorts of complaints and company responses to assess the accuracy, timeliness, and completeness of an individual company's responses to complaints sent to them for response.

---

[14] This optional survey invites consumers to provide feedback to three prompts: (1) The company's response addressed all of my issues; (2) I understand the company's response to my complaint; and (3) The company did what they said they would do with my complaint.

[15] *See* Consumer Fin. Prot. Bureau, Consumer Complaint Database, https://www.consumerfinance.gov/data-research/consumer-complaints/. *See also* Disclosure of Consumer Complaint Narrative Data, 80 FR 15572 (Mar. 24, 2015), https://www.federalregister.gov/documents/2015/03/24/2015-06722/disclosure-of-consumer-complaint-narrative-data.

[16] 12 U.S.C. 5511(b)(3)(A).

- Conducting text analytics to identify emerging trends and statistical anomalies in large volumes of complaints.

- Visualizing data to highlight geographic and temporal patterns and using tools to filter, sort, and search complaints.

- Pairing complaint data with market information to better understand the prevalence of issues among consumers.

- Augmenting manual review with statistical approaches to understanding large volumes of complaints (e.g., topic modeling) and tools to make complaint data easier to filter, sort, and search (e.g., elastic search-based search applications).

These analyses support the CFPB's work to supervise companies, enforce federal consumer financial laws, propose rules, spot and assess emerging issues, and develop tools that help empower consumers to make informed financial decisions. The CFPB also shares consumer complaint information with prudential regulators, the Federal Trade Commission (FTC), and other federal, state, and local agencies.[17]

This report provides information and analysis about complaints received by the CFPB from January 1 through December 31, 2024, including information and analysis about complaint numbers, complaint types, and, where applicable, information about the resolution of complaints.[18]

---

[17] 12 U.S.C. 5493(b)(3)(D).

[18] This report fulfills the reporting requirements of 12 U.S.C. 5493(b)(3)(C).

# 2. Complaint numbers

Of the approximately 3,187,900 complaints the CFPB received in 2024, it sent approximately 2,829,400 (or 89%) to companies for review and response, referred 3% to other regulatory agencies, and found 8% to be not actionable. As of March 3, 2025, 0.03% of complaints were pending with the consumer and 0.06% were pending with the CFPB.

**FIGURE 2:** COMPLAINT OUTCOMES IN 2024



In 2024, the CFPB sent complaints to more than 3,600 companies for review and response. Companies confirmed a commercial relationship with the named consumer and closed the complaint with explanation or relief to approximately 2,674,000 complaints. When a company cannot take action on a complaint because it was a duplicate, was submitted by unauthorized third parties, was in active litigation, was the result of fraud, scams or business identity theft, or the company cannot confirm a commercial relationship with the consumer, the company can provide an administrative response that includes a statement or other evidence supporting this

response. Companies provided an administrative response to approximately 84,300 complaints.[19]

The remainder of this section analyzes complaints received in 2024 by:

- Product and service

- Geographic region

- Special population (servicemembers and older consumers)[20]

- Consumers from U.S. territories

---

[19] *See* discussion *infra* Section 3 (Complaint responses) for more information on how companies respond to complaints.

[20] "Servicemembers" and "older consumers" are both self-identified. Servicemembers refers to servicemembers, veterans, and military families. "Older consumers" refers to consumers who voluntarily reported their age as 62 or older.

## Products and services

Like prior years, the most-complained-about consumer financial product in 2024 was credit or consumer reporting. Consumers submitted more than 2.7 million credit or consumer reporting complaints, which accounted for 85% of all complaints received (Figure 3).[21] Complaints about debt collection, credit cards, and checking or savings accounts made up a combined 12% of complaints received in 2024.

**FIGURE 3:** COMPLAINT VOLUME BY FINANCIAL PRODUCT OR SERVICE





---

[21] The number of complaints is not equal to the total number of consumers who submitted complaints to the CFPB. This figure excludes approximately 400 complaints where the consumer did not indicate a specific consumer financial product or service.

# Geographic region

Consumers from all 50 states, the District of Columbia, and Puerto Rico and other U.S. territories submitted complaints to the CFPB.[22] To understand state and regional trends, the CFPB analyzes the geographic distribution of complaints after accounting for population differences.[23] On a per capita basis, the CFPB received more complaints from consumers from Georgia than anywhere else in the United States, followed by consumers in Florida, D.C., Delaware, and Nevada. Consumers in Vermont submitted the fewest complaints of any state per capita (Figure 4).

**FIGURE 4:** U.S. COMPLAINT SUBMISSIONS PER 100K POPULATION



---

[22] *See* Appendix (counts of complaints by location and product).

[23] Population data is from 2020 U.S. Census data as of April 1, 2020, https://data.census.gov/all?y=2020.

## Servicemembers

The CFPB monitors and analyzes complaints from servicemembers, veterans, and military families (collectively, "servicemembers"). Consumers provided their servicemember affiliation in approximately 97,900 complaints, or 3.1% of all complaints submitted in 2024. Figure 5 compares the product breakdown of complaints submitted by self-identified servicemembers to all consumers.

**FIGURE 5:** COMPLAINTS SUBMITTED BY SERVICEMEMBERS AND ALL CONSUMERS



## Older consumers

The CFPB also monitors and analyzes complaints from older consumers. Consumers provided their age in approximately 426,300 complaints, or 13% of all complaints submitted in 2024. Figure 6 compares the product breakdown of complaints submitted by self-identified older consumers (age 62 or older) to consumers who reported an age under 62 years old.

**FIGURE 6:** PERCENTAGE OF COMPLAINTS BY PRODUCT AND AGE GROUP[24]



---

[24] When comparing older consumers to their younger counterparts, the Bureau limits its analysis to consumers who provided their age when submitting a complaint.

14    BUREAU OF CONSUMER FINANCIAL PROTECTION

# Consumers from U.S. territories

Consumers in U.S. territories submitted approximately 14,200 complaints, or approximately 0.4% of all complaints submitted in 2024. The U.S. territories include Puerto Rico, U.S. Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands. The product breakdown of complaints submitted by consumers in U.S. territories generally mirrors that of all consumers (Figure 7).

**FIGURE 7:** COMPLAINTS SUBMITTED BY U.S. TERRITORIES AND ALL CONSUMERS



# 3. Complaint responses

The CFPB sent complaints to more than 3,600 companies for review and response in 2024. Companies review the information provided in the complaint, communicate with the consumer as needed, determine what action to take in response, and provide a written response to the CFPB and the consumer. When a company cannot act on a complaint, the company can provide an administrative response that includes a statement or other evidence supporting this response.[25]

## Complaint response elements

The CFPB expects companies to provide complaint responses tailored to the issues described in each consumer's complaint. Three elements make up a complaint response:

- **Completeness:** the company addressed all the issues raised by the consumer, including providing any relevant documentation. Where appropriate, the company described communications with the consumer, attached copies of all relevant documents, and described any follow-up actions the company has taken or plans to take in response to the issues described in the consumer's complaint.

- **Accuracy:** the company selected the most appropriate response category for the written response provided and, when appropriate, described the non-monetary or monetary relief provided to the consumer. Response categories include *Closed with monetary relief*,[26] *Closed with non-monetary relief*,[27] *Closed with explanation*, and administrative response options.

---

[25] *See* discussion *supra* Section 2 (Complaint numbers).

[26] *Monetary relief* is objective, measurable, and verifiable monetary relief to the consumer as a direct result of the steps that have or will be taken in response to the complaint.

[27] *Non-monetary relief* is other objective and verifiable relief to the consumer as a direct result of the steps that have or will be taken in response to the complaint (e.g., stopping unwanted calls from debt collectors; correcting account information; correcting inaccurate data provided or reported in consumers' credit reports; issuing corrected documents; restoring account access; and, addressing formerly unmet customer service issues).

- **Timeliness:** the company provided a response within 15 calendar days of the complaint being sent to the company. If a complaint could not be closed within 15 calendar days, the company provided an interim explanation to the consumer and the CFPB and then a final response within 60 calendar days of the complaint being sent to the company.

## Monitoring complaint responses

As part of its ongoing monitoring efforts, Consumer Response systematically reviews and assesses how companies respond to complaints. These analyses assess how well companies are providing complete, accurate, and timely responses.

Consumer Response's analyses suggest that companies generally addressed the issues consumers raised in their complaints. Companies sometimes refer to documents in their responses, but do not attach the corresponding documents as expected. The CFPB has developed functionality that allows companies to securely share their responses, including documents, with consumers directly via the Company and Consumer Portals. When companies prefer to mail or deliver responses and documents directly to their customers, the Company Portal enables companies to provide the CFPB with copies.

Consumer Response's analyses suggest that companies generally selected a closure category that is supported by their written complaint response. When this was not the case, companies most commonly selected the *Closed with explanation* category, despite their written complaint response indicating that the consumer received monetary or non-monetary relief. Table 1 summarizes how companies responded in 2024.

Companies overwhelmingly met the timeliness expectation in their responses to the CFPB. Companies provided a timely response to 99.7% of the approximately 2,829,400 complaints sent to them for review in 2024.[28] Approximately 13% of complaints were closed within the initial response period of 15 days and 98% were closed within the final response period of 60 days.

---

[28] Complaints in which a company did not provide a response within 15 calendar days of the complaint being sent to the company—or within 60 days if it requested more time—are reflected in the Consumer Complaint Database as not having received a timely response. *See* Consumer Fin. Prot. Bureau, Consumer Complaint Database, https://www.consumerfinance.gov/data-research/consumer-complaints/search/api/v1/?date_received_max=2024-12-31&date_received_min=2024-01-01&field=all&format=csv&no_aggs=true&size=5528&sort=created_date_desc&timely=No (last accessed Mar. 3, 2025).

**TABLE 1:**    HOW COMPANIES HAVE RESPONDED TO CONSUMER COMPLAINTS

| Financial product or service | Closed with monetary relief | Closed with non-monetary relief | Closed with explanation | Admin response | Company reviewing | Company did not provide a timely response |
|---|---|---|---|---|---|---|
| All | 0.8% | 48% | 46% | 3% | 2% | <1% |
| Credit or consumer reporting | <1% | 52% | 42% | 3% | 2% | <1% |
| Debt collection | <1% | 27% | 67% | 2% | 2% | 2% |
| Credit card | 13% | 25% | 58% | 2% | 2% | <1% |
| Checking or savings | 14% | 7% | 75% | 2% | 1% | 1% |
| Mortgage | 2% | 3% | 91% | 2% | 2% | 1% |
| Money transfer or service, virtual currency | 8% | 4% | 82% | 1% | 2% | 2% |
| Student loan | 1% | 2% | 89% | 1% | 2% | 6% |
| Vehicle loan or lease | 3% | 6% | 84% | 4% | 1% | 1% |
| Personal loan | 5% | 6% | 84% | 1% | 2% | 3% |
| Prepaid card | 26% | 5% | 61% | 1% | 1% | 7% |
| Debt or credit management | 4% | 10% | 69% | 1% | 3% | 13% |
| Payday loan | 4% | 2% | 83% | 4% | 2% | 5% |
| Title loan | 1% | 4% | 91% | <1% | 1% | 3% |
| Deposit advance | 6% | 1% | 87% | 1% | 1% | 4% |

# 4. Complaint types

This section summarizes the types of complaints received by the CFPB in 2024 and issues identified by consumers.[29] As part of its ongoing monitoring work, the CFPB analyzes the narrative text provided by consumers and companies.[30] Analyzing these texts provides a more complete understanding of issues and, importantly, a clearer understanding of how companies respond to those issues. Therefore, in addition to summarizing the types of issues identified in complaints, this section also briefly discusses topics consumers commonly raised in their complaints. Where appropriate, the CFPB includes a discussion of how product type and issue selections differ for older consumers and servicemembers.[31]

## 4.1    Credit or consumer reporting

The CFPB received approximately 2,703,400 credit or consumer reporting complaints in 2024. The CFPB sent approximately 2,451,400 (91%) of these complaints to companies for review and response, referred 1% to other regulatory agencies, and found 8% to be not actionable.

Companies responded to 99.6% of credit or consumer reporting complaints sent to them for review and response. Companies closed 42% of complaints with an explanation, 52% with non-monetary relief, and 0.03% with monetary relief. Companies provided an administrative response for 3% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 0.1% of complaints.

---

[29] *See* discussion *supra* Section 1 (Consumer complaint process) (discussing how consumers select the issue that best describes the problem). Throughout this report, some labels have been streamlined to increase readability.

[30] *See* discussion *supra* Section 1 (How the CFPB uses complaint information). Product and issues summaries, as well as narrative discussions, focus only on those complaints for which the company confirmed a commercial relationship with the consumer and responded with an explanation or relief.

[31] *See* discussion *supra* note 20. Figures in this section display 95% confidence intervals, which estimate the true value for the statistic within the specialty population. The lines with each mark show the confidence interval, with a shorter line reflecting a narrower range of likely values and a longer line reflecting a wider range of likely values.

Consumers submitted credit or consumer reporting complaints about consumer reporting agencies (CRAs)—including three nationwide CRAs (Equifax, Experian, and TransUnion; collectively "NCRAs")—and data furnishers.[32] Unlike most other products and services, a consumer's problem with a credit or consumer report may prompt them to submit multiple complaints about, for example, a data furnisher and each of the CRAs. The complaint form reflects this market feature. Consumers may use one submission process to submit complaints about up to four companies.  In 2024, the CFPB received more than 2,514,000 credit or consumer reporting complaints about the NCRAs.

In 86% of credit or consumer reporting complaints with closure responses in 2024, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting credit or consumer reporting complaints, consumers specify whether their complaint is about a credit report or some other personal consumer report (e.g., background checks, employment screening). In 2024, consumers complained about credit reporting most frequently (Figure 8).

**FIGURE 8:**  CREDIT OR CONSUMER REPORTING COMPLAINTS BY TYPE OF REPORT AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Incorrect information on your report* (Figure 9).

---

[32] The CFPB publishes an annual list of consumer reporting companies. This list includes nationwide credit reporting companies as well as other companies that focus on certain market areas and consumer segments. *See* Consumer Fin. Prot. Bureau, List of Consumer Reporting Companies (Jan. 2025), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies_list_2025.pdf.

**FIGURE 9:** CREDIT OR CONSUMER REPORTING COMPLAINTS BY ISSUES AND OUTCOMES



Credit or consumer reporting complaint volume increased in 2024. Complaints about credit reporting increased 182%, while complaints about other personal consumer reports increased 124%, compared to the monthly average for the prior two years (Figure 10).

**FIGURE 10:** MONTHLY COMPLAINT VOLUME FOR TYPES OF CREDIT OR CONSUMER REPORTING COMPLAINTS



In 2024, the monthly average for the top issue, *Incorrect information on your report*, increased 247% compared to the monthly average for the prior two years (Figure 11).

**FIGURE 11:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF CREDIT OR CONSUMER REPORTING COMPLAINTS



In 2024, the most common complaint continued to be about incorrect information on a report. Consumers frequently described credit report inaccuracies involving credit inquiries, account and payment statuses, bankruptcies, and their personal information. Consumers also disputed results of previous investigations, frequently asserting that it took more than 30 days to reinvestigate disputed reporting. Other consumers asserted that CRAs merely accepted the word of furnishers without validating furnisher claims. Many consumers said they had previously attempted to resolve disputes directly with CRAs and that the companies neither validated nor removed disputed information.

CRAs typically responded with brief descriptions of disputed information and results of investigations. They often stated whether disputed information was validated by the furnisher, updated, removed, or otherwise was not being reported.

Consumer complaints related to identity theft and fraud rose steadily in 2024. Some consumers stated that they had included police reports or FTC identity theft reports with their complaints and asserted CRAs did not remove disputed items. Consumers often indicated they had previously submitted complaints to CRAs.

In response, CRAs typically stated they blocked disputed accounts and inquiries or denied requests to block or delete them. In some cases, CRAs indicated consumers had not provided proof of identity or other required information to initiate identity theft related disputes. The CRA's often included information on how consumers could place a security freeze or fraud alert on their credit report.

Consumers also reported that inquiries on their reports did not belong to them or that creditors accessed their reports without permission. Some consumers stated the CRAs took more than 30 days to investigate disputed information. Consumers often indicated they had previously submitted a complaint and that CRAs continued to report that a disputed inquiry was accurately furnished.

CRAs often responded with summaries of disputed information and investigation results. In some responses, NCRA's indicated they contacted the furnisher and asserted that they were reporting inquiries accurately. In some cases, companies indicated the furnisher asserted a permissible purpose to access consumers' credit reports.

In complaints about specialty consumer reporting agencies (specialty CRAs), consumers raised concerns about errors on their credit reports, including inaccurate addresses, telephone numbers, employment, and other information. Some consumers reported aged accounts or inaccurate tradelines or inquiries on their reports. Specialty CRAs typically responded with the results of investigations initiated in response to complaints and stated whether they updated accounts or verified disputed information. Some companies responded that they would not investigate until they obtained proof of identity from the consumer.

Compared to consumers who provided their age as a whole, older consumers submitted a greater percentage of complaints about a range of credit reporting issues (Figure 12). In these complaints, older consumers often mentioned problems with getting their free annual credit report, freezing or unfreezing their credit reports, or getting information corrected on their reports.

**FIGURE 12:** PROPORTION OF CREDIT OR CONSUMER REPORTING COMPLAINTS FOR OLDER CONSUMERS BY ISSUE



## 4.2   Debt collection

The CFPB received approximately 207,800 debt collection complaints in 2024. The CFPB sent approximately 159,700 (77%) of these complaints to companies for review and response, referred 18% to other regulatory agencies, and found 5% to be not actionable. As of March 3, 2025, 0.2% of debt collection complaints were pending with the consumer and 0.3% were pending with the CFPB.

Consumers can submit complaints about creditors collecting their own debts (i.e., first-party collectors) or companies collecting debt on behalf of others, such as creditors or businesses (i.e., third-party collectors). When the CFPB received debt collection complaints about companies where it was not the primary federal regulator (e.g., a mobile phone or internet service provider) or about depository institutions with less than $10 billion in assets, it referred the complaints to other regulatory agencies (e.g., FTC) or a prudential regulator.

Companies responded to 97% of debt collection complaints sent to them for review and response. Companies closed 67% of complaints with an explanation, 27% with non-monetary relief, and 0.2% with monetary relief. Companies provided an administrative response for 2% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 2% of complaints. In 79% of debt collection complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

Debt collection complaint volume increased in 2024. Complaints about debts consumers did not recognize (*I do not know*) increased 333%, while complaints about *Other debt* increased 54%, compared to the monthly average for the prior two years (Figure 13).

**FIGURE 13:** MONTHLY COMPLAINT VOLUME FOR TYPES OF DEBT COLLECTION COMPLAINTS



When submitting debt collection complaints, consumers specify the type of debt. In 2024, *I do not know,* and *Credit card debt* were the top two most common complaints by type (Figure 14).

**FIGURE 14:** DEBT COLLECTION COMPLAINTS BY TYPE OF DEBT AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Attempts to collect debt not owed* (Figure 15). This has been the predominant issue selected by consumers since the CFPB began accepting debt collection complaints in 2013.

**FIGURE 15:** DEBT COLLECTION COMPLAINTS BY ISSUES AND OUTCOMES



In 2024, the monthly average for the *Attempts to collect debt not owed* issue increased 107% compared to the monthly average for the prior two years (Figure 15).

**FIGURE 15:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF DEBT COLLECTION COMPLAINTS



In many complaints about debt collection, consumers said that debts were the result of accounts taken out in their names without their knowledge or consent. Consumers frequently alleged this was due to identity theft or fraud, and that debt collectors were collecting on debt they never obtained.

In response to these complaints, some debt collectors closed accounts. Others requested additional identifying information from consumers, and some provided verification information about the debts in question.

Consumers also frequently requested debt collectors validate debts the consumer did not recognize or disputed. Consumers frequently requested original or "wet ink" contracts to validate debts. Some debt collectors closed accounts after receiving debt validation requests. Others provided verification information, such as the name of the original creditor and account statements.

In other complaints, consumers stated that there were tradelines on their credit reports that they did not recognize or that were incorrect. Company responses to these complaints varied. Some companies sent verification information and kept the tradelines, while others deleted the tradeline or returned the account to their creditor clients for verification.

Consumers also complained that debt collectors would not stop calling them despite cease and desist requests. Consumers frequently stated that they made these requests both orally and in writing before submitting complaints to the CFPB. Debt collectors usually added the consumers' contact information to their Do Not Call lists. In some cases, debt collectors denied that they either violated or ignored prior cease and desist requests from consumers.

Finally, consumers reported that debt collectors called them too often or outside permitted hours (before 8 am or after 9 pm local time). Consumers often characterized debt collectors' communications as harassing or abusive. Companies maintained that their calling practices conformed with applicable requirements. Debt collectors frequently stated that they would add the consumers' phone numbers to their Do Not Call lists.

The CFPB also accepts debt collection complaints about rental debt. In these complaints, consumers often stated that they are being subjected to debt collection for a rental debt they do not owe, often as the result of identity theft. In their responses, companies generally requested more information from the consumer to investigate the claim. In other complaints about rental debt collection, consumers stated that they had already paid the debt in question. In response, collection companies sometimes agreed to stop collection activity.

Compared to consumers who provided their age as a whole, older consumers submitted a markedly greater percentage of debt collection complaints about mortgage debt collection (Figure 16). In these complaints, older consumers often stated that debt collectors were attempting to collect a debt not owed—due to bankruptcy discharge or it having been paid off. The companies typically responded by denying any wrongdoing.

**FIGURE 16:** PROPORTION OF DEBT COLLECTION COMPLAINTS FOR OLDER CONSUMERS BY SUB-PRODUCT



Compared to consumers who provided their age as a whole, older consumers also submitted a greater percentage of complaints about debt collectors taking or threatening to take legal action (Figure 17). In these complaints, older consumers often state that debt collectors took inappropriate legal action against them. The companies typically responded by denying any wrongdoing.

**FIGURE 17:** PROPORTION OF DEBT COLLECTION COMPLAINTS FOR OLDER CONSUMERS BY ISSUE



Additionally, servicemembers submitted a greater percentage of complaints about certain debts—most notably, payday loan debt (Figure 18). In those complaints, servicemembers often stated that a company was attempting to collect a debt the consumer did not owe—because it had already been paid, was the result of identity theft, or another issue. In their responses, companies sometimes provided proof of the debt or asked for more information from the consumer to investigate the complaint.

**FIGURE 18:** PROPORTION OF DEBT COLLECTION COMPLAINTS FOR SERVICEMEMBERS BY SUB-PRODUCT



## 4.3   Credit card

The CFPB received approximately 92,100 credit card complaints in 2024. The CFPB sent approximately 77,900 (85%) of these complaints to companies for review and response, referred 12% to other regulatory agencies, and found 3% to be not actionable. As of March 3, 2025, 0.1% of credit card complaints were pending with the consumer and 0.2% were pending with the CFPB.

Companies responded to 99.2% of credit card complaints sent to them for review and response. Companies closed 58% of complaints with an explanation, 13% with monetary relief, and 25% with non-monetary relief. Companies provided an administrative response for 2% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 0.2% of complaints. In 92% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting credit card complaints, consumers specify whether they are complaining about a general-purpose credit card or charge card, or a store credit card. In 2024, consumers complained about general-purpose credit cards or charge cards more frequently than store credit cards (Figure 19).

**FIGURE 19:** CREDIT CARD COMPLAINTS BY TYPE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Problem with credit report or credit score* (Figure 20).

**FIGURE 20:** CREDIT CARD COMPLAINTS BY ISSUES AND OUTCOMES



Credit card complaint volume increased in 2024. Complaints about general purpose credit cards or charge cards had the greatest change in volume, increasing 67% from the prior two years' monthly average (Figure 21).

**FIGURE 21:** MONTHLY COMPLAINT VOLUME FOR TYPES OF CREDIT CARD COMPLAINTS



In 2024, the monthly average for the top issue, *Problem with a credit report or credit score*, increased 240% compared to the monthly average for the prior two years (Figure 22).

**FIGURE 22:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF CREDIT CARD COMPLAINTS



In these complaints, consumers stated inaccurate delinquency and credit limit information was reported on their credit reports. Sometimes consumers said errors were due to fraudulent accounts. Other consumers said inaccurate balance information was reported to their credit report after their account was paid in full. Consumers expressed frustration and dissatisfaction about reputational risk to their credit history making it more difficult to secure credit in the future.

Companies typically responded the late payment history and other credit reporting issues were accurately reported per the terms of the account agreement and in accordance with the Fair Credit Reporting Act (FCRA). However, when credit card companies acknowledged an error occurred, they typically sent correction requests to the credit reporting companies.

Consumers also complained about billing errors. Consumers stated billing errors were typically resolved in favor of merchants despite documentation consumers provided in support of their complaint. Consumers also said they were charged more than transaction receipts showed, made returns not credited to their accounts, received bills long after closing accounts, and experienced unauthorized charges resulting from identity theft. Some consumers cancelled their credit card accounts and companies sometimes transferred unauthorized transactions to newly opened accounts.

Companies typically reinvestigated consumer dispute claims and settled in favor of consumers after reviewing additional documentation provided. In other complaints, companies clarified the reason for the dispute denial in their responses, or stated no error occurred.

Consumers also complained about extended hold times when attempting to reach customer service by phone. They often stated repeated calls were required to resolve issues or customer service representatives were unresponsive, did not provide follow–up as promised, or dismissed their concerns. Consumers also said promises made by customer service representatives did not occur despite multiple inquiries about the status of assurances made.

Companies typically apologized for challenges consumers reported about customer service, including long hold times and the need for repeated calls. When companies determined they were wrong, they usually provided relief. However, in many complaints companies determined they were not responsible for consumer concerns and referenced previous card agreements.

In addition, consumers reported that payments were applied inaccurately, later than expected, or not at all. In many complaints the company denied responsibility for payment issues. In some complaints, when consumers established auto–pay they faced obstacles when it was not set up as intended leading to late fees and negative credit reporting. Some consumers reported difficulties receiving account statements both electronically and by regular mail leading to payment challenges. Companies typically said payments were handled properly and timely and they were not responsible for payments withdrawn from incorrect accounts or in improper amounts. In response to issues about monthly statements, companies generally said they were delivered appropriately.

In some complaints, consumers said they were victims of identity theft and credit cards were fraudulently opened in their name. Some stated they were unaware of the situation until receiving information about a balance due on accounts they did not recognize. Other consumers said they became aware of the fraudulent accounts from credit report information. Consumers typically requested that the account information be removed from their credit reports.

Companies typically investigated the fraud and identity theft claims. When they determined consumers were liable for accounts and claims denied, companies often provided denial reasons, confirmed account closures due to delinquency, and said accounts were accurately reported to the

credit reporting companies. They also said consumers were responsible for outstanding balances and usually explained why the account information and credit reporting were accurate.

Some consumers reported their accounts were unfairly closed without notification and requested they be reopened. Consumers also stated that closures negatively affected their credit scores. Many consumers said closure occurred despite paying their credit card bills on time with a positive credit history.

Sometimes upon appeal from consumers, companies reopened accounts, but usually the decision remained unchanged. Consumers expressed frustration with the lack of transparency by companies. Companies typically did not reveal specific reasons for account closures. They said they reserved the right to close accounts at any time. Sometimes, companies revealed account closure decisions were not based on payment histories of accounts consumers had with them, but rather from credit report reviews or consumers' association with a previously closed account held with the company. They also said that closures were in accordance with cardmember agreements.

Some consumers stated in their complaints that they were unable to redeem credit card rewards due to system issues or failed to receive all bonus rewards after meeting requirements. Other consumers reported frustration about the disclosure of requirements in fine print or conflicting information received about bonus point expiration dates. Consumers expressed dissatisfaction when reward points were lost upon account closure.

Companies typically clarified the promotional terms offered to the consumer during the application process and denied the requests for reinstatement of points or the providing of additional points. In other complaints, companies resolved issues by adding reward points to consumer accounts. When accounts were closed and points lost, companies said they had the right to close accounts by providing proper notice.

Finally, some consumers complained about the denial of their credit card applications and requested they be approved. Consumers sometimes claimed discrimination was associated with credit card denial. Consumers also said that the reasons given for denial were unclear and lacked specificity. Companies typically refused to change their original decision to deny credit card applications and said denials were appropriate.

Compared to consumers as a whole, servicemembers submitted a greater percentage of credit card complaints about store credit cards (Figure 23). In these complaints, servicemembers often complained about being charged high or incorrect interest or fees. The companies often agreed to refund the fees but typically stated that the interest rates being charged were correct.

**FIGURE 23:** PROPORTION OF CREDIT CARD COMPLAINTS FOR SERVICEMEMBERS BY SUB-PRODUCT



Compared to consumers who provided their age as a whole, older consumers also submitted a greater percentage of credit card complaints about store credit cards (Figure 24). Similar to servicemember complaints, older consumers often complained about being charged high or incorrect interest or fees. As above, the companies often agreed to refund the fees but typically stated that the interest rates being charged were correct.

**FIGURE 24:** PROPORTION OF CREDIT CARD COMPLAINTS FOR OLDER CONSUMERS BY SUB-PRODUCT



# 4.4   Checking or savings account

The CFPB received approximately 67,900 checking or savings complaints in 2024. The CFPB sent 54,100 (80%) of these complaints to companies for review and response, referred 17% to other regulatory agencies, and found 3% to be not actionable.  As of March 3, 2025, 0.1% of checking or savings complaints were pending with the consumer and 0.3% were pending with the CFPB.

Companies responded to 99% of checking or savings complaints sent to them for review and response. Companies closed 75% of complaints with an explanation, 14% with monetary relief, and 7% with non-monetary relief. Companies provided an administrative response for 2% of complaints. As of March 3, 2025, 1% of complaints were pending review by the company. Companies did not provide a timely response for 0.6% of complaints. In 93% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting checking or savings account complaints, consumers specify the type of product. In 2024, *Checking account* was the most complained about product type (Figure 25).

**FIGURE 25:** CHECKING OR SAVINGS ACCOUNT COMPLAINTS BY TYPE OF PRODUCT OR SERVICE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Managing an account* (Figure 26).

**FIGURE 26:** CHECKING OR SAVINGS ACCOUNT COMPLAINTS BY ISSUES AND OUTCOMES



Checking or savings complaint volume increased in 2024. Complaints about certificates of deposit (CDs) had the greatest percentage increase in volume, increasing 81% from the prior two years' monthly average (Figure 27).

**FIGURE 27:** MONTHLY COMPLAINT VOLUME FOR TYPES OF CHECKING OR SAVINGS ACCOUNT COMPLAINTS



In 2024, the monthly average for the top issue, *Managing an account*, increased 17% compared to the monthly average for the prior two years. (Figure 28).

**FIGURE 28:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF CHECKING OR SAVINGS ACCOUNT COMPLAINTS



In their checking and savings complaints, consumers stated funds were taken from their deposit accounts without their knowledge or consent through unauthorized and fraudulent transactions. In some instances, fraudulent transactions resulted from lost or stolen debit cards, Zelle transfers, and out of state transactions. However, consumers also reported being the victims of elaborate scams where funds were transferred from their accounts after they were tricked into thinking they were communicating with their banks, but instead they were speaking to people committing fraud.

Companies stated that claims of unauthorized and fraudulent transactions were investigated. When it was determined that errors had occurred, claims were approved, and funds were credited to consumers' accounts. Companies stated claims were denied in transactions where a valid PIN was used, or it appeared the consumer authorized the transaction. Companies often

denied refunding transactions resulting from scams because the consumers authorized and/or performed the transfer of funds from their accounts.

Consumers also complained about issues with customer service when seeking to address problems with access to deposit accounts. Consumers stated that when they were unable to access their accounts, they reached out to customer service but received little assistance. Company representatives were unable to verify consumers' identities or locate accounts and refused to answer questions about account status or the location of funds. Consumers stated they were often transferred between departments which provided different information or disconnected the calls.

Companies apologized for any inconvenience experienced by consumers, but stated requests often could not be processed due to verification issues or the need for additional information. Companies stated that due to security concerns account restrictions and closures were allowed under Deposit Account Agreements.

In some complaints, consumers stated they were denied access to funds in their deposit accounts due to frozen accounts, holds on deposited funds, and being locked out of online banking platforms. Consumers stated that when they contacted customer service, they were told such actions were taken due to suspected fraudulent activity or verification issues. Consumers stated they provided all requested information or identification for the release of account restrictions. Companies stated restrictions were placed on accounts for various reasons, including verification of identity and deposited funds, belief that check funds were uncollectible, and suspected fraud. Companies stated that once investigation and verification concerns were completed, restrictions were removed from the account. Companies also stated account restrictions were permitted by the Deposit Account Agreement.

Consumers also complained that companies closed their accounts abruptly after deposits or transfers, often without notice or a reason for the closures. Consumers stated they learned of the closures when inquiring about restrictions placed on accounts prior to closure. Consumers said the unexpected closures impacted reoccurring payments scheduled to be taken from their accounts. Following the closures, consumers stated account funds were not immediately returned but were held for prolonged periods by the companies.

Companies stated Deposit Account Agreements allowed them to close an account at any time, for any reason or no reason, and without notice. Companies also stated internal policies and Deposit Account Agreements permitted restrictions on accounts for various reasons, including verification of identity and deposits, and account reviews. Companies stated account funds were held pending verification and review of account activity, but upon completion funds were mailed by check to the consumer.

In many cases, companies gave no reason for the account closure. When companies did give a reason for account closure, they varied, but companies tended to adopt phrases that they used in many responses. This scenario demonstrates a common feature in many company responses—the use of boilerplate language that, on the surface gives the appearance of a response but in reality, does not seem to convey any actual information to the consumer. While it seems likely that, despite the boilerplate language being difficult to understand, the decisions companies made to close accounts were usually based on legitimate concerns, it is genuinely difficult to tell from the responses given.

Consumers also complained about overdraft fees. Consumers stated their accounts were assessed overdraft fees when charges should not have been processed or there were enough funds to cover the charges. Consumers said companies changed the posting order of transactions, deducting larger transactions first, leaving no funds to cover smaller transactions. Consumers also stated sometimes the overdraft charges were larger than the amount of the transaction.

Companies stated overdraft fees assessed to accounts were valid. They also stated transactions were posted in the order disclosed in the Deposit Account Agreement. Some companies refunded overdraft fees after additional review, while others referred to company policy which permitted a courtesy refund of overdraft fees once a year.

Compared to consumers as a whole, servicemembers submitted a greater percentage of checking or savings complaints about problems caused by low funds (Figure 29). In these complaints, servicemembers often brought up what they felt were excessive or unfair overdraft charges. In their responses, companies often explained how the fees were calculated and sometimes extended a courtesy refund.

**FIGURE 29:** PROPORTION OF CHECKING OR SAVINGS COMPLAINTS FOR SERVICEMEMBERS BY ISSUE



## 4.5   Money transfer, money services, and virtual currencies

The CFPB received approximately 27,400 money transfer or service, virtual currency (collectively, "money services") complaints in 2024. The CFPB sent approximately 17,100 (or 62%) of these complaints to companies for review and response, referred 33% to other regulatory agencies, and found 3% to be not actionable. As of March 3, 2025, 0.1% of money services complaints were pending with the consumer and 0.8% were pending with the CFPB.

Companies responded to 97% of money services complaints sent to them for review and response. Companies closed 82% of complaints with an explanation, 8% with monetary relief, and 4% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 2% of complaints. In 94% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting money services complaints, consumers specify the type of product. In 2024, *Mobile or digital wallet* was the most complained about type of product (Figure 30).

**FIGURE 30:** MONEY SERVICES COMPLAINTS BY TYPE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Fraud or scam* (Figure 31).

**FIGURE 31:** MONEY SERVICES COMPLAINTS BY ISSUES AND OUTCOMES



Money services complaint volume increased in 2024. The monthly average for the top type of product, *Mobile or digital wallet,* increased 15% from the prior two year's monthly average. *Virtual currency* increased 53% from the prior two year's monthly average. *Money order, traveler's check or cashier's check* increased 56% from the prior two year's monthly average. (Figure 32).

**FIGURE 32:** MONTHLY COMPLAINT VOLUME FOR TYPES OF MONEY SERVICES COMPLAINTS



In 2024, the monthly average for the top issue, *Fraud or scam*, increased 10% compared to the monthly average for the prior two years (Figure 33).

**FIGURE 33:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF MONEY SERVICES COMPLAINTS



Fraud and scams related to virtual currency continue to drive money services complaints. Consumers were frequently scammed, with common tactics including phishing, smishing, posing as investment or financial representatives, and fraudulent sales or rental listings. Zelle was often involved in these scams.

Companies generally denied responsibility for unauthorized transactions, citing user authorization or policy limitations. Some companies investigated fraud claims but offered limited or no guarantees of resolution. In a few cases, companies reversed their initial decisions and provided refunds after receiving complaints. Cryptocurrency firms consistently explained that blockchain transactions are irreversible.

Consumers also reported various customer service issues, including delayed or unhelpful responses, difficulties canceling subscriptions or closing accounts, unauthorized transactions, and account restrictions without clear explanation. Companies typically investigated the reported issues, sometimes offering refunds or resolving account restrictions. Some companies denied responsibility, citing user agreements or policy limitations, while others acknowledged errors and provided compensation for inconvenience.

Some consumers reported issues accessing or withdrawing funds from their accounts due to compliance reviews, account restrictions, or technical errors. Some consumers experienced delays in receiving refunds or resolving disputes related to canceled transactions. Companies attributed account restrictions or delays to various reasons, such as suspected policy violations, technical issues, or ongoing investigations. In some cases, companies stated they had resolved the issue by releasing funds or restoring account access.

Finally, consumers also complained of delays or non-receipt of domestic and international money transfers. Some consumers experienced difficulties getting refunds for failed or incorrect transfers. Companies acknowledged delays or errors, stating they processed refunds or that transfers were eventually completed. Some companies attributed delays to technical issues or compliance reviews. The sending bank often implied the recipient bank was responsible for the hold-up and eventual return of the money transfer.

Compared to consumers who provided their age as a whole, older consumers submitted a greater percentage of money services complaints about, most notably, money transfers (Figure 34). Older consumers often complained about falling victim to fraud and inadvertently sending money to a scammer. Companies typically responded that they were unable to help recover the funds.

**FIGURE 34:** PROPORTION OF MONEY SERVICES COMPLAINTS FOR OLDER CONSUMERS BY SUB-PRODUCT



## 4.6 Mortgage

The CFPB received approximately 26,100 mortgage complaints in 2024. The CFPB sent 22,100 (85%) of these complaints to companies for review and response, referred 11% to other regulatory agencies, and found 4% to be not actionable. As of March 3, 2025, 0.1% of mortgage complaints were pending with the consumer and 0.2% were pending with the CFPB.

Companies responded to 98% of mortgage complaints sent to them for review and response. Companies closed 91% of complaints with an explanation, 2% with monetary relief, and 3% with non-monetary relief. Companies provided an administrative response for 2% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 1% of complaints. In 93% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting mortgage complaints, consumers specify the type of mortgage. In 2024, conventional home mortgages were the most complained about mortgage type (Figure 35).

**FIGURE 35:** MORTGAGE COMPLAINTS BY TYPE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Trouble during payment process* (Figure 36).

**FIGURE 36:** MORTGAGE COMPLAINTS BY ISSUES AND OUTCOMES



Mortgage complaint volume decreased in 2024, a 10% decrease for VA mortgages and a 12% decrease for conventional mortgages. This was likely caused at least partially by the slow housing market as buyers wait for interest rates to decrease while sellers are reluctant to give up their existing low rates. The monthly average for home equity loan or line of credit (HELOC) mortgage complaints increased 23% compared to the monthly average for the prior two years.

The monthly average for *All other*[33] complaints increased 53% compared to the monthly average for the prior two years. (Figure 37).

**FIGURE 37:** MONTHLY COMPLAINT VOLUME FOR TYPES OF MORTGAGE COMPLAINTS



In 2024, the monthly average for the top issue, *Trouble during payment process* increased 2% compared to the monthly average for the prior two years (Figure 38).

---

[33] This category includes reverse mortgage, USDA mortgage, and manufactured home loans.

**FIGURE 38:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF MORTGAGE COMPLAINTS



In their complaints, some consumers reported frustration communicating with companies during the servicing of their loans, stating they were unable to reach servicer representatives, did not have calls or emails returned, that they received inaccurate or conflicting information, or that servicer representatives were rude. Common servicing issues involved loss mitigation, payment, and escrow issues.

Companies generally acknowledged consumers' frustration and apologized for unsatisfactory customer service. Some companies summarized call recordings or notes to reiterate or clarify information provided during earlier communications. Companies sometimes failed to provide details and explanations to consumers during earlier communications prior to complaint submissions. Some companies did not address consumer allegations that they needed to call or email several times for the company to address issues, or that company representatives provided conflicting or inaccurate information. Some consumers complained about payment challenges after servicing transfers, after filing for bankruptcy, and when exiting forbearance plans, with

automatic payments or payment amounts different than a single monthly payment. Some consumers stated companies did not apply payments as instructed, that they could not make payments due to cyber incidents, or experienced delays in receiving payoff amounts or in applying payoff payments. Consumer-reported harms included late fees and other fees, negative credit reporting, loss mitigation delays, and foreclosure threats.

Companies typically responded to payment complaints by noting that certain payments were not received timely. Some companies explained that payments would be placed in suspense accounts until a permanent loss mitigation option was implemented after forbearance plan completion. Servicers usually reapplied payments that were intended to be applied to principal reduction. In some responses, servicers admitted to system and other errors and reversed corresponding fees.

Consumers also expressed frustration with having to make repeated attempts to resolve escrow issues, such as late fees and penalties associated with servicers failing to timely disburse property tax or insurance payments. Issues appeared to be especially frequent after servicing transfers. Other consumers expressed surprise that monthly escrow payments increased, sometimes alleging inaccurately calculated escrow analyses. Some company communications confused consumers about how escrow balances would be handled after forbearance plans ended.

Companies typically apologized and paid fees for late tax or insurance payments, frequently attributing delinquencies to third party vendors, loan boarding, or prior servicers. Companies usually explained that increased escrow payment amounts resulted from projected shortages, but in some cases admitted to escrow analysis calculation errors.

Consumers also reported that companies incorrectly reported their payments as late even though their loans were in a forbearance plan or were in the process of having loans modified after a forbearance plan. Some consumers stated that companies reported timely payments as late. Others noted that new servicers incorrectly furnished negative information after servicing transfers or after consumers had filed for bankruptcy protection.

Companies generally updated the information reported to the three NCRAs if consumers' loans were in a forbearance plan or if there were delays in implementing loss mitigation options after a forbearance exit. Other times companies stated that consumers had missed regular monthly payments, and the information furnished was accurate.

In addition, consumers frequently reported that representatives were unresponsive during purchase, refinance, and assumption processing. Some consumers indicated that lack of communication from companies increased frustration and led to closing delays. Consumers also expressed disappointment about lack of clarity and transparency throughout the process

and reported receiving misleading information from company representatives. Consumers also expressed dissatisfaction about unwelcome solicitation calls and deceptive practices.

Companies typically responded that these consumer experiences involved miscommunication and sometimes refunded fees associated with consumer's loan applications. At times they apologized for the unsatisfactory customer service experience or confusion created by representatives.

Consumers complained about lengthy loan application processing times and challenges dealing with unresponsive loan officers, processors, and companies. They also expressed frustration with extensive and repeated document requests, settlement delays, and closings that did not occur. Consumers also reported loan assumption process delays and said companies failed to establish accurate estimates of the time required to complete the process.

Company representatives were reportedly difficult to reach for questions and process updates. Companies acknowledged delays due to loan officer processing errors and miscommunication. In other complaints, they attributed delays to loan programs or other unanticipated complexities which became evident during loan processing or underwriting. Regarding loan assumptions, companies typically said the increase in volume and insufficient resources were responsible for delays and limited communication with representatives. Companies often apologized for processing, closing, and other application delays.

Some consumers also expressed frustration when lenders denied their applications, especially after consumers provided extensive documentation and received assurances that they were qualified. Upon receiving denial notices, consumers frequently stated that denial reasons were unclear, did not provide information about potential corrective actions to obtain approval, and that denials occurred late in the process.

Companies generally responded that loan denials were appropriate based on mortgage lending guidelines. In response to concerns about initial approval by loan officers followed by denial, companies responded that final loan approvals were dependent upon underwriter review of documentation to verify income, assets, liabilities, credit history, and other information.

Finally, some consumers expressed dissatisfaction about unexpected changes to loan terms. They were concerned about receiving multiple closing disclosures with different terms than originally discussed or disclosed in loan estimates. Consumers also said loan originators verbally promised interest rates and then increased them in written disclosures. Some consumers thought their interest rates were locked and were surprised about rate increases during the loan application process.

Companies told consumers that certain charges and fees could change even after locking the interest rate if adjustments were within allowable limits. Companies sometimes adjusted the interest rate in favor of consumers, or attributed changes to rate lock expirations, or insisted the changes were appropriate.

Compared to consumers as a whole, servicemembers submitted a greater percentage of mortgage complaints about refinancing or closing on a mortgage (Figure 39). Servicemembers often complained about delays with the closing process, including issues with VA loan assumptions. Companies often responded that they were working diligently to obtain necessary approvals, or that they were waiting to receive additional documents from the consumer.

**FIGURE 39:** PROPORTION OF MORTGAGE COMPLAINTS FOR SERVICEMEMBERS BY ISSUE



## 4.7   Vehicle loan or lease

The CFPB received approximately 18,900 vehicle loan or lease complaints in 2024. The CFPB sent 14,000 (74%) of these complaints to companies for review and response, referred 22% to other regulatory agencies, and found 3% to be not actionable. As of March 3, 2025, 0.1% of vehicle loan or lease complaints were pending with the consumer and 0.4% were pending with the CFPB.

Some consumers submit complaints about vehicle dealerships. The CFPB generally does not send vehicle loan or lease complaints to vehicle dealerships for response unless the dealer retains motor vehicle installment sales contracts (often known as "buy here, pay here" dealers).

Companies responded to 98% of vehicle loan or lease complaints sent to them for review and response. Companies closed 84% of complaints with an explanation, 3% with monetary relief, and 6% with non-monetary relief. Companies provided an administrative response for 4% of complaints. As of March 3, 2025, 1% of complaints were pending review by the company. Companies did not provide a timely response for 1% of complaints. In 88% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

Consumers who submit vehicle loan or lease complaints specify whether they are complaining about a vehicle loan or lease. In 2024, consumers complained about vehicle loans more frequently than vehicle leases (Figure 40).

**FIGURE 40:** VEHICLE LOAN OR LEASE COMPLAINTS BY SUB-PRODUCT AND OUTCOMES



Consumers identify the issue that best describes the problem they experienced. The most common issue was *Managing the loan or lease* (Figure 41).

**FIGURE 41:** VEHICLE LOAN OR LEASE COMPLAINTS BY ISSUES AND OUTCOMES



Vehicle loan or lease complaints volume increased in 2024. Loan-related complaints increased by 26% compared to the monthly average for the prior two years, while lease-related complaints increased by 15% (Figure 42).

**FIGURE 42:** MONTHLY COMPLAINT VOLUME FOR TYPES OF VEHICLE LOAN OR LEASE COMPLAINTS



In 2024, the monthly average for the top issue, *Managing the loan or lease*, increased 11% compared to the monthly average for the prior two years. *Repossession* increased 99% compared to the monthly average for the prior two years (Figure 43).

**FIGURE 43:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF VEHICLE LOAN OR LEASE COMPLAINTS



Consumers complained about the customer service they received for their auto loans. The complaints frequently stated that representatives were unhelpful or disrespectful. They also reported long hold times and that representatives denied requests to speak to a supervisor. Consumers said they experienced multiple transfers and disconnected calls, or that companies ignored account information requests. Other consumers reported that companies provided conflicting or inaccurate information about their account.

Companies generally apologized for the service consumers received and often said customer service is a priority. Some companies apologized for inaccurate information provided by representatives, and some complaint responses included previously requested documentation or detailed responses to consumer concerns. Sometimes companies ignored consumers' customer service concerns.

Consumers also complained that auto lenders reported tradelines and payments as late despite on time payments. In addition, consumers said companies improperly reported late payments and charged off accounts despite submitting insurance payments for vehicles deemed a total loss, or after companies sold repossessed vehicles at auction. Lastly, consumers stated companies reported incorrect account statuses for accounts in bankruptcy and vehicles redeemed after repossession.

Companies typically responded that they reported consumer account information accurately to the credit reporting companies. Regarding insurance claims and repossessed vehicles sold at auction, companies stated consumers were still responsible for payments until the insurance company or the consumer fully paid the account balance.

Consumers complained that companies delayed posting their payments, resulting in additional interest charged on their account. Consumers also reported that companies withdrew more money than intended, did not apply their payments correctly, and sometimes lost payments.

Companies usually responded that they processed consumer payments the day received and followed company policies and procedures. Companies also explained how simple interest was calculated and assessed, and informed consumers how it allocated excess payments. Regarding lost payments, companies instructed consumers to provide copies of cancelled checks, and requested they have the issuing company place a stop payment. Sometimes companies admitted to payment processing errors and then credited the accounts.

Consumers reported that dealerships failed to honor advertised vehicle pricing and often increased interest rates much higher than advertised. Consumers said they fell victim to high-pressure sales tactics, and were rushed through loan closing documents, resulting in unnoticed changes to loan terms and unwanted add on services. Some consumers stated dealerships listed them on loan agreements as a primary or co-borrower without their consent and sometimes cancelled newly signed contracts and repossessed their vehicle.

In response, companies usually referenced loan agreements and loan terms. Companies stated that consumers received loan disclosures at the time of purchase, and signatures reflected the consumers' acknowledgement and agreement to the terms of the loan. Lending companies often referred consumers to dealerships to discuss mechanical problems or alleged deceptive sales practices, explaining that dealers are separate entities.

# 4.8   Student loan

The CFPB received approximately 16,700 student loan complaints in 2024. The CFPB sent 14,900 (89%) of these complaints to companies for review and response, referred 8% to other regulatory agencies, and found 2% to be not actionable. As of March 3, 2025, 0.1% of student loan complaints were pending with the consumer and 0.1% were pending with the CFPB.

Companies responded to 94% of student loan complaints sent to them for review and response. Companies closed 89% of complaints with an explanation, 1% with monetary relief, and 2% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 6% of complaints. In 86% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting student loan complaints, consumers specify whether they are complaining about a federal student loan or a private student loan. In 2024, consumers complained about federal student loans more frequently than private student loans (see Figure 44).[34]

FIGURE 44: STUDENT LOAN COMPLAINTS BY TYPE OF LOAN AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Dealing with your lender or servicer* (Figure 45).

---

[34] The federal student loan market is much larger than the private student loan market. *See, e.g.*, Consumer Fin. Prot. Bureau, *Report of the CFPB Education Loan Ombudsman* (Oct. 2023), https://files.consumerfinance.gov/f/documents/cfpb_annual-education-loan-ombudsman-report_2023.pdf (discussing that the federal student loan portfolio grew to $1.643 trillion in 2023, representing more than 92% of all outstanding student loans).

**FIGURE 45:** STUDENT LOAN COMPLAINTS BY ISSUES AND OUTCOMES



Student loan complaint volume increased in 2024. Complaints about federal student loans increased 43% while complaints about private student loans increased 98% from the prior two year's monthly average (Figure 46).

**FIGURE 46:** MONTHLY COMPLAINT VOLUME FOR STUDENT LOAN TYPES



In 2024, the monthly average for the top issue, *Dealing with your lender or servicer*, increased 42% compared to the monthly average for the prior two years (Figure 47).

**FIGURE 47:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF STUDENT LOAN COMPLAINTS



Consumers often complained that their loan servicer failed to credit or delayed crediting payments. Other consumers reported issues with auto-debits, including higher than expected debits or failure to debit a planned payment. Some stated payments were not credited due to servicing transfers or a transition to a new servicing platform. And others reported confusion over payment amounts due to poor communication about payment plans. Other consumers stated their payments were not allocated to their loans per their instructions.

Companies often provided information about the consumer's payment plan and payment amounts and included past payment history. Some servicers denied having a record of the alleged missing payment. Servicers sometimes acknowledged the consumer's issues and credited the payment without providing an explanation for the delay in processing the payment or reported the consumer's bank rejected the payment.

Consumers also reported delays in processing income-dependent repayment (IDR) applications and difficulties getting information about the status of their application. Consumers reported receiving conflicting information about payment amounts after enrolling in the Saving on a Valuable Education (SAVE) or other IDR payment plan. Consumers enrolled in the SAVE plan reported frustration that their loans were placed in forbearance due to the legal challenges with the SAVE plan.

Servicers often apologized for the delay and provided an update to the status of the consumer's application. In recent complaints, servicers explained that consumers' loans were being transferred to the Department of Education.

Consumers reported multiple unsatisfactory attempts to contact their student loan servicer due to either extended wait times or disconnected phone calls. Some consumers reported their servicer provided misleading or incorrect information about their loan. Other consumers reported they did not have access to their account information during servicing transfers or system changes. Servicers generally apologized for the long wait times and stated they were experiencing significantly high call volumes. Companies typically provided an update on the status of the loan or IDR applications.

Consumers also complained about delayed processing of their Public Service Loan Forgiveness (PSLF) applications, despite the consumer having made the required 120 payments. Consumers expressed frustration with forced forbearances that delayed their ability to reach forgiveness. Some consumers reported they had to continue making payments after they made 120 qualifying payments. MOHELA typically said they were waiting on the Federal Student Aid (FSA) to forward approval for loan forgiveness. In recent complaints, the company responded that PSLF applications were paused and will now be processed by the Department of Education.

Some consumers complained that loan servicers continued to report their student loans with an outstanding balance after the loans had been forgiven or discharged. Other consumers reported there were fraudulent accounts on their credit report. Some private student loan consumers reported incorrect adverse credit reporting.

Companies typically submitted update requests to the credit reporting companies after investigating the consumer's claims. In other instances, companies maintained that the initial reporting was accurate, and changes could not be made. Federal student loan servicers reported that they would not report delinquencies during the on-ramp period.

Some consumers reported being scammed with promises of loan forgiveness for a fee. Other consumers reported loans were opened in their name without permission. Many consumers reported the school they attended was closed for deception or fraud and they were looking for relief or discharge of their student loans.

Servicers typically explained that they were not affiliated with the company that was requesting fees for assistance in getting payment assistance. Federal student loan servicers stated they were waiting on an update from the Department of Education for information on consumer defense to repayment claims. Many private student loan servicers indicated they do not have a program to forgive loans for school misconduct.

# 4.9   Personal loan

The CFPB received approximately 9,500 personal loan complaints in 2024. The CFPB sent approximately 6,900 (or 73%) of these complaints to companies for review and response, referred 23% to other regulatory agencies, and found 4% to be not actionable. As of March 3, 2025, 0.1% of personal loan complaints were pending with the consumer and 0.6% were pending with the CFPB.

Companies responded to 96% of personal loan complaints sent to them for review and response. Companies closed 84% of complaints with an explanation, 5% with monetary relief, and 6% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 3% of complaints. In 86% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting personal loan complaints, consumers can specify whether they obtained the loan online or at a store (in person). In 2024, consumers complained about personal loans obtained online more than personal loans obtained at a store (Figure 48).

**FIGURE 48:** PERSONAL LOAN COMPLAINTS BY LOAN SOURCE AND OUTCOMES



When submitting personal loan complaints, consumers specify the type of product. In 2024, *Installment loans* were the most complained about type of personal loan product (Figure 49).

**FIGURE 49:** PERSONAL LOAN COMPLAINTS BY TYPE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Charged fees or interest you didn't expect* (Figure 50).

**FIGURE 50:** PERSONAL LOAN COMPLAINTS BY ISSUES AND OUTCOMES



Personal loan complaint volume increased in 2024. Complaints about pawn loans increased 82% while complaints about installment loans increased 56% from the prior two year's monthly average (Figure 51).

**FIGURE 51:** MONTHLY COMPLAINT VOLUME FOR PERSONAL LOAN TYPES



In 2024, the monthly average for the top issue, *Charged fees or interest you didn't expect*, increased 50% from the prior two year's monthly average (Figure 52).

**FIGURE 52:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF PERSONAL LOAN COMPLAINTS



In their complaints, consumers reported they were unable to access their online accounts or were unable to make a payment in person which resulted in additional fees, late payments or negative credit reporting. Other consumers reported they made payments timely, but the company did not apply the payments when they were received. Consumers reported that companies did not withdraw autopayments as scheduled which resulted in late payments, or the payments were withdrawn from their bank accounts without permission or on incorrect dates.

Companies often responded that they applied payments as of the date received or that payments were returned by the consumer's depository institution. Companies typically provided information about the terms of the loan and available payment options. Companies occasionally agreed to waive late fees as a courtesy and agreed to cancel the autopayments.

Consumers disputed information small dollar loan servicers reported on their credit report. Some consumers reported that despite providing supporting documentation and submitting

frequent disputes the item or incorrect information remained on the report. Consumers stated that loans were falsely reported as late. Some consumers disputed loans on their credit report that they stated they did not apply for or were unaware of.

Companies typically responded that they are required to report accurate information to the credit reporting companies and confirmed information was accurately furnished. In some instances, companies acknowledged reporting errors and updated the credit reporting, removed accounts, or agreed to remove the negative reporting as a courtesy. Companies also directed consumers to submit a law enforcement or FTC Identity Theft report before considering the consumers' requests to remove the fraudulent loan from the consumer's credit report.

Consumers reported items appeared on their credit report that did not belong to them, or they received collection calls on debts they were unaware of. Consumers reported being asked to purchase gift cards or provide an initial payment after getting approved for a loan but not receiving the proceeds of the loan.

Companies generally responded that the consumer might be a victim of fraud or identity theft, and that the company did not undertake the actions identified in the complaint or reported that other individuals appear to have used their name without their permission. Companies instructed consumers to complete a fraud packet and requested a police report. In some complaints, the company agreed to forgive the loan or remove the item from the consumer's credit report.

Consumers reported their loans or leases had high or usurious interest rates or fees that were predatory and often made it difficult to pay off. Some consumers explained that they did not understand the terms of the loan or lease when they applied. Consumers reported that the company did not provide disclosures or hid the costs of the loan or lease during the origination process.

Companies typically responded that the terms of the loan and the APR were disclosed at origination. Some companies responded that they are wholly-owned by a tribe and therefore ruled by tribal law and not subject to state laws and licensing.

Consumers also reported issues with merchants or retailers that impacted their Buy-Now-Pay-Later (BNPL), point-of-sale (POS), or solar loans. Consumers reported that they did not receive the item they purchased using their BNPL or POS loans, returned the item but did not receive credit for the returned item, or the company went out of business. Other consumers reported that merchants did not complete the installation of their solar panels or that the solar panels were not operating as expected.

Companies typically responded that they investigated the merchant dispute, and consumers were still responsible for their debts. In some complaints companies cancelled remaining balances or wrote off balances as a courtesy.

# 4.10  Prepaid card

The CFPB received approximately 9,300 prepaid card complaints in 2024. The CFPB sent approximately 6,400 (or 69%) of these complaints to companies for review and response, referred 26% to other regulatory agencies, and found 4% to be not actionable. As of March 3, 2025, 0.2% of prepaid card complaints were pending with the consumer and 0.4% were pending with the CFPB.

Companies responded to 92% of prepaid card complaints sent to them for review and response. Companies closed 61% of complaints with an explanation, 26% with monetary relief, and 5% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 1% of complaints were pending review by the company. Companies did not provide a timely response for 7% of complaints. In 90% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting prepaid card complaints, consumers specify the type of product. In 2024, *General-purpose prepaid cards* were the most complained about prepaid product type (Figure 53).

**FIGURE 53:** PREPAID COMPLAINTS BY TYPE OF CARD AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Trouble using the card* (Figure 54).

**FIGURE 54:** PREPAID CARD COMPLAINTS BY ISSUES AND OUTCOMES



Prepaid card complaint volume increased in 2024. Complaints about gift cards increased 95%, while complaints about general-purpose prepaid cards complaints increased 56% from the prior two year's monthly average (Figure 55).

**FIGURE 55:** MONTHLY COMPLAINT VOLUME FOR TYPE(S) OF PREPAID CARD COMPLAINTS



In 2024, the monthly average for the top issue, *Trouble using the card*, increased 112% compared to the monthly average for the prior two years (Figure 56).

**FIGURE 56:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF PREPAID CARD COMPLAINTS



Consumers complained about challenges activating cards, successfully making purchases, or withdrawing or transferring funds. They reported difficulty reaching representatives to resolve issues and said they were provided minimal information about the cause of frozen access to cards. Consumers reported problems with identity verification to reactivate or use their cards, including sending verification documents multiple times.

Companies typically said they implemented procedures to ensure the safety and security of funds, resulting in denied transactions and account freezes. Companies often required verification documents from consumers before releasing funds and explained how consumers could provide them. Once verification was completed companies typically issued new prepaid cards to consumers as needed.

Consumers reported that third parties fraudulently used their prepaid cards to conduct unauthorized transactions. Some reported that newly purchased gift cards had low or zero

balances the first time they tried to use them. Consumers mentioned frustration when trying to reach customer service to dispute transactions and were dissatisfied with company claim denials. Consumers expressed frustration with freezes placed on cards following disputed transactions or challenges activating new cards issued due to fraud.

Companies often denied disputes when transactions were within the geographic area of normal usage or believed consumers allowed third parties to access their cards. Companies also explained package tampering at purchase locations resulted in reduced or no funds on new cards and issued replacement cards or sent consumers a check for the funds. In some complaints, companies approved the consumer disputes, credited accounts for disputed amounts and issued new cards.

Consumers reported frustration trying to resolve prepaid card issues. They had difficulty reaching customer service representatives due to long hold times, phone disconnections, recordings about high call volume, and no follow-up communication. Consumers reported receiving misleading or conflicting information from representatives about card reactivation status or billing disputes. Consumers described frustration given the potential consequences of not being able to access the funds for necessities, such as food, rent, and utilities.

Companies addressed customer service dissatisfaction by replying with apologetic language about negative experiences. In response to some complaints, companies provided times when call volume was typically lower. Companies also reported experiencing challenges reaching consumers during contact efforts.

Some consumers also complained that they were unable to access their government benefit funds often resulting in serious financial hardship since they relied on these funds for basic necessities, such as food, rent, and utilities. Consumers reported difficulty unfreezing or activating their cards after providing identity verification to both the prepaid card company and the issuing government agency. Others reported their claims were denied for alleged unauthorized transactions.

Companies typically explained that freezes or blocks were placed on cards due to suspected fraudulent behavior and provided steps for consumers to unfreeze their cards. In some complaints, companies apologized for customer service issues and unfroze accounts or issued credits for the disputed unauthorized transactions. In other complaints, the company directed the consumer to the issuing government agency.

Compared to consumers who provided their age as a whole, older consumers submitted a greater percentage of prepaid card complaints about government benefit cards (Figure 57). Older consumers often complained about their government benefit cards being locked. Companies typically responded and requested documents verifying consumers' identities.

**FIGURE 57:** PROPORTION OF PREPAID CARD COMPLAINTS FOR OLDER CONSUMERS BY SUB-PRODUCT



## 4.11 Debt or credit management

The CFPB received approximately 4,400 debt or credit management complaints in 2024.[35] The CFPB sent approximately 2,600 (or 58%) of these complaints to companies for review and response, referred 33% to other regulatory agencies, and found 7% to be not actionable. As of March 3, 2025, 0.5% of debt or credit management complaints were pending with the consumer and 1% were pending with the CFPB.

Companies responded to 85% of debt or credit management complaints sent to them for review and response. Companies closed 69% of complaints with an explanation, 4% with monetary relief, and 10% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 3% of complaints were pending review by the company. Companies did not provide a timely response for 13% of complaints. In 79% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting debt or credit management complaints, consumers specify the type of product. In 2024, *Debt settlement* was the most complained about debt or credit management product type (Figure 58).

---

[35] The CFPB introduced *Debt or credit management* as a new product category in August 2023; however, some of the sub-products comprising this category (e.g., *Credit repair services*) were previously available on the complaint form. *See* Consumer Fin. Prot. Bureau, *Consumer complaint form product and issue options* (Aug. 2023), https://files.consumerfinance.gov/f/documents/cfpb_consumer_complaint_form_product_issue_options_August_2023_FINAL.pdf.

**FIGURE 58:** DEBT OR CREDIT MANAGEMENT COMPLAINTS BY TYPE OF SERVICE AND OUTCOMES



Consumers identify the issue that best describes the problem they experienced. The most common issue was *Didn't provide services promised* (Figure 59).

**FIGURE 59:** DEBT OR CREDIT MANAGEMENT COMPLAINTS BY ISSUES AND OUTCOMES



Debt or credit management complaints volume increased in 2024 (Figure 60).

**FIGURE 60:** MONTHLY COMPLAINT VOLUME FOR TYPE(S) OF DEBT OR CREDIT MANAGEMENT COMPLAINTS



In 2024, the monthly average for the top issue, *Didn't provide services promised*, decreased 24% compared to the monthly average for the prior two years (Figure 61).

**FIGURE 61:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF DEBT OR CREDIT MANAGEMENT COMPLAINTS



Consumers submit debt or credit management complaints about a wide range of products that purport to help them with credit reports and scores. These include debt or credit management companies, websites that provide free credit scores, credit monitoring services, debt settlement services, and new products that are marketed towards improving consumers' credit scores by crediting them for making regular and on-time utility and other payments.

In some complaints, consumers reported that debt settlement companies charged upfront fees before performing any services. Other consumers reported that companies charged unexpected fees. In response to these complaints, companies typically referred consumers to their contracts to cite their fee structures in exchange for services. In some cases, companies offered monetary relief, but in others did not.

# 4.12  Payday loan

The CFPB received approximately 2,400 payday loan complaints in 2024. The CFPB sent approximately 1,400 (or 60%) of these complaints to companies for review and response, referred 32% to other regulatory agencies, and found 6% to be not actionable. As of March 3, 2025, 0.6% of payday loan complaints were pending with the consumer and 1.0% were pending with the CFPB.

Companies responded to 93% of payday loan complaints sent to them for review and response. Companies closed 83% of complaints with an explanation, 4% with monetary relief, and 2% with non-monetary relief. Companies provided an administrative response for 4% of complaints. As of March 3, 2025, 2% of complaints were pending review by the company. Companies did not provide a timely response for 5% of complaints. In 79% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting payday loan complaints, consumers can specify whether they obtained the loan online or at a store (in person). In 2024, consumers complained about payday loans obtained online more than payday loans obtained at a store (Figure 62).

**FIGURE 62:** PAYDAY LOAN COMPLAINTS BY LOAN SOURCE AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Charged fees or interest you didn't expect* (Figure 63).

**FIGURE 63:** PAYDAY LOAN COMPLAINTS BY ISSUES AND OUTCOMES



Payday loan complaint volume increased in 24% from the prior two year's monthly average in 2024 (Figure 64).

**FIGURE 64:** MONTHLY COMPLAINT VOLUME FOR PAYDAY LOAN COMPLAINTS



In 2024, the monthly average for the top issue, *Charged fees or interest you didn't expect*, increased 41% compared to the monthly average for the prior two years (Figure 65).

**FIGURE 65:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF PAYDAY LOAN COMPLAINTS



In their complaints, consumers often stated that they did not realize until after taking the loan how high the interest rate was, or that they were being charged fees or interest they did not expect. In some of these complaints, borrowers sometimes stated that none or very little of their loan payments had gone toward the principal. Consumers sometimes also stated that they felt the company's practices were predatory or violated state laws.

In their responses, companies often emphasized that all relevant information had been disclosed as required when the loan was taken. In addition, companies generally explained how interest was calculated and how payments were applied, and maintained that the payment had been applied correctly. Some companies also stated that they were owned by sovereign tribes and as such were not subject to regulation by states.

Consumers also submitted complaints stating that they had received a loan they did not apply for. In some instances, companies responded by asking the consumer to submit further

information to pursue an identity theft claim. In other instances, the companies stated that the loan was valid and would not be canceled.

# 4.13  Title loan

The CFPB received approximately 860 title loan complaints in 2024. The CFPB sent approximately 680 (or 79%) of these complaints to companies for review and response, referred 16% to other regulatory agencies, and found 4% to be not actionable. As of March 3, 2025, 0.6% of title loan complaints were pending with the consumer and 0.6% were pending with the CFPB.

Companies responded to 96% of title loan complaints sent to them for review and response. Companies closed 91% of complaints with an explanation, 0.7% with monetary relief, and 4% with non-monetary relief. Companies provided an administrative response for 0.3% of complaints. As of March 3, 2025, 1% of complaints were pending review by the company. Companies did not provide a timely response for 3% of complaints. In 85% of these complaints, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting title loan complaints, consumers identify the issue that best describes the problem they experienced. The most common issue was *Charged fees or interest you didn't expect* (Figure 66).

**FIGURE 66:** TITLE LOAN COMPLAINTS BY ISSUES AND OUTCOMES



Title loan complaint volume increased in 24% from the prior two year's monthly average in 2024 (Figure 67).

**FIGURE 67:** MONTHLY COMPLAINT VOLUME FOR TITLE LOAN COMPLAINTS



In 2024, the monthly average for the top issue, *Charged fees or interest you didn't expect*, increased 66% compared to the monthly average for the prior two years (Figure 68).

**FIGURE 68:** MONTHLY COMPLAINT VOLUME FOR ISSUES OF TITLE LOAN COMPLAINTS



Similar to complaints about personal loans and payday loans, consumers complaining about title loans mentioned being charged fees or interest they did not expect. Consumers expressed confusion that they still owed large balances despite having made many payments. In response, companies often reiterated the terms of the loan and explained that the amount due was correctly calculated. In other instances, companies explained that consumers had refinanced their original loan, changing the terms of the loan and extending the repayment period.

Consumers also complained about vehicles being repossessed. In response, companies sometimes stated that consumers had not made the agreed-upon payments on time. In other cases, companies sometimes explained that the repossession had been the result of not meeting other terms of the loan agreement, such as failing to provide the vehicle title to the lender.

# 4.14 Deposit advance

The CFPB received approximately 590 deposit advance complaints in 2024.[36] The CFPB sent approximately 250 (or 43%) of these complaints to companies for review and response, referred 46% to other regulatory agencies, and found 10% to be not actionable. As of March 3, 2025, 0.2% of deposit advance complaints were pending with the consumer and 2% were pending with the CFPB.

Companies responded to 96% of deposit advance complaints sent to them for review and response. Companies closed 87% of complaints with an explanation, 6% with monetary relief, and 1% with non-monetary relief. Companies provided an administrative response for 1% of complaints. As of March 3, 2025, 0.8% of complaints were pending review by the company. Companies did not provide a timely response for 4% of complaints. In 84% of deposit advance complaints with closure responses in 2024, consumers reported that they attempted to resolve their issue with the company before submitting a complaint to the CFPB.

When submitting deposit advance complaints, consumers specify the type of product.  In 2024, *Other advances of future income* was the most complained about deposit advance product type (Figure 69).

**FIGURE 69:** DEPOSIT ADVANCE COMPLAINTS BY SUB-PRODUCT AND OUTCOMES



Consumers also identify the issue that best describes the problem they experienced. The most common issue was *Issues with repayment* (Figure 70).

---

[36] The CFPB introduced *Deposit advance* as a new product category in August 2023; however, some of the sub-products comprising this category (e.g., *Tax refund anticipation loan or check*) were previously available on the complaint form. *See* Consumer Fin. Prot. Bureau, *Consumer complaint form product and issue options* (Aug. 2023), https://files.consumerfinance.gov/f/documents/cfpb_consumer_complaint_form_product_issue_options_August_2023_FINAL.pdf.

**FIGURE 70:** DEPOSIT ADVANCE COMPLAINTS BY ISSUES AND OUTCOMES



The most common deposit advance complaints submitted by consumers involve issues with repayment. In these complaints, consumers often reported being charged unexpected fees. In their responses, companies typically agreed to cancel the user's account and refund the fees as a "courtesy." In other complaints, consumers stated that they continued to be charged for the service after cancelling it. In response, companies would sometimes agree to refund the fees. Finally, consumers sometimes complained about very high interest rates on their deposit advances. Companies would sometimes respond that, as wholly owned tribal entities, they were permitted to charge such rates.

# 5. Conclusion

When Congress created the CFPB, it designated "collecting, investigating, and responding to consumer complaints" as one of the CFPB's primary functions. In 2024, the CFPB sent more than 2.8 million complaints to more than 3,600 companies for review and response. Complaints provide consumers the ability to bring their issues to the attention of companies. In turn, consumers—and the CFPB—expect complaint responses that are complete, accurate, and timely. Companies' responses to the variety of issues consumers raise in their complaints, provide the CFPB with important information about areas of potential consumer harm.

The CFPB uses this information to monitor risk in financial markets, assess risk at companies, and prioritize agency action. The CFPB makes complaint data and analyses readily available to CFPB staff to support their supervisory, enforcement, and market monitoring activities. Additionally, the CFPB makes complaint data available to other federal, state, and local agencies, as well as the public.

Companies can similarly use complaint information to gain important knowledge about their business, competitors, and industry more broadly. Consumer complaints can be an indicator of potential risk management weaknesses or other deficiencies, such as violations of laws or regulations. Complaints can reveal a weakness in a particular product, service, function, department, or vendor. Complaints can also identify opportunities to enhance consumers' experience and understanding of consumer financial products and services.

The CFPB will continue monitoring complaints, and how companies respond, to meet its statutory obligations and to ensure that consumers remain at the center of its policymaking efforts.

# Appendix

**TABLE 1:** TOTAL COMPLAINTS BY CONSUMER'S LOCATION AND PRODUCT IN 2024

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 707 | 1,079 | 52,348 | 4,073 | 85 | 7 | 245 | 334 | 46 | 215 | 116 | 169 | 22 | 314 | 59,760 |
| Alaska | 95 | 103 | 1,058 | 200 | 10 | | 46 | 51 | 7 | 8 | 4 | 34 | | 15 | 1,631 |
| American Samoa | | 11 | 10 | | | | | 1 | | 1 | | | | | 23 |
| Arizona | 1,505 | 2,058 | 39,587 | 4,659 | 111 | 17 | 563 | 563 | 38 | 208 | 177 | 371 | 31 | 446 | 50,342 |
| Arkansas | 413 | 437 | 13,360 | 1,287 | 31 | 7 | 136 | 154 | 16 | 58 | 92 | 105 | 5 | 131 | 16,234 |
| California | 9,965 | 11,227 | 263,457 | 18,753 | 448 | 56 | 3,659 | 3,283 | 242 | 926 | 1,986 | 1,737 | 76 | 1,803 | 317,668 |
| Colorado | 1,149 | 1,161 | 12,880 | 1,842 | 77 | 7 | 467 | 552 | 27 | 129 | 197 | 351 | 8 | 229 | 19,082 |
| Connecticut | 832 | 1,078 | 20,623 | 1,437 | 52 | 5 | 252 | 279 | 14 | 71 | 111 | 216 | 3 | 181 | 25,161 |
| Delaware | 307 | 492 | 13,595 | 947 | 16 | 4 | 136 | 165 | 12 | 58 | 42 | 69 | 4 | 135 | 15,983 |
| District of Columbia | 426 | 533 | 9,362 | 639 | 14 | 5 | 154 | 164 | 6 | 49 | 63 | 144 | | 88 | 11,648 |
| Federated Micronesia | | | 1 | | | | | | | | | | | | 1 |
| Florida | 6,076 | 8,995 | 404,606 | 23,626 | 423 | 53 | 2,250 | 2,691 | 174 | 954 | 507 | 1,073 | 72 | 2,004 | 453,569 |
| Georgia | 3,284 | 4,326 | 208,147 | 16,201 | 261 | 31 | 1,114 | 1,334 | 111 | 571 | 288 | 801 | 87 | 1,452 | 238,028 |
| Guam | 14 | 6 | 53 | 9 | | | 4 | 5 | | | | 5 | | 4 | 100 |
| Hawaii | 159 | 224 | 3,753 | 321 | 15 | 2 | 100 | 116 | 6 | 23 | 27 | 60 | | 29 | 4,837 |
| Idaho | 186 | 288 | 1,980 | 418 | 9 | 4 | 96 | 96 | 10 | 34 | 20 | 53 | 3 | 49 | 3,247 |

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illinois | 2,686 | 4,627 | 122,103 | 8,728 | 150 | 21 | 889 | 969 | 68 | 299 | 317 | 725 | 20 | 759 | 142,376 |
| Indiana | 811 | 1,205 | 36,956 | 3,018 | 85 | 7 | 311 | 365 | 54 | 164 | 134 | 287 | 12 | 317 | 43,734 |
| Iowa | 341 | 338 | 5,040 | 659 | 17 | 4 | 143 | 99 | 21 | 35 | 80 | 119 | 2 | 69 | 6,968 |
| Kansas | 299 | 401 | 5,112 | 823 | 20 | 5 | 130 | 118 | 23 | 45 | 49 | 100 | 10 | 83 | 7,220 |
| Kentucky | 518 | 471 | 9,767 | 1,296 | 52 | 3 | 165 | 181 | 36 | 87 | 93 | 124 | 8 | 109 | 12,913 |
| Louisiana | 684 | 1,254 | 58,005 | 4,154 | 69 | 10 | 267 | 426 | 57 | 213 | 92 | 155 | 11 | 409 | 65,813 |
| Maine | 115 | 195 | 1,256 | 233 | 7 | 2 | 52 | 84 | 4 | 18 | 30 | 69 | 1 | 20 | 2,088 |
| Maryland | 1,749 | 2,191 | 71,134 | 4,658 | 119 | 20 | 551 | 977 | 80 | 274 | 185 | 503 | 18 | 560 | 83,033 |
| Massachusetts | 1,310 | 1,802 | 36,656 | 2,340 | 62 | 10 | 531 | 454 | 51 | 106 | 231 | 591 | 3 | 250 | 44,402 |
| Michigan | 1,652 | 1,919 | 62,067 | 5,389 | 130 | 14 | 595 | 649 | 59 | 234 | 222 | 477 | 17 | 629 | 74,066 |
| Minnesota | 861 | 962 | 11,972 | 1,347 | 51 | 5 | 321 | 310 | 35 | 118 | 92 | 295 | 6 | 197 | 16,573 |
| Mississippi | 403 | 631 | 29,433 | 2,088 | 60 | 5 | 134 | 165 | 31 | 131 | 98 | 120 | 18 | 254 | 33,572 |
| Missouri | 724 | 1,145 | 27,692 | 3,124 | 57 | 13 | 321 | 317 | 69 | 157 | 142 | 275 | 17 | 318 | 34,381 |
| Montana | 109 | 125 | 644 | 221 | 13 | | 55 | 62 | 4 | 13 | 21 | 51 | 2 | 38 | 1,358 |
| Nebraska | 211 | 406 | 5,032 | 757 | 24 | | 104 | 96 | 10 | 22 | 43 | 63 | 1 | 41 | 6,812 |
| Nevada | 1,018 | 1,305 | 38,662 | 2,851 | 52 | 9 | 367 | 270 | 46 | 133 | 163 | 156 | 9 | 255 | 45,300 |
| New Hampshire | 152 | 211 | 2,630 | 280 | 19 | 1 | 76 | 69 | 13 | 19 | 27 | 103 | 2 | 47 | 3,649 |
| New Jersey | 2,418 | 3,052 | 100,602 | 5,340 | 145 | 27 | 872 | 920 | 71 | 291 | 323 | 490 | 18 | 569 | 115,158 |
| New Mexico | 294 | 343 | 4,485 | 595 | 31 | 4 | 116 | 127 | 14 | 54 | 24 | 56 | 11 | 77 | 6,235 |
| New York | 5,446 | 6,371 | 179,902 | 9,853 | 256 | 23 | 1,813 | 1,461 | 39 | 472 | 643 | 1,020 | 16 | 955 | 208,305 |
| North Carolina | 2,060 | 2,599 | 85,999 | 6,430 | 163 | 19 | 711 | 787 | 72 | 321 | 225 | 525 | 24 | 607 | 100,555 |

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Dakota | 77 | 95 | 1,539 | 240 | 6 | 2 | 21 | 22 | 3 | 10 | 10 | 29 | 1 | 18 | 2,073 |
| Northern Mariana Islands | 2 | 2 | 6 | 4 | | | 1 | | | | | 2 | | | 17 |
| Ohio | 1,780 | 2,188 | 55,254 | 5,123 | 120 | 19 | 695 | 599 | 118 | 327 | 272 | 638 | 29 | 602 | 67,770 |
| Oklahoma | 427 | 524 | 10,079 | 1,515 | 51 | 6 | 191 | 238 | 23 | 96 | 87 | 131 | 7 | 158 | 13,537 |
| Oregon | 635 | 654 | 5,372 | 978 | 32 | 7 | 274 | 270 | 21 | 71 | 118 | 266 | 4 | 110 | 8,822 |
| Palau | | | 2 | | | | | | | | | | | | 2 |
| Pennsylvania | 2,538 | 3,950 | 123,700 | 8,467 | 147 | 25 | 889 | 1,065 | 69 | 301 | 244 | 909 | 24 | 639 | 142,986 |
| Puerto Rico | 131 | 223 | 11,927 | 241 | 6 | 2 | 42 | 81 | 2 | 12 | 8 | 26 | 2 | 37 | 12,741 |
| Rhode Island | 195 | 190 | 5,685 | 377 | 18 | 3 | 70 | 69 | 6 | 16 | 36 | 58 | 2 | 41 | 6,766 |
| South Carolina | 985 | 1,125 | 51,996 | 4,375 | 104 | 9 | 406 | 437 | 38 | 184 | 111 | 259 | 27 | 404 | 60,466 |
| South Dakota | 83 | 93 | 668 | 188 | 6 | | 30 | 35 | 9 | 14 | 20 | 44 | 2 | 28 | 1,221 |
| Tennessee | 1,044 | 1,329 | 39,135 | 3,947 | 80 | 12 | 383 | 483 | 55 | 244 | 165 | 257 | 36 | 410 | 47,581 |
| Texas | 5,672 | 11,713 | 361,322 | 32,666 | 364 | 49 | 2,227 | 2,103 | 247 | 970 | 657 | 1,133 | 129 | 1,825 | 421,108 |
| U.S. - Armed Forces Americas | | | 29 | 5 | | | 1 | 1 | | | | | | | 36 |
| U.S. - Armed Forces Europe | 15 | 21 | 268 | 36 | | | 11 | 5 | 1 | 9 | | 5 | | 7 | 378 |
| U.S. - Armed Forces Middle East | | | 20 | | | | | | | | | | | | 20 |
| U.S. - Armed Forces Pacific | 9 | 17 | 171 | 29 | | | 9 | 5 | 1 | 1 | 5 | 5 | | 3 | 255 |
| US Virgin Islands | 10 | 8 | 1,259 | 44 | | | 6 | 4 | | | 2 | 6 | | 1 | 1,340 |
| United States Minor Outlying Islands | 6 | 6 | 224 | 55 | 2 | | 9 | 5 | 1 | | 1 | 1 | | 6 | 316 |
| Unspecified | 846 | 600 | 5,007 | 610 | 62 | 14 | 2,481 | 83 | 71 | 94 | 92 | 64 | 1 | 54 | 10,083 |

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | 353 | 448 | 5,548 | 804 | 26 | 3 | 184 | 166 | 19 | 58 | 69 | 114 | 6 | 95 | 7,893 |
| Vermont | 63 | 106 | 384 | 80 | 3 | | 20 | 46 | | 8 | 9 | 33 | | 16 | 769 |
| Virginia | 1,913 | 2,584 | 50,307 | 5,074 | 99 | 16 | 747 | 795 | 48 | 289 | 230 | 537 | 30 | 533 | 63,229 |
| Washington | 1,237 | 1,360 | 14,740 | 2,037 | 56 | 14 | 583 | 551 | 46 | 153 | 175 | 375 | 13 | 173 | 21,522 |
| West Virginia | 209 | 326 | 2,426 | 536 | 13 | | 81 | 64 | 5 | 24 | 53 | 60 | | 59 | 3,859 |
| Wisconsin | 597 | 945 | 15,745 | 1,652 | 54 | 9 | 279 | 247 | 51 | 102 | 92 | 228 | 11 | 212 | 20,226 |
| Wyoming | 85 | 57 | 607 | 135 | 2 | | 60 | 33 | 5 | 13 | 9 | 22 | | 14 | 1,043 |
| Grand Total[37] | 67,891 | 92,135 | 2,703,389 | 207,814 | 4,385 | 590 | 27,446 | 26,101 | 2,405 | 9,507 | 9,329 | 16,694 | 861 | 18,888 | 3,187,884 |

---

[37] Total column includes approximately 400 complaints where no specific consumer financial product was selected by consumers.

**TABLE 2:**   TOTAL MONETARY RELIEF BY CONSUMER'S LOCATION AND PRODUCT IN 2024[38]

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | $209,650 | $64,684 | $34,577 | $9,783 | $1,760 | $13 | $8,526 | $7,548 | | $20,746 | $6,079 | | | $7,888 | $371,254 |
| Alaska | $82,561 | $38,729 | $267 | $252 | | | $1,303 | | | | | | | | $123,111 |
| American Samoa | | $3,748 | | | | | | | | | | | | | $3,748 |
| Arizona | $1,141,719 | $318,861 | $12,361 | $46,582 | $4,641 | | $136,208 | $17,222 | | $2,615 | $25,657 | $11,088 | | $22,661 | $1,739,615 |
| Arkansas | $420,699 | $79,682 | $4,109 | $862 | | | $2,214 | $1,459 | | $697 | $17,683 | | | | $527,405 |
| California | $14,995,272 | $2,568,075 | $91,095 | $79,317 | $107,361 | $75 | $1,583,471 | $269,832 | $1,051 | $35,775 | $1,058,140 | $297,235 | $939 | $113,940 | $21,201,578 |
| Colorado | $1,273,693 | $381,056 | $23,680 | $5,668 | $608 | | $130,929 | $6,020 | | $1,597 | $17,165 | $3,748 | | $14,476 | $1,858,639 |
| Connecticut | $555,711 | $323,586 | $9,024 | $2,091 | | | $97,993 | $13,404 | | $606 | $16,052 | $42,620 | | $3,445 | $1,064,531 |
| Delaware | $148,254 | $54,975 | $633 | $9,157 | | | $4,289 | $1,851 | | $18 | $599 | | | $8,117 | $227,893 |
| District of Columbia | $202,831 | $96,368 | $30,436 | $68 | $2,606 | | $18,652 | $27,332 | | $1,318 | $974 | $2,441 | | | $383,026 |
| Florida | $4,537,166 | $1,612,480 | $71,573 | $78,222 | $17,334 | | $1,358,398 | $399,350 | $586 | $34,914 | $63,997 | $4,994 | $1,000 | $48,071 | $8,228,085 |
| Georgia | $2,395,442 | $482,016 | $57,039 | $29,961 | $11,070 | | $143,151 | $92,777 | $1,219 | $17,271 | $82,775 | $27,685 | $378 | $106,977 | $3,447,761 |
| Guam | $5,675 | | | | | | | | | | | | | | $5,675 |
| Hawaii | $260,697 | $50,475 | $259 | $2,807 | | | $6,737 | $30 | | $291 | $24,965 | | | $3,018 | $349,280 |
| Idaho | $771,701 | $47,985 | | $2,441 | | | $4,323 | | | | $250 | | | $563 | $827,263 |
| Illinois | $3,367,478 | $427,773 | $48,369 | $38,872 | $2,589 | $6 | $215,458 | $31,056 | $3,362 | $3,175 | $26,520 | $2,912 | | $23,683 | $4,191,253 |

[38] The amounts reported in this table are company reported and have not been verified by the CFPB. When a company closes a complaint with "Closed with monetary relief," the system prompts them to provide the number of dollars being provided back to the consumer. Monetary relief is the amount of relief companies reported providing back to consumers.

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | $437,095 | $138,923 | $1,296 | $13,456 | $6,618 | | $22,094 | $9,117 | $15 | $4,287 | $7,584 | | | $3,319 | $643,804 |
| Iowa | $38,760 | $52,966 | $61,308 | $2,160 | $1,500 | | $19,801 | | | | $801 | $34,413 | | $808 | $212,517 |
| Kansas | $195,880 | $27,412 | $19,718 | $9,618 | $251 | | $11,340 | | | $30 | $16,006 | $18,268 | | $13,409 | $311,933 |
| Kentucky | $292,282 | $56,265 | $13,980 | $1,059 | | | $13,620 | $2,172 | $40 | $21,080 | $38,246 | $1,466 | $520 | $25,726 | $466,457 |
| Louisiana | $165,668 | $195,651 | $37,010 | $2,248 | $23 | | $570 | $19,411 | $54 | $14,998 | $4,332 | | | $59,904 | $499,869 |
| Maine | $142,231 | $190,323 | $3,459 | $18,164 | | | $9,054 | $5,422 | | $8,798 | $4,320 | $213 | | $22,078 | $404,062 |
| Maryland | $721,156 | $362,754 | $89,579 | $16,006 | $7,101 | | $204,866 | $21,192 | $3,393 | $31,515 | $173,605 | $25,421 | | $66,267 | $1,722,857 |
| Massachusetts | $1,161,531 | $538,689 | $3,080 | $7,713 | $299 | | $223,987 | $1,629 | $58 | $11,795 | $26,447 | $43,628 | | $2,615 | $2,021,470 |
| Michigan | $778,429 | $315,068 | $31,676 | $17,155 | $1,364 | | $156,101 | $63,931 | $2 | $8,814 | $12,900 | $3,198 | | $34,876 | $1,423,524 |
| Minnesota | $160,532 | $295,950 | $45 | $1,635 | | | $12,358 | $2,929 | $711 | $24,431 | $9,979 | $4,096 | | $8,653 | $521,321 |
| Mississippi | $110,278 | $21,739 | $25,991 | $25,092 | $1,208 | | $6,604 | $9,584 | | $653 | $3,918 | | | $38,112 | $243,179 |
| Missouri | $393,132 | $131,620 | $3,247 | $47,676 | $4,605 | $930 | $14,858 | $1,144 | $393 | $291 | $85,407 | $13,199 | | $32,264 | $728,764 |
| Montana | $1,846 | $20,124 | $50 | $100 | | | $20,763 | $317 | | $164 | $11,166 | | | $565 | $55,096 |
| Nebraska | $109,157 | $182,002 | $550 | | $2,311 | | $661 | $1,315 | | $70 | $3,370 | $4,255 | | $2,882 | $306,573 |
| Nevada | $516,355 | $208,815 | $30,755 | $11,270 | $1,410 | | $22,764 | $13,226 | $1,868 | $4,568 | $24,885 | $586 | | $5,111 | $841,613 |
| New Hampshire | $411,591 | $59,596 | $78 | $3,348 | $278 | | $6,067 | $159 | $740 | $807 | $3,977 | | | $1,170 | $487,811 |
| New Jersey | $2,145,226 | $415,064 | $62,330 | $14,487 | $3,663 | $239 | $482,621 | $41,457 | $17 | $16,459 | $25,380 | $25,075 | | $32,132 | $3,264,151 |
| New Mexico | $242,673 | $65,537 | $2,807 | $4,075 | | | $33,264 | $3,962 | $8 | $14,124 | $190 | $9 | | $5 | $366,655 |
| New York | $5,032,491 | $1,477,403 | $51,691 | $84,749 | $2,104 | | $1,557,454 | $23,019 | $137 | $73,923 | $103,067 | $3,180 | | $157,635 | $8,566,854 |
| North Carolina | $790,958 | $269,452 | $66,244 | $38,794 | $1,560 | | $561,779 | $12,701 | $229 | $35,403 | $36,836 | $361 | | $15,629 | $1,829,948 |
| North Dakota | $12,325 | $2,717 | $58 | $30 | | | $4,847 | $32 | | $3,525 | $200 | | | | $23,735 |

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Northern Mariana Islands | | $382 | | | | | | | | | | | | | $382 |
| Ohio | $1,493,736 | $342,338 | $23,185 | $15,252 | $5,623 | $777 | $388,413 | $82,664 | $8 | $26,970 | $19,252 | $17,296 | | $115,443 | $2,530,958 |
| Oklahoma | $68,354 | $22,981 | $26,140 | $35,607 | | $619 | $55,734 | $16,583 | | $842 | $3,575 | $921 | | $9,198 | $240,554 |
| Oregon | $515,515 | $134,728 | $745 | $4,585 | $21,000 | | $10,548 | $3,317 | | $7,991 | $5,423 | $108 | | $6,250 | $710,211 |
| Pennsylvania | $829,020 | $432,420 | $92,360 | $73,741 | $1,023 | $55 | $2,610,681 | $349,412 | $191 | $2,388 | $9,954 | $8,793 | | $12,002 | $4,422,039 |
| Puerto Rico | $7,077 | $6,160 | $12,686 | $2,195 | | | $1,071 | $2,397 | | | $5 | | | $615 | $32,206 |
| Rhode Island | $87,534 | $58,767 | | $3,002 | | | $7,677 | $4,058 | | $75 | $1,920 | | | $775 | $163,808 |
| South Carolina | $770,777 | $132,398 | $11,827 | $74,194 | $2,550 | | $104,522 | $10,719 | | $12,896 | $23,691 | | | $49,619 | $1,193,193 |
| South Dakota | $1,211 | $23,342 | $100 | | | | $13 | | | | $9,231 | | | | $33,897 |
| Tennessee | $779,888 | $237,939 | $30,735 | $15,939 | $2,500 | $1,061 | $44,470 | $52,540 | $312 | $362 | $10,717 | $12,281 | $2,887 | $10,380 | $1,202,011 |
| Texas | $3,040,486 | $1,067,600 | $178,975 | $64,116 | $18,839 | $37 | $955,755 | $215,120 | $504 | $63,269 | $70,727 | $31,292 | | $64,610 | $5,771,330 |
| U.S. - Armed Forces Americas | | | | | | | | | | | | | | | |
| U.S. - Armed Forces Europe | $624 | $3,582 | $872 | $19,298 | | | | | | | | | | | $24,376 |
| U.S. - Armed Forces Middle East | | | | | | | | | | | | | | | |
| U.S.- Armed Forces Pacific | $738,008 | $2,484 | | | | | | | | | | $550 | | | $741,043 |
| United States Minor Outlying Islands | $10,000 | $99 | | | | | $5 | | | | | | | | $10,104 |
| Unspecified | $552,107 | $48,406 | $1,950 | | | | $583,567 | | | $109 | $2,193 | $2,200 | | | $1,190,531 |
| US Virgin Islands | $5,559 | $3,647 | | | | | | | | | | $3,568 | | | $12,774 |

| Consumer's Location | Checking or savings | Credit card | Credit or consumer reporting | Debt collection | Debt or credit management | Deposit advance | Money transfer or service, virtual currency | Mortgage | Payday loan | Personal loan | Prepaid card | Student loan | Title loan | Vehicle loan or lease | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | $301,440 | $92,212 | $6,654 | $807 | $57 | | $30,932 | $9,274 | $68 | $4,273 | $5,018 | $220 | | $452 | $451,408 |
| Vermont | $18,453 | $24,051 | $25 | | | | $787 | | | $15 | $500 | | | $1,100 | $44,931 |
| Virginia | $1,443,197 | $301,504 | $23,582 | $4,752 | | | $657,330 | $16,489 | $115 | $64,846 | $22,620 | $10,919 | | $47,260 | $2,592,615 |
| Washington | $1,096,605 | $519,867 | $27,706 | $115,131 | $6,914 | $195 | $126,202 | $13,269 | | $5,412 | $26,271 | $11,710 | | $2,410 | $1,951,692 |
| West Virginia | $184,401 | $46,546 | $10,944 | | $19,307 | | $906 | | | $76 | $269 | $23,600 | | $23,982 | $310,031 |
| Wisconsin | $159,333 | $112,064 | $3,862 | $9,020 | $3,860 | $34 | $40,999 | $13,797 | $317 | $2,160 | $4,681 | $17,699 | | $1,829 | $369,656 |
| Wyoming | $2,982 | $24,266 | $36 | | | | $111 | | | | | | | | $27,395 |
| **Grand Total** | **$56,334,453** | **$15,216,351** | **$1,340,758** | **$1,062,556** | **$263,936** | **$4,041** | **$12,716,850** | **$1,890,241** | **$15,399** | **$586,445** | **$2,150,076** | **$710,699** | **$5,725** | **$1,221,924** | **$93,519,454** |