ELIZABETH B. WYDRA (BAR NO. 218200)
BRIANNE J. GOROD
MIRIAM BECKER-COHEN
JOSHUA D. BLECHER-COHEN
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RISE ECONOMY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br> Defendants. | Case No. 5:25-cv-10481-EJD <br><br> **BRIEF OF CURRENT AND FORMER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: March 5, 2026 <br> Time: 9:00 A.M. <br> Place: San Jose <br> Judge: Honorable Edward J. Davila |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF *AMICI CURIAE* ......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

ARGUMENT .......................................................................................................................... 1

    I.     In the Wake of the 2008 Financial Crisis, Congress Designed the Bureau's Funding Structure to Ensure Stable and Continuous Support for Its Important Operations ................................................................................................................ 3

    II.    Acting Director Vought's Novel Interpretation of "Combined Earnings," Which Would Permit Repeated Interruptions to Bureau Funding, Contravenes Congress's Statutory Plan .................................................................................... 6

CONCLUSION ...................................................................................................................... 10

APPENDIX ............................................................................................................................. 1A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) .................................................................................................. 6

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020) .................................................................................................. 8

STATUTES AND LEGISLATIVE MATERIALS

12 U.S.C. § 5497 ............................................................................................................ 2, 5, 9

12 U.S.C. § 5511 ............................................................................................................ 3

12 U.S.C. § 5512 ............................................................................................................ 3

12 U.S.C. § 5513 ............................................................................................................ 3

12 U.S.C. § 5514 ............................................................................................................ 3

12 U.S.C. § 5515 ............................................................................................................ 3

12 U.S.C. § 5516 ............................................................................................................ 3

12 U.S.C. § 5517 ............................................................................................................ 3

12 U.S.C. § 5518 ............................................................................................................ 3

12 U.S.C. § 5531 ............................................................................................................ 3

12 U.S.C. § 5532 ............................................................................................................ 3

12 U.S.C. § 5533 ............................................................................................................ 3

12 U.S.C. § 5534 ............................................................................................................ 3

12 U.S.C. § 5535 ............................................................................................................ 3

12 U.S.C. § 5536 ............................................................................................................ 3

12 U.S.C. § 5537 ............................................................................................................ 3

12 U.S.C. § 5538 ............................................................................................................ 3

**TABLE OF AUTHORITIES – cont'd**

| | |
|---|---|
| 12 U.S.C. § 5581 | 2 |
| 156 Cong. Rec. (2010) | 5 |
| Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 | 1, 5 |
| H.R. Rep. No. 111-367 (2009) | 3 |
| Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2653 | 4 |
| S. Rep. No. 111-176 (2010) | 1, 4, 5, 9 |

OTHER AUTHORITIES

| | |
|---|---|
| Bureau Opp. to MTD, *CFPB v. Active Network, LLC*, No. 22-cv-898 (E.D. Tex. July 15, 2024), Doc. No. 38 | 6 |
| Bureau Opp. to MTD, *CFPB v. Populus Fin. Grp., Inc.*, No. 22-cv-1494 (N.D. Tex. Aug. 30, 2024), Doc. No. 41 | 6 |
| Bureau Opp. to MTD, *CFPB v. Solo Funds, Inc.*, No. 24-cv-4108 (C.D. Cal. Sept. 16, 2024), Doc. No. 37 | 6 |
| 76 Fed. Reg. 43569 (July 21, 2011) | 2 |
| *Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report*, Fed. Rsrv. Sys. (Mar. 12, 2025) | 7 |
| Letter from Acting Director Vought to President Trump, *Nat'l Treasury Emp. Union v. Vought*, No. 25-5091 (D.C. Cir. Nov. 21, 2025), Doc. No. 147-1 | 6 |
| Memorandum for Russell T. Vought, *Nat'l Treasury Emp. Union v. Vought*, No. 25-5091 (D.C. Cir. Nov. 10, 2025), Doc. No. 145-1 | 7 |
| *The Semiannual Monetary Policy Report to the Congress: Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. (Feb. 11, 2025), http://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress | 6 |
| U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* (2002) | 8 |

**TABLE OF AUTHORITIES – cont'd**

Arthur E. Wilmarth, Jr., *The Financial Services Industry's Misguided Quest to Undermine the Consumer Financial Protection Bureau*,
   31 Rev. Banking & Fin. L. 881 (2012) .................................................................   4

# INTEREST OF *AMICI CURIAE*[1]

*Amici* are current and former members of Congress who are familiar with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, and with the Consumer Financial Protection Bureau (CFPB) and the critical role it plays in overseeing the nation's financial institutions and protecting America's consumers.  Indeed, *amici* were sponsors of Dodd-Frank, participated in drafting that legislation, or serve on committees with jurisdiction over the federal financial regulatory agencies.  Having studied the financial crisis of 2008, its causes, and its consequences for the American people, *amici* understand the importance of the Bureau and its work—and know that it was structured to guarantee a continuous and stable source of funding to perform that work without interruption.  *Amici* have a strong interest in ensuring that Dodd-Frank is interpreted in a manner consistent with its text and history and that, pursuant to that proper interpretation, the Bureau receives the funding required to carry out its important functions.

A full list of *amici* appears in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2010, Congress enacted the Dodd-Frank Act in response to the financial crisis of 2008, a crisis that "shattered" lives, "shuttered" businesses, "evaporated" savings, and caused millions of Americans to lose their homes.  S. Rep. No. 111-176, at 39 (2010).  After extensively studying the crisis, Congress determined that the fragmented manner in which financial regulatory authority was apportioned among federal agencies had led to government delay in responding to the mortgage abuses that precipitated the crisis.

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.  All parties consent to the filing of this brief.

To solve this problem, Congress established the Consumer Financial Protection Bureau, an agency with the sole mission of protecting Americans from harmful practices of the financial-services industry. Congress consolidated federal consumer-protection responsibilities in a single agency, transferring "consumer financial protection functions" from seven existing agencies to the Bureau. 12 U.S.C. § 5581; *see* 76 Fed. Reg. 43569, 43569-71 (July 21, 2011). Since its creation, the Bureau has successfully protected consumers from unfair and predatory practices across the financial-services industry.

Notwithstanding all of this, Defendants now seek to effectively shutter the CFPB by stripping it of the funding it needs to operate. To accomplish this end, Acting Director Russell Vought has endorsed a novel reading of Dodd-Frank's requirement that the Bureau be funded by the "combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Even though the Bureau has long understood those "combined earnings" to include all the money the various components of the Federal Reserve take in or generate, Vought now adopts the position that the Federal Reserve has "earnings" only when its total revenue exceeds its interest expenses. According to Vought, the Federal Reserve currently has no "earnings" under that narrowed definition, *but see* Pls. MSJ, Doc. No. 10, at 24-25 (explaining that "even under [Vought's] definition, Defendants are wrong that the Federal Reserve System currently has no 'combined earnings'" from which the CFPB can draw)—and he therefore refuses to requisition any funds for the Bureau's operations.

Defendants' position is wrong as a matter of statutory interpretation, *see id*. at 15-20, and it is at odds with Congress's plan in setting up the Bureau. As *amici* well know, Congress structured the Bureau—which it charged with sweeping oversight of the nation's largest banks and financial institutions in the aftermath of the 2008 financial crisis—to have a stable source of

funding that would enable it to carry out its important work without interruption. Vought's interpretation is wholly at odds with that plan, subjecting the Bureau to intermittent defunding based on unpredictable fluctuations in the Federal Reserve's balance sheet. Indeed, under Vought's interpretation, the Bureau is most likely to be deprived of its funding in times of nationwide economic upheaval, exactly when the need for its regulatory and consumer-protection functions is most urgent.

In short, Vought's reading of Dodd-Frank is at odds with that statute's text and history and would prevent the Bureau from doing its critical work on behalf of the American people. This Court should reject it.

## ARGUMENT

**I.  In the Wake of the 2008 Financial Crisis, Congress Designed the Bureau's Funding Structure to Ensure Stable and Continuous Support for Its Important Operations.**

In 2010, Congress passed Dodd-Frank and established the CFPB. Responding to the nation's most significant financial crisis since the Great Depression, Congress tasked the newly created agency with vital and, in many cases, statutorily required obligations. Among other duties, the Bureau must investigate consumer complaints, monitor risk in consumer financial-product markets, and address violations of federal consumer financial law. *See* 12 U.S.C. § 5511; *see also id.* §§ 5512-18, 5531-38 (specifying the Bureau's general powers and responsibilities). Today, no other federal agency has the authority to perform many of these critical functions.

The Bureau's creation—and its specific institutional design—were informed by Congress's extensive inquiry into the factors that caused the devastating 2008 financial crisis. Across more than fifty hearings, Congress evaluated and diagnosed the country's "disparate regulatory system," which had failed to "aggressive[ly] enforce[] against abusive and predatory loan products." H.R. Rep. No. 111-367, pt. 1, at 91 (2009). That examination of the financial

crisis sought to "assess the types of reforms needed" going forward and to establish a regulatory framework that could "respond to the challenges of a [twenty-first] century marketplace." S. Rep. No. 111-176, at 44, 42.

Through these investigations, Congress identified an important structural feature that contributed to the 2008 crisis: a lack of consistent funding for federal financial regulators. Issues of inadequate funding exacerbated the "long-standing failure of our regulatory structure to keep pace with the changing financial system and prevent the sort of dangerous risk-taking that led" to the crisis. *Id*. at 40; *see* Arthur E. Wilmarth, Jr., *The Financial Services Industry's Misguided Quest to Undermine the Consumer Financial Protection Bureau*, 31 Rev. Banking & Fin. L. 881, 951-55 (2012) ("Congress has undermined the effectiveness of [the Commodity Futures Trading Commission] and [the Securities and Exchange Commission] . . . by frequently failing to provide those agencies with adequate funds."). Looking at the Office of Federal Housing Enterprise Oversight, for example, Congress found that tying that agency's funding to the annual congressional appropriations process left it "subject to repeated Congressional pressure," which "limit[ed] [its] effectiveness" as a financial regulator. S. Rep. No. 111-176, at 163. Taking this "hard learned lesson" to heart, Congress made sure that the Office's successor, the Federal Housing Finance Agency, was not "subject to appropriations" and so could avoid the "difficulties" caused by that process. *Id.*; *see* Housing and Economic Recovery Act of 2008, § 1106, Pub. L. No. 110-289, 122 Stat. 2653, 2669.

Congress carried that lesson forward when designing the Bureau. Explaining the importance of creating a stable and continuous funding source for the CFPB, the Senate Committee on Banking, Housing, and Urban Affairs emphasized how the year-to-year appropriations cycle can deprive financial regulators of the funds needed to perform their statutory duties. *See* S. Rep.

No. 111-176, at 163. In creating the Bureau, the Committee expressly concluded that "the assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator." *Id.* Congress's approach to institutional design aimed to "ensure that the Bureau has the funds to perform its mission" without interruption, fluctuation, or outside pressure. *Id.*

The statutory plan for the Bureau thus included a funding mechanism that insulated it from the unpredictable annual appropriations cycle. Under Dodd-Frank's statutory scheme, the Bureau is funded via transfers from the Federal Reserve rather than through the congressional appropriations process. Specifically, Congress provided that the Federal Reserve's "Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1); *see* Dodd-Frank, 124 Stat. at 1975. Congress designed this system of transfers to operate "automatically," as *amicus* and former Senator Chris Dodd then explained, guaranteeing the Bureau the steady stream of "resources it needs to perform its functions." 156 Cong. Rec. 13195 (2010).

The sole role for congressional appropriators in this scheme is as a backstop if the Bureau's Director determines that "the funding needs of the Bureau are anticipated to exceed" the funds transferred to it from the Federal Reserve, which are capped by statute at a fixed percentage of the Federal Reserve System's total operating expenses. 12 U.S.C. § 5497(e)(1); *see id.* § 5497(a)(2)(A) (setting such percentages). Otherwise, Congress entirely insulated the Bureau's funding from "review by the Committees on Appropriations of the House of Representatives and the Senate." *Id.* § 5497(a)(2)(C). This statutory design ensures that the Bureau maintains a continuous and stable stream of support for its vital responsibilities via a funding source that is

"shielded . . . from the influences of the political branches." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422 (2024).

## II. Acting Director Vought's Novel Interpretation of "Combined Earnings," Which Would Permit Repeated Interruptions to Bureau Funding, Contravenes Congress's Statutory Plan.

Throughout its history, the CFPB consistently interpreted the phrase "combined earnings of the Federal Reserve System" in Dodd-Frank to refer to the Federal Reserve's *total revenue*, in line with Congress's plan in creating the Bureau and its funding structure. Indeed, the Bureau itself repeatedly took this position in litigation. *See, e.g.*, Bureau Opp. to MTD, *CFPB v. Solo Funds, Inc.*, No. 24-cv-4108 (C.D. Cal. Sept. 16, 2024), Doc. No. 37, at 3-6; Bureau Opp. to MTD, *CFPB v. Populus Fin. Grp., Inc.*, No. 22-cv-1494 (N.D. Tex. Aug. 30, 2024), Doc. No. 41, at 3-15; Bureau Opp. to MTD, *CFPB v. Active Network, LLC*, No. 22-cv-898 (E.D. Tex. July 15, 2024), Doc. No. 38, at 17-22. And so did Federal Reserve stakeholders, including Chair Jerome Powell, who testified before a Senate committee that it was "very clear on the law and the legislative history that [the Federal Reserve is] still required to make those payments" to fund the Bureau so long as it has positive revenue. *The Semiannual Monetary Policy Report to the Congress: Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:25:50-1:26:02 (Feb. 11, 2025) (statement of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.), http://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress.

Acting Director Vought's novel reading of Dodd-Frank is a sudden about-face from this settled definition. On his narrower construction, "the term 'combined earnings' refers to the *profits* of the Federal Reserve System"—namely, total revenue less interest expenses. Letter from Acting Director Vought to President Trump, *Nat'l Treasury Emp. Union v. Vought*, No. 25-5091 (D.C.

6

Cir. Nov. 21, 2025), Doc. No. 147-1, at 2-3 (emphasis added).  Although the Federal Reserve's total revenue remains positive, its interest expenses have at times eclipsed that revenue such that its balance sheet has not displayed any profit.  *See Federal Reserve Banks Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report*, Fed. Rsrv. Sys. 3-4 (Mar. 12, 2025).  In this scenario, under Vought's definition, "the Federal Reserve System has no combined earnings" and thus "there are no funds legally available for the Bureau to request" from the Federal Reserve.  Letter from Acting Director Vought at 2-3.  This interpretation accords with a recent memorandum from the Department of Justice's Office of Legal Counsel, which suggests that the Bureau instead seek "additional funds . . . from Congress pursuant to the Appropriations Clause."  *See* Memorandum for Russell T. Vought, *NTEU*, No. 25-5091 (D.C. Cir. Nov. 10, 2025), Doc. No. 145-1, at 2.  The Bureau now "estimates that it will run out of funds at some point in the first quarter of Fiscal Year 2026."  Letter from Acting Director Vought at 2.

This restrictive new interpretation of "combined earnings" directly contravenes Congress's plan in designing the CFPB's funding structure.  In connecting the Bureau's funding to the Federal Reserve System, Congress acted to guarantee the continuity and stability of the Bureau's funding.  *See supra* Part I.  That independent funding source, in turn, was crucial for ensuring that the Bureau could maintain operational continuity and carry out its important financial-regulation responsibilities without interruption.

Acting Director Vought's proposed definition of "combined earnings" would instead force the Bureau into the precarity of an unpredictable, on-again-off-again funding stream. That result flies in the face of Congress's plan in tethering the Bureau's funding to the Federal Reserve rather than to the volatility of the annual appropriations process.

To start, the new definition of "combined earnings" would cause the Bureau to be defunded intermittently based on the vagaries of the Federal Reserve's balance sheet because the Bureau will lose funding whenever the Federal Reserve's interest expenses exceed its total revenue. Congress was well aware that the Federal Reserve could experience such shortfalls when it passed Dodd-Frank. *See, e.g.*, U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 11 (2002) (describing 352 weeks in which "earnings were less than expenses and losses" at the regional Federal Reserve Banks). Thus, according to Vought, when Congress created the Bureau in the immediate wake of the 2008 financial crisis, it established a structure for the agency that would predictably generate significant interruptions to its funding. Even more implausibly, on this account, Congress established a structure for the agency that would cause the Bureau's funding to lapse precisely in times of economic shock or upheaval, when the need for its regulatory and consumer-protection functions is especially acute.

Moreover, this intermittent defunding would create disruptions and instability at the expense of the Bureau's ongoing operations as a financial regulator. The consequences would be disastrous. The Supreme Court has explained that eliminating the Bureau would "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila L. LLC v. CFPB*, 591 U.S. 197, 237 (2020). The result of leaving the Bureau unable to operate for lack of funds would be no different. Indeed, the Bureau currently performs many functions that no other agency has the authority to execute and, even where other agencies could, in theory, assume some of those responsibilities, they "do not have the staff or appropriations to absorb the CFPB's 1,500-employee, 500-million-dollar operations," as the Supreme Court has recognized. *Id.* Thus, critical functions that Congress established the Bureau to carry out simply will not be performed during periods when the Bureau is without funds. It

beggars belief to think that this was Congress's plan for the agency. As *amici* well know, it plainly was not.

Notably, such funding gaps caused by Vought's proposed definition would be curable only by largescale changes in the Federal Reserve's balance sheet (to restore profitability) or recourse to congressional appropriations (as a stopgap measure on a year-by-year basis). Given the difficulties inherent in both predicting future Federal Reserve shortfalls and navigating the congressional appropriations process, relying on year-by-year appropriations would almost certainly leave the Bureau unfunded for long periods of time. Congress, which strove to "ensure that the Bureau has the funds to perform its mission," certainly did not design a funding structure that holds the Bureau's operations hostage to either macroeconomic trends or the congressional appropriations process. S. Rep. No. 111-176, at 163. Quite the opposite: Congress expressly rejected direct oversight of the Bureau's funding by "the Committees on Appropriations of the House of Representatives and the Senate." 12 U.S.C. § 5497(a)(2)(C).

Indeed, Vought's new definition of "combined earnings" would destroy the Bureau's independence from the appropriations gauntlet by forcing it back to Congress to request funding. Informed by the "hard learned lesson" of the 2008 financial crisis, Congress carefully designed the Bureau to insulate it from the whims and pressures of the annual appropriations process. S. Rep. No. 111-176, at 163. But the new definition would preclude the Bureau from seeking any funds from the Federal Reserve if the latter has revenue but no profit, requiring the Bureau to turn regularly to congressional appropriators to request funding instead—precisely the result Congress sought to avoid when passing Dodd-Frank to set up the agency. *See id.* ("[T]he assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator."); *see also* 12 U.S.C. § 5497(e)(1)(B)

(contemplating relaying the CFPB's funding needs to Congress only when "anticipated to exceed the level of" funds transferred from the Federal Reserve's "combined earnings").

In sum, Acting Director Vought's newfound definition of "combined earnings" is completely at odds with Congress's plan in passing Dodd-Frank and setting up the Bureau. It undermines the Bureau's independence as a financial regulator; it deprives the Bureau of the continuous and stable funding source Congress expressly authorized; and it supports results Congress never fathomed—and actively worked to avoid. This Court should reject it.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

Dated: December 15, 2025            Respectfully submitted,

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra (Bar No. 218200)
Brianne J. Gorod
Miriam Becker-Cohen
Joshua D. Blecher-Cohen
Constitutional Accountability Center
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amici Curiae*

# APPENDIX

List of *Amici Curiae*

**Current Members of Congress**

Sen. Elizabeth Warren

Rep. Maxine Waters

Sen. Angela Alsobrooks

Sen. Lisa Blunt Rochester

Sen. Catherine Cortez Masto

Sen. Ruben Gallego

Sen. Andy Kim

Sen. Jack Reed

Sen. Tina Smith

Sen. Chris Van Hollen

Sen. Mark R. Warner

Sen. Raphael Warnock

Rep. Joyce Beatty

Rep. Janelle S. Bynum

Rep. Sean Casten

Rep. Emanuel Cleaver, II

Rep. Cleo Fields

Rep. Bill Foster

Rep. Sylvia R. Garcia

Rep. Vicente Gonzalez

Rep. Al Green

Rep. Jim Himes

1A

Rep. Sam Liccardo

Rep. Stephen F. Lynch

Rep. Gregory W. Meeks

Rep. Brittany Pettersen

Rep. Ayanna Pressley

Rep. David Scott

Rep. Brad Sherman

Rep. Rashida Tlaib

Rep. Ritchie Torres

Rep. Juan Vargas

Rep. Nydia M. Velázquez

**Former Members of Congress**

Sen. Chris Dodd

Rep. Barney Frank