1   BRETT A. SHUMATE
    Assistant Attorney General
2   Civil Division

3   BRAD P. ROSENBERG
    Special Counsel
4   Federal Programs Branch

5   CHARLES E.T. ROBERTS
    Counsel
6    (PA Bar No. 326539)

7       U.S. Department of Justice
        Civil Division
8       950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20005
9       Tel.: (202) 305-1141
        Fax: (202) 616-8470
10      E-mail: Charles.Roberts2@usdoj.gov

11  *Attorneys for Defendants*

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                  SAN JOSE DIVISION

15

16  RISE ECONOMY; NATIONAL              ) Case No. 5:25-cv-10481-EJD
    COMMUNITY REINVESTMENT             )
17  COALITION; and WOODSTOCK           ) **DEFENDANTS' OPPOSITION TO**
    INSTITUTE,                         ) **PLAINTIFFS' MOTION FOR SUMMARY**
                                       ) **JUDGMENT**
18          Plaintiffs,                )
                                       ) Hearing Date: February 11, 2026
19      v.                             ) Hearing Time: 10:00 AM
                                       ) Judge: Hon. Edward J. Davila
20  RUSSELL VOUGHT, in his official capacity as ) Place: San Jose
    Acting Director of the Consumer Financial   )
21  Protection Bureau; and CONSUMER             ) Date Filed: December 9, 2025
    FINANCIAL PROTECTION BUREAU,               ) Trial Date: None set
22                                      )
                                       )
23          Defendants.                )

24

25

26

27

28

1

# TABLE OF CONTENTS

2  BACKGROUND .................................................................................................................1

3  ARGUMENT .....................................................................................................................3

4  I.  Defendants' Request for and Receipt of Funding Moot this Case...................................3

5  II.  Plaintiffs' Claim Is at Least Prudentially Moot. ..........................................................4

6  III.  Plaintiffs Lack Standing and Ripeness. ......................................................................5

7  IV.  Plaintiffs Failed to Join a Necessary Party. ................................................................8

8  V.  Dismissal Is Warranted to Avoid Duplicative Litigation and Gamesmanship. ...............8

9  VI.  Plaintiffs Are Not Entitled to Judgment on Plaintiffs' Sole Claim for Relief. ...............10

10      A.  The Complaint Does Not State a Claim Under 5 U.S.C. § 706(2)(A)............................10

11      B.  The Complaint Fails to Satisfy the APA's Finality Requirement....................................12

12      C.  Plaintiffs Are Not Entitled to Judgment on Their Claim for a Mandatory
            Injunction Compelling Defendants to Request Funds from the Federal
13          Reserve..................................................................................................................13

14          1.  Section 5497(a)(1) Does Not Impose a Plainly Prescribed Duty on the
                Acting Director to Seek Funds from the Federal Reserve. ...................................13
15
                (i)  Section 5497(a)(1) Imposes Only One Duty on the CFPB
16                   Director, which He Has Satisfied for Fiscal Year 2026..........................14

17              (ii)  Plaintiffs Are Incorrect that the "Combined Earnings of the
                     Federal Reserve System" Refers to Revenues Rather than
18                   Profits.................................................................................................16

19          2.  Plaintiffs Fail to Satisfy the Remaining Criteria for Mandamus Relief.................24

20      D.  Plaintiffs Fail to Show Prejudicial Error..........................................................25

21  VII.  The Court Should Narrowly Tailor and Temporarily Stay Any Injunctive Relief. .......25

22  CONCLUSION.................................................................................................................25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*A.L. Mechling Barge Lines, Inc v. United States*,
  368 U.S. 324 (1961) ................................................................................................. 4

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................. 8

*AFGE, AFL-CIO v. Weinberger, No. C86-242T*,
  1986 WL 15495 (W.D. Wash. Aug. 5, 1986) ......................................................... 9

*Alcoa. Inc. v. Bonneville Power Admin.*,
  698 F.3d 774 (9th Cir. 2012) ................................................................................... 5

*Allis-Chalmers Corp. v. Arnold*,
  619 F.2d 44 (9th Cir. 1980) ..................................................................................... 4

*Ass'n of Flight Attendants-CWA v. Chao*,
  493 F.3d 155 (D.C. Cir. 2007) ................................................................................ 11

*Bennett v. Bed Bath & Beyond, Inc.*,
  No. C 11-02220 CRB, 2011 WL 3022126 (N.D. Cal. July 22, 2011) ................... 10

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................ 12

*Biden v. Texas*,
  597 U.S. 785 (2022) ...................................................................................... 10, 11, 12

*Blitz v. Donovan*,
  740 F.2d 1241 (D.C. Cir. 1984) ............................................................................. 21

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ................................................................................................ 21

*Bova v. City of Medford*,
  564 F.3d 1093 (9th Cir. 2009) ................................................................................. 5

*Braniff Airways, Inc. v. Civil Aeronautics Bd.*,
  379 F.2d 453 (D.C. Cir. 1967) ............................................................................... 11

*Cantrell v. City of Long Beach*,
  241 F.3d 674 (9th Cir. 2001) ................................................................................ 3, 4

*CFPB v. CashCall, Inc.*,
  35 F.4th 734 (9th Cir. 2022) ................................................................................... 19

*CFPB v. ITT Educ. Servs., Inc.*,
  219 F. Supp. 3d 878 (S.D. Ind. 2015) .................................................................... 19

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024) ............................................................... 15

*Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy*,
    627 F.2d 289 (D.C. Cir. 1980) ........................................... 4, 5

*City of N.Y. v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................... 10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................... 5, 7

*Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*,
    No. 92-4228, 1993 WL 496946 (E.D. Pa. 1993) ..................... 20

*Comm. on Judiciary of U.S. House of Reps. v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ............................................. 13

*Continental Grain Co. v. The FBL-585*,
    364 U.S. 19 (1960) ................................................................. 9

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
    77 F.4th 679 (D.C. Cir. 2023) ............................................. 25

*Custodian Bank, Inc. v. Fed. Resv. Bd. of Governors*,
    157 F.4th 1235 (10th Cir. 2025) .......................................... 19

*Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) ............................................... 8

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023) ............................................................. 11

*Dep't of Homeland Sec. v. MacLean*,
    574 U.S. 383 (2015) ............................................................. 19

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
    375 F.3d 861 (9th Cir. 2004) ................................................. 8

*Elecs. for Imaging, Inc. v. Tesseron, Ltd.*,
    No. C 07-05534 CRB, 2008 WL 276567 (N.D. Cal. Jan. 29, 2008) ............................................. 9, 10

*Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ............................................... 7

*Fallini v. Hodel*,
    783 F.2d 1343 (9th Cir. 1986) ........................................ 14, 16

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................. 11

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ............................................................. 13

*Fund for Animals, Inc v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ................................................................. 11

*Gerin v. Aegon USA, Inc.*,
    No. C 06-5407 SBA, 2007 WL 1033472 (N.D. Cal. April 4, 2007) ................... 9

*Hearst Radio v. FCC*,
    167 F.2d 225 (D.C. Cir. 1948) ................................................................. 10

*In re Nat'l Nurses United*,
    47 F.4th 746 (D.C. Cir. 2022) ................................................................. 14

*In re County of Orange*,
    262 F.3d 1014 (9th Cir. 2001) ................................................................. 8

*Inland Empire Waterkeeper v. Corona Clay Co.*,
    17 F.4th 825 (9th Cir. 2021) ................................................................. 8

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
    140 F. Supp. 3d 1123 (D.N.M. 2015) ......................................................... 12

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 5

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................. 4

*Makah Indian Tribe v. Verity*,
    910 F.2d 555 (9th Cir. 1990) ................................................................. 8

*Michigan v. EPA*,
    576 U.S. 743 (2015) ................................................................. 11

*Mont. Env't Info. Ctr. v. Stone-Manning*,
    766 F.3d 1184 (9th Cir. 2014) ................................................................. 5

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ................................................................. 21

*Munoz v. PHH Corp.*,
    No. 22-15407, 2023 WL 2202228 (9th Cir. Feb. 24, 2023) ......................... 8

*Nat'l Cmty. Reinvestment Coal. v. CFPB*,
    No. 1:20-cv-2074, 2022 WL 4447293 (D.D.C. Sept. 23, 2022) ..................... 9

*Nat'l Health Fed'n v. Weinberger*,
    518 F.2d 711 (7th Cir. 1975) ................................................................. 9

*Nat'l Treasury Emps. Union v. Vought*,
    No. 1:25-cv-0381, 2025 WL 3771192 (D.D.C. Dec. 30, 2025) ................... 2, 3

*Nat'l Wildlife Fed'n v. United States*,
    626 F.2d 917 (D.C. Cir. 1980) ................................................................. 4, 5

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004) ......................................................................................... 10, 13

*Olin Indus. v. NLRB*,
 192 F.2d 799 (5th Cir. 1952) ....................................................................................... 25

*Or. Nat. Res. Council. v. Harrell*,
 52 F.3d 1499 (9th Cir. 1995) ....................................................................... 13, 24, 25

*Park v. Dole Fresh Vegetables, Inc.*,
 964 F. Supp. 2d 1088 (N.D. Cal. 2013) ...................................................................... 10

*Pub. Citizen v. Bowen*,
 833 F.2d 364 (D.C. Cir. 1987) ..................................................................................... 13

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
 45 F.4th 353 (D.C. Cir. 2022) ..................................................................................... 13

*Republic of Sudan v. Harrison*,
 587 U.S. 1 (2019) ........................................................................................................ 19

*Russello v. United States*,
 464 U.S. 16 (1983) ................................................................................................ 21, 22

*Sanchez-Espinoza v. Reagan*,
 770 F.2d 202 (D.C. Cir. 1985) ..................................................................................... 13

*Seaverns v. Federal Emergency Mgmt. Agency*,
 2025 WL 786742 (D.N.M. Mar. 12, 2025) .................................................................. 12

*Sequiera v. Dep't of Homeland Sec.*,
 119 Fed. R. Serv. 3d 1871 at *515 (N.D.C.A. Sept. 30, 2024) ...................................... 8

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ...................................................................................................... 7

*St. Pierre v. United States*,
 319 U.S. 41 (1943) ........................................................................................................ 3

*Sullivan v. Finkelstein*,
 496 U.S. 617 (1990) .................................................................................................... 24

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ...................................................................................................... 7

*Tanzin v. Tanvir*,
 592 U.S. 43 (2020) ...................................................................................................... 21

*Texas v. United States*,
 523 U.S. 296 (1998) ...................................................................................................... 5

*Thomas v. Anchorage Equal Rights Comm'n*,
 220 F.3d 1134 (9th Cir. 2020) (en banc) ...................................................................... 5

*TransUnion v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................... 7

*Verizon v. FCC,*
    740 F.3d 623 (D.C. Cir. 2014) .......................................................... 24

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) ............................................................ 10

*Willow Creek Ecology v. U.S. Forest Serv.,*
    225 F. Supp. 2d 1312 (D. Utah 2002) ................................................ 4

**United States Code**

5 U.S.C. § 551 ........................................................................... 10, 11, 12

5 U.S.C. § 552 .................................................................................... 15

5 U.S.C. § 553 .................................................................................... 11

5 U.S.C. § 554 .................................................................................... 11

5 U.S.C. § 555 .................................................................................... 11

5 U.S.C. § 702 ...................................................................................... 4

5 U.S.C. § 704 .................................................................................... 12

5 U.S.C. § 706 ........................................................................... 1, 10, 25

12 U.S.C. § 201 .................................................................................. 19

12 U.S.C. § 289 ....................................................................... 18, 19, 20

12 U.S.C. § 341 .................................................................................. 19

12 U.S.C. § 527 .................................................................................. 19

12 U.S.C. § 1473 ................................................................................ 19

12 U.S.C. § 5367 ................................................................................ 19

12 U.S.C. § 5381 ................................................................................ 19

12 U.S.C. § 5390 ........................................................................... 19, 20

12 U.S.C. § 5465 ................................................................................ 19

12 U.S.C. § 5497 ............................................................................ *passim*

12 U.S.C. § 8206 ................................................................................ 19

15 U.S.C. § 78u-6 .............................................................................. 19

15 U.S.C. § 1691c-2 ............................................................................ 6

28 U.S.C. § 1404 .................................................................................. 9

31 U.S.C. § 1341 .................................................................................. 6

31 U.S.C. § 1342 .................................................................................. 6

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................ 8

Fed. R. Civ. P. 19 ................................................................................................................ 8

**Other Authorities**

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2005) ...................................... 17, 18

*The American Heritage Dictionary of the English Language* (5th ed. 2016) .................... 17, 18

The Federal Reserve, Interest on Reserve Balances (IORB) Frequently Asked Questions
(Sept. 23, 2025) ...............................................................................................................16, 23

The Federal Reserve Banks, Combined Financial Statements as of and for the Years Ended
December 31, 2009 and 2008 and Independent Auditors' Report (Apr. 21, 2010) ......................... 20, 21

The Federal Reserve Banks, Combined Financial Statements as of and for the Years Ended
December 31, 2024 and 2023 and Independent Auditors' Report (Mar. 12, 2025) .............................. 17

U.S. Dep't of Justice, Office of Legal Counsel, *Whether the CFPB May Continue to Draw
Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve
System is Operating at a Loss*, 49 Op. O.L.C. ___ (Nov. 7, 2025) .................................... *passim*

*Webster's Third New International Dictionary* (1993 ed.) ................................................... 17, 18

Plaintiffs rushed into this Court and demanded, over the holidays, final relief on a preliminary-relief timeframe. They alleged their harms "will begin in just a few weeks' time" without such haste. Compl. 18 ¶ 62. But, as Defendants forecasted in opposing such alacrity, those allegations ring hollow in hindsight. *See* Defs.' Opp'n to Pls.' Admin. Mot., Dkt. 21. The CFPB has requested and received funding for this quarter. And no decision has been made as to future requests to the extent either (i) the *NTEU* injunction requiring Defendants to continue seeking funding expires or is otherwise superseded at some hypothetical point in the future, or (ii) the Federal Reserve System is generating surplus funds such that it could provide funding even under the definition of "combined earnings" Plaintiffs dispute. These developments moot this case—if not technically, then prudentially. Those and several other threshold problems—including standing, required joinder, and avoiding duplicative litigation—justify denying Plaintiffs' Motion for Summary Judgment (Mot.) and dismissing without prejudice.

In all events, Plaintiffs are not entitled to judgment on their lone claim, under 5 U.S.C. § 706(2)(A). That provision governs judicial review of an agency rule, order, license, sanction, or relief, as those terms are defined in the Administrative Procedure Act (APA). The Complaint seeks judicial review of a putative decision *not* to act, but the statute contemplates judicial review of failures to act only under § 706(1), not § 706(2), and Plaintiffs raise no such claim in this case. Even if the Court disregarded this problem, Plaintiffs are not entitled to mandatory declaratory or injunctive relief compelling the Acting Director to request funds from the Federal Reserve System (Fed). As Plaintiffs acknowledge, the relevant statutory "text assigns only one role to the CFPB Director: To determine the amount 'reasonably necessary to carry out the authorities of the Bureau[.]" Compl. ¶ 47. The Acting Director has done that for the entire Fiscal Year 2026 (FY26). He is violating no other mandatory duty described in 12 U.S.C. § 5497(a)(1). Finally, Plaintiffs' request for mandatory declaratory and injunctive relief is premised on a misunderstanding of the meaning of "combined earnings" in § 5497(a)(1). As the Office of Legal Counsel (OLC) has determined, the "combined Earnings of the Federal Reserve System" refers to the Fed's profits. When the Fed is operating at a loss, it cannot transfer funding to the CFPB.

## BACKGROUND

On November 7, 2025, OLC issued a memorandum opinion concluding that, because "the Federal Reserve has no profits" at present, "it cannot transfer money to the CFPB" under 12 U.S.C. § 5497(a)(1).

U.S. Dep't of Justice, Office of Legal Counsel, *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System is Operating at a Loss*, 49 Op. O.L.C. ___, at *1 (Nov. 7, 2025). (Op.), *available at* http://www.justice.gov/olc/opinions. In light of that opinion, on November 20, 2025, Acting Director Vought issued a report required by § 5497(e)(1) in which he identified the amount determined by the Director to be reasonably necessary for the CFPB to carry out its authorities under law. Defs.' Request for Judicial Notice (RJN), Ex. D. He then transmitted that report to the President and to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives as required by § 5497(e)(1)(B).

About a month later, a district court in the District of Columbia issued an order concluding that an earlier preliminary injunction required the CFPB to request funding from the Fed under the present circumstances, notwithstanding the OLC Opinion. *Nat'l Treasury Employees Union v. Vought*, --- F. Supp. 3d ---, 2025 WL 3771191 (D.D.C. Dec. 30, 2025). In accordance with that order, the Acting Director submitted a request for funding to the Fed. *See* RJN, Ex. A. On January 14, 2026, the CFPB informed litigation counsel that it is in receipt of the funds requested. *Id.* The December 30 injunction is on appeal before the *en banc* D.C. Circuit, with argument set for February 24, 2026. *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-0381, 2025 WL 3771192, at *17 (D.D.C. Dec. 30, 2025) (*NTEU*).

Plaintiffs filed this action on December 5, 2025. Compl. Two of the three Plaintiffs participated in the DC litigation as amici, and their lead counsel here represented different plaintiffs in the DC litigation until the day of filing this complaint.[1] Here, they seek declaratory and mandatory injunctive relief "requiring" the Acting Director "to request funding from the Federal Reserve Board of Governors in the amount determined "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year),'" as well as attorney's fees. Compl. 19, Prayer for Relief. Days later, Plaintiffs moved for Summary Judgment. Dkt. 10. On December 16, 2025, the Court issued an order

---

[1] Amicus Br., *Nat'l Treasury Emps. Union*, No. 25-5091 (D.C. Cir. Oct. 7, 2025) (joined by Rise Economy and Woodstock Institute); *see NTEU*, Dkt. 153 (noticing withdrawal of Attorney Allison Marcy Zieve on December 5), 155 (same for Attorney Wendy Liu), 158 (same for Attorney Stephanie Garlock).

1    setting an expedited briefing schedule with a hearing on February 11, 2026. Dkt. 23.

2    <center>**ARGUMENT**</center>

3    **I.    Defendants' Request for and Receipt of Funding Moot this Case.**

4            It is axiomatic that "[a] federal court is without power to decide moot questions or to give advisory

5    opinions which cannot affect the rights of the litigants in the case before it." *St. Pierre v. United States*,

6    319 U.S. 41, 42 (1943). A case becomes moot when it "los[es] its character as a present, live controversy

7    of the kind that must exist" to avoid "advisory opinions on abstract propositions of law." *Cantrell v. City*

8    *of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001).

9            This case is moot. Plaintiffs' counsel rushed from one court already adjudicating the same funding

10   question at their request to this one, asking for "relief requiring Defendants to request funding." Compl.

11   19; *see* Mot. 1 (specifying "an injunction" requiring the same). But Defendants have requested and

12   received funding. RJN, Ex. A. And Plaintiffs can point to no decision as to future requests that could

13   conceivably keep their lone claim alive.

14           The question on which Plaintiffs sought to hurry a decision has been overtaken by events in at

15   least two respects, one legal and one factual: *First*, the *NTEU* district court has clarified that its injunction

16   requires Defendants to request sufficient funds to comply with their obligations under that court's

17   injunction. 2025 WL 3771192, at *17. That injunction remains in place pending *en banc* proceedings in

18   the D.C. Circuit, which vacated a panel decision overturning the injunction and set oral argument for

19   February 24. *Nat'l Treasury Emps. Union*, 2025 WL 3659406, at *1. Defendants do not intend to seek an

20   appeal of the clarification order and will continue complying with it while it remains in effect.

21           *Second*, the Fed appears to have returned to profitability, such that it would have sufficient

22   "combined earnings" to continue funding the CFPB. Since early November, the Fed's deferred asset has

23   shrunk from $243,818 million, Dkt. 11-6, to $243,700 million, Federal Reserve Balance Sheet: Factors

24   Affecting Reserve Balances - H.4.1 (Jan. 15, 2026), RJN, Ex. C with that number accounting for the recent

25   transfer to CFPB. Three forthcoming records may shed even further light on this development. On

26   December 16, Defendants' counsel requested the Fed's opinion on whether it has returned to profitability.

27   RJN, Ex. B. And, apart from that anticipated response, the Fed consistently releases both its financial

28   statements for the prior year and its quarterly financial report for Q1 in March. Defendants will, in

1  accordance with the OLC opinion and § 5497, continue seeking funds if it is established that there are
2  sufficient "combined earnings" to draw from.

3      These developments have extinguished the purported case or controversy at the heart of the
4  complaint.[2] To the extent Plaintiffs still seek relief regarding future requests, this Court should not be
5  drawn into such "abstract propositions," *Cantrell*, 241 F.3d at 678, especially regarding an agency's "day-
6  to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

7  **II.    Plaintiffs' Claim Is at Least Prudentially Moot.**

8      Even if these developments did not technically moot this case, they still would render Plaintiffs'
9  current request prudentially moot, such that the Court should deny it and dismiss without prejudice. The
10  APA specifically provides for "the power or duty of the court to dismiss any action or deny relief on any
11  other appropriate legal or equitable ground," 5 U.S.C. § 702(1), including "where it appears that a
12  challenged" action "is, at the moment adjudication is sought, undergoing significant modification so that
13  its ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines, Inc v. United States*, 368
14  U.S. 324, 331 (1961). For example, a court may decline to intervene in "budget procedures" where a case
15  presents "serious justiciability questions" (such as "standing" and "moot[ness]") or the possibility that
16  "this issue may never arise again." *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 924-28 (D.C. Cir.
17  1980) (affirming dismissal of suit alleging failure to comply with certain statutory requirements related to
18  preparing a proposed fiscal budget because intervening in budgetary matters would be "improvident").[3]

19      As discussed further below, Plaintiffs fail to establish any "final agency action" as defined by the
20  APA. *See infra* Part VI.B. But if the Court finds action, it still should withhold relief because that action
21  "is currently under review" by the agency "and may never recur" in light of the events discussed above.
22  *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy*, 627 F.2d 289, 292 (D.C. Cir. 1980) (affirming

23

24      [2] Defendants also submitted a report regarding the CFPB's funding needs to Congress, pursuant to
25  § 5497(e)(1)(B), so that body also may consider providing funding. RJN, Ex. D.

26      [3] *See, e.g.*, *Allis-Chalmers Corp. v. Arnold*, 619 F.2d 44, 47 (9th Cir. 1980) (affirming dismissal
27  of challenge to ended agency conduct); *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312,
28  1318 (D. Utah 2002) (dismissing challenge to withdrawn decision).

1  dismissal of challenge to agency decision to provide funds to a consumer-oriented organization based on

2  *Mechling Barge*). Doing so here also avoids the risk of conflicting judicial orders on the same issue. It

3  therefore would be "improvident" for the Court to intervene. *Nat'l Wildlife Fed'n*, 626 F.2d at 924-28.

4  **III.    Plaintiffs Lack Standing and Ripeness.**

5       To show that they have standing at summary judgment, Plaintiffs must demonstrate with evidence

6  "an injury in fact, that is, 'an invasion of a legally protected interest which is (a) concrete and

7  particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Alcoa. Inc. v. Bonneville

8  Power Admin*, 698 F.3d 774, 793 (9th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

9  (1992)). Imminence is "a somewhat elastic concept," but "it cannot be stretched beyond its purpose, which

10  is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper v. Amnesty Int'l

11  USA*, 568 U.S. 398, 409 (2013). To that end, the Supreme Court has "repeatedly reiterated that threatened

12  injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury

13  are not sufficient." *Id*. (cleaned up).

14       The related doctrine of ripeness is often "characterized as standing on a timeline." *Bova v. City of

15  Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220

16  F.3d 1134, 1138 (9th Cir. 2020) (en banc)). For instance, a claim that "rests upon contingent future events

17  that may not occur as anticipated, or indeed may not occur at all," is not yet ripe; nor is it sufficiently

18  concrete and particularized to establish an injury-in-fact. *Id.* (quoting *Texas v. United States*, 523 U.S.

19  296, 300 (1998)). In other words, if "the supposed injury has not materialized and may never materialize,"

20  the "dispute is more an abstraction than an actual case" and cannot "survive the standing/ripeness inquiry."

21  *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014) (cleaned up).

22       Here, for many of the same reasons this case is moot, Plaintiffs lack standing or ripeness.

23       **A.** As noted above, Acting Director Vought has requested and received $145,000,000 in funds

24  from the Federal Reserve to allow the CFPB to carry out its authorities for the second quarter of FY26—

25  in other words, at least through March 31, 2026. That funding request was made pursuant to Judge

26  Jackson's order, which will require the CFPB to request additional funds for as long as it remains in effect.

27  For the order to no longer remain in effect, Defendants would need to obtain relief from the *en banc* D.C.

28  Circuit—relief which the court may or may not provide. And even if that court does provide relief, it is

unclear when it will provide that relief, or what the scope of relief would be. Even if the *en banc* court provides Defendants complete relief, the CFPB would still request funding if the Fed has returned to profitability. As noted above, the Fed's deferred asset has already shrunk and the Fed has fulfilled the CFPB's January 9 funding request, thus raising the likelihood of current profitability. And by the time the *en banc* court issues its decision—whenever that may be—the likelihood that the Fed will have returned to profitability may be even greater.

It is also unknown at this point how the CFPB would respond to any lapse in its funding, including whether it would again submit a report to Congress pursuant to § 5497(e) or whether the lapse even would impact its ability to carry out the specific statutory authorities regarding the information and services that these Plaintiffs allegedly use. Those allegations address three forms of information and one service. *See* Mot. 9-13. Whether and how all might be affected by a hypothetical future lapse in funding is uncertain. To start, Plaintiffs' arguments nowhere account for the Antideficiency Act or the *NTEU* injunction, either of which may operate to permit or require the CFPB to continue performing many obligations in the event of a lapse. *See* 31 U.S.C. §§ 1341(a)(1)(B), 1342 (Antideficiency Act); *NTEU* Dkt. 88 (requiring agency to maintain data and certain consumer complaint collection functions, among other things). And each allegation falls flat upon closer examination. The first, Home Mortgage Disclosure Act data, Plaintiffs admit is published on "March 31" each year, *i.e.*, during the period covered by the agency's recently fulfilled funding request. Mot. 11. The second is "an analysis" regarding complaints received "during the preceding year," *i.e.*, during a period that the agency has been funded, that is due "concurrent[ly] with each semi-annual hearing" held by two congressional committees. § 5496(a), (b), (c)(4); *see* Mot. 11. Plaintiffs nowhere plausibly allege that this report would not be ready for any as-yet-unscheduled hearing; nor do they cite any authority requiring more frequently updated data. The timing of access to the third, Section 1071 lending data, Plaintiffs acknowledge depends on ongoing regulatory proceedings. *See* Mot. 11-12. In other words, they do not have access to or depend on this data currently, as the agency continues implementing 15 U.S.C. § 1691c-2(f) and at most worry that a lapse may delay aspects of that implementation down the line. *See* Mot. 11-12; Compl. 16 (describing 1071 data as "long awaited"). Lastly, one Plaintiff asserts associational standing on behalf of one member who allegedly "relies on the CFPB's consumer response function" to fulfill its own mission. Mot. 12-13. But the *NTEU* injunction

1   specifically requires "maintain[ing]" complaint collection functions and "continu[ing] to monitor and

2   respond to those complaints, including by providing Elevated Case Management." *NTEU*, Dkt. 88 at 2-3.

3       The links in Plaintiffs' speculative chain of causation are many. For any injury to occur, (i) the *en*

4   *banc* court would need to provide relief to CFPB, (ii) by the time it provides relief, the Fed would still

5   need to be unprofitable; and (iii) then, the CFPB would need to be unable to carry out statutory obligations

6   in a manner that impacts these particular Plaintiffs. This is exactly the "highly attenuated chain of

7   possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending."

8   *Clapper*, 568 U.S. at 410. Indeed, the fact that Plaintiffs' Motion is based on a factual pattern that has now

9   been overtaken by events—and that may be subject to further intervening events by the D.C. Circuit and

10  the Fed—confirm the speculative nature of Plaintiffs' claims.

11      **B.** For these same reasons, Plaintiffs cannot establish that their claim is ripe. They apparently mean

12  to challenge the CFPB's November 20 legal position in a court filing, based on the OLC opinion, that

13  CFPB could not request funds from the Fed at that time, but that determination has been overtaken as a

14  practical matter by the January 9 request for funds. What Plaintiffs are now challenging—even though

15  they have not amended their complaint or updated their summary judgment motion—can only be the

16  future, *theoretical* possibility that the CFPB will once again find itself in the position of needing funds at

17  a point in time where it is not bound by an injunction *and* the Fed is not running at a profit. Whatever may

18  be said of that future course of events, that claim is not ripe now.

19      **C.** Plaintiffs also lack standing based on "informational harm." Mot. 9. To show an informational

20  injury, courts require that Plaintiffs show (i) a deprivation of information guaranteed by statute; and (ii) the

21  deprivation suffered is "the type of harm Congress sought to prevent by requiring disclosure." *Electronic*

22  *Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir.

23  2017). Plaintiffs have established neither here, where there is no likelihood of any deprivation and where

24  the statutes cited do not even guarantee information to organizations like theirs. *See* Mot. 9-10. And even

25  if one of the statutes provided Plaintiffs with a guarantee of information, any alleged injury must bear a

26  likeness to a common-law injury, which they have not established here. *See Spokeo, Inc. v. Robins*, 578

27  U.S. 330, 339-41 (2016); *TransUnion v. Ramirez*, 594 U.S. 413, 414 (2021); *see Summers v. Earth Island*

28  *Inst.*, 555 U.S. 488, 497 (2009). Although the Ninth Circuit has recognized "informational harm" in certain

1  contexts, Plaintiffs' proffered authorities are distinguishable. *See* Mot. 9; *Munoz v. PHH Corp.*, No. 22-

2  15407, 2023 WL 2202228, at *1 (9th Cir. Feb. 24, 2023) (addressing requirements regarding disclosures

3  by offerors to purchasers); *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833 (9th Cir.

4  2021) (addressing clean water monitoring and reporting requirements).

5  **IV.    Plaintiffs Failed to Join a Necessary Party.**

6  Under the Federal Rules, joinder is required when "in that person's absence, the court cannot

7  accord complete relief among existing parties." Fed. R. Civ. P. 19 (a)(1); *see In re County of Orange*, 262

8  F.3d 1014, 1022 (9th Cir. 2001); *Sequiera v. Dep't of Homeland Sec.*, 119 Fed. R. Serv. 3d 1871 at *515

9  (N.D.C.A. Sept. 30, 2024). The Ninth Circuit asks whether neglecting to join the nonparty "would

10 preclude the district court from fashioning meaningful relief as between the parties." *Disabled Rights*

11 *Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004). If so, the nonparty must be

12 joined, and failure to do so results in dismissal. *Id.*; *see* Fed. R. Civ. P. 12(b)(7); *Dawavendewa v. Salt*

13 *River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1154-55 (9th Cir. 2002).

14 The Federal Reserve System is a required party under Rule 19 because providing meaningful relief

15 to Plaintiffs hinges on the Fed transferring funds to the CFPB. Compl. at 19 (requesting the Court "issue

16 preliminary and permanent relief requiring Defendants to request funding from the Federal Reserve…").

17 Plaintiffs' alleged injury is "an informational injury because, without a funded and operating CFPB, they

18 will soon be deprived of information … that is essential to carrying out their work." Mot. 9. For relief to

19 be meaningful, the CFPB must *acquire* this funding from the Federal Reserve, not just *ask* for it. Plaintiffs'

20 complete relief requires both the CFPB *requesting* funding (as Plaintiffs have requested) and the Fed

21 *providing* it to the CFPB. *Dawavendewa*, 276 F.3d at 1154-55. Additionally, joinder is feasible under Rule

22 19(b) as the Fed has an interest in the case and there are no apparent equitable or practical reasons not to

23 add them as a party. Fed. R. Civ. P. Rule 19(b); *see Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th

24 Cir. 1990). Thus, Rule 19 required the joinder and Plaintiffs' failure to do so should result in dismissal.

25 **V.    Dismissal Is Warranted to Avoid Duplicative Litigation and Gamesmanship.**

26 **A.** As the Supreme Court has stated, a "court may … in its discretion dismiss a … suit if the same

27 issue is pending in litigation elsewhere." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). In this

28 analysis, courts consider the identity of the issues, the stage of the other litigation, avoiding conflicting

1   decisions, and broad principles of convenience, expediency, and efficiency. *AFGE, AFL-CIO v.*
2   *Weinberger*, No. C86-242T, 1986 WL 15495, at *2 (W.D. Wash. Aug. 5, 1986).

3       Here, dismissal without prejudice would be appropriate for several reasons. The issue raised in the
4   complaint is "identical" to the one addressed in *NTEU*, so "a full airing of the issues is occurring in the
5   [DC] litigation;" whereas litigating the same issue here raises "a concern for judicial economy,"
6   "duplication of effort," and "piecemeal litigation." *Nat'l Health Fed'n v. Weinberger*, 518 F.2d 711, 713-
7   14 (7th Cir. 1975) (applying *Abbott Labs.*). Plaintiffs very well "were aware of the [*NTEU*] suit." *Id.* at
8   714. "In fact, [Plaintiffs Rise Economy and Woodstock Institute both] appeared as amicus curiae" *in that*
9   *case*, and Plaintiffs' lead counsel here (who are based in DC) represented other plaintiffs *in that case* up
10  until the day this complaint was filed. *Id.* at 714; *see supra* n.1. The third Plaintiff here is "based in
11  Washington, DC," Compl. 3, and has recently sued CFPB there over another matter, *Nat'l Cmty.*
12  *Reinvestment Coal. v. CFPB*, No. 1:20-cv-2074, 2022 WL 4447293, at *1 (D.D.C. Sept. 23, 2022). "In
13  view of these circumstances," "this suit could have been as easily brought in the" District of Columbia,
14  "and the filing of the complaint here smacks of gamesmanship." *Nat'l Health Fed'n*, 518 F.2d at 714.
15  "Clearly, it has not been burdensome for the [Plaintiffs] to litigate in" DC, and "[n]o reason [has been]
16  given for not filing in that district which might then have led to a consolidation of the suits." *Id.* This Court
17  should decline "the burden of considering anew the same issues." *Id.*

18      **B.** Similarly, 28 U.S.C. § 1404(a) authorizes transferring a case "in the interest of justice." *See*
19  *Gerin v. Aegon USA, Inc.*, No. C 06-5407 SBA, 2007 WL 1033472, at *4 (N.D. Cal. April 4, 2007).
20  "Interests of justice" considerations include whether transfer will affect judicial economy, limit wasted
21  resources, and, of chief importance, avoid duplicative litigation. *Id.* The Supreme Court has counseled
22  that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously
23  pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a)
24  was designed to prevent." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19 (1960).

25      For the same reasons discussed above, this Court alternatively should consider transferring to the
26  District of Columbia. Plaintiffs' choice of forum is owed little deference when that choice would waste
27  judicial and party resources. And courts in this District routinely transfer actions in similar situations. *See,*
28  *e.g.*, *Elecs. for Imaging, Inc. v. Tesseron, Ltd.,* No. C 07-05534 CRB, 2008 WL 276567, at *1 (N.D. Cal.

1    Jan. 29, 2008) (transferring action because parallel litigation was ongoing in another district court);

2    *Bennett v. Bed Bath & Beyond, Inc.*, No. C 11-02220 CRB, 2011 WL 3022126, at *2 (N.D. Cal. July 22,

3    2011) (same); *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1096 (N.D. Cal. 2013)

4    (transferring where Plaintiffs' filings "indicate the possibility of forum shopping").

5    **VI.    Plaintiffs Are Not Entitled to Judgment on Plaintiffs' Sole Claim for Relief.**

6        **A.    The Complaint Does Not State a Claim Under 5 U.S.C. § 706(2)(A).**

7           Plaintiffs are not entitled to judgment on their single claim for relief because an agency's failure

8    to act is resolved under 5 U.S.C. § 706(1). Because the Complaint does not include a § 706(1) claim and

9    an agency's failure to act is not an agency action, as defined by the APA—let alone one the APA

10   contemplates being reviewable under § 706(2)—their Motion should be denied.

11          The APA's judicial review provision is divided into Section 706(1) and Section 706(2). The divide

12   reflects two types of claims that can be brought against Executive Branch agencies. First, "[t]he APA

13   provides relief for [an agency's] failure to act in § 706(1): 'The reviewing court shall ... compel agency

14   action unlawfully withheld or unreasonably delayed.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62

15   (2004) (*SUWA*). Section 706(2), in contrast, applies after the agency has taken a specific "final agency

16   action," as that term is defined in the APA. Under § 706(2), a plaintiff may not seek review of an "abstract

17   decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, only "specific agency action, as defined in

18   the APA," is subject to judicial review. *See id*. The APA defines the term "agency action" to include a

19   specific "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). The Act further

20   defines each of these terms. *Id.* § 551(4), (6), (8), (10), (11).

21          The term "agency action" "does not provide review for everything done by an agency." *City of

22   N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (quoting *Hearst Radio v. FCC*, 167 F.2d 225,

23   227 (D.C. Cir. 1948)). Rather, the "term is similar in concept to the meaning of 'final decision' as used in

24   describing the appealability of court orders." *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*,

25   714 F.3d 186, 193 (4th Cir. 2013). Even if construed expansively, the definition of "agency action" does

26   not encompass (1) the mental processes or abstract plans of an agency head, (2) discrete statements shared

27   by an agency head with his staff as part of a deliberative process, or (3) other abstract policy decisions

28   divorced from the vehicles though which an agency conveys a substantive decision.

Start with the last of these categories. As the Supreme Court confirmed in *Biden v. Texas*, an "agency action" is the vehicle through which an agency conveys a substantive decision either during or at the conclusion of an agency proceeding, not an "abstract" policy decision. 597 U.S. 785, 809 (2022). Agency actions are judged by courts on whether they are supported by "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Because a central goal of APA review is to determine whether a specific agency action rests on an adequate rationale, challenges to agency action under the APA do not—indeed, could not—separate out for review an agency's disembodied substantive "decision" from the vehicle through which the decision is conveyed and explained. *Biden*, 597 U.S. at 809.

In fact, the opposite is true: § 706(2) review necessarily focuses simultaneously on the vehicle in which an agency decision is delivered and the reasoning expressed in that vehicle. *Id*. Particularly for arbitrary-and-capricious review, the soundness of the agency's reasoning is what counts. *See, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 426 (2021) (considering whether "in particular" the agency has "reasonably considered the relevant issues and reasonably explained the decision" and determining that the agency's "analysis" in the agency action "was reasonable and reasonably explained").

No matter how expansively "agency action" under 5 U.S.C. § 551 is construed, the term does not encompass either the mental processes or abstract plans of an agency head, or statements he shares with his staff as part of a deliberative process. The APA reflects the "general rule [] that a party is not entitled to probe the deliberations of administrative officials, oversee their relationships with their assistants, or screen the internal documents and communications they utilize.'" *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 462 (D.C. Cir. 1967). Indeed, an agency's "plans themselves are generally unreviewable; it is only specific [concrete agency] actions implementing the plans that are subject to judicial scrutiny." *Fund for Animals, Inc v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006).[4]

---

[4] The APA also contemplates that interested parties can generate an agency action if one does not exist. *E.g.*, 5 U.S.C. §§ 553(e), 554(e), 555. "Ordinarily, a party's recourse to induce an agency to [issue] a desired [agency] action is to file not a lawsuit, but" to file a petition. *Dep't of Educ. v. Brown*, 600 U.S. 551, 565 (2023). In that way, the APA's codification of the exhaustion doctrine, "does not contain an escape hatch for litigants" like Plaintiffs "who steer clear of established [APA] procedures altogether."

1    Plaintiffs' complaint seeks § 706(2) review of precisely the type of "abstract decision apart from

2    specific agency action, as defined in the APA," that § 706(2) does not subject to judicial review. *See*

3    *Biden*, 597 U.S. at 809. Specifically, the Complaint seeks judicial review of an abstract "decision not to

4    request funding from the Federal Reserve[.]" Compl. ¶ 64. But the Complaint fails to plausibly allege

5    facts identifying, nor do Plaintiffs show, any rule, order, license, sanction, or relief, as defined by the APA,

6    on this issue. Moreover, the APA claim in the Complaint does not seek to hold unlawful and set aside any

7    such rule, order, license, sanction, or relief.[5]

8    True, the APA defines the term "agency action" to include a "failure to act[.]" 5 U.S.C. § 551(13).

9    Putting aside artful pleading, there is no doubt that this *should be* (at most) a failure-to-act case. Compl.

10   ¶ 6 ("Defendants have thus refused to request funds from the Federal Reserve Board"); ¶ 49 (Defendants

11   "cannot now refuse to request funding from the Federal Reserve System."). But "[t]he only way to 'set

12   aside' a failure to act is to compel agency action ... which is the relief that § 706(1) provides.'" *Seaverns v.*

13   *Federal Emergency Mgmt. Agency*, 2025 WL 786742, at *4 (D.N.M. Mar. 12, 2025) (quoting *Jarita Mesa*

14   *Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1197 (D.N.M. 2015)). And the

15   Complaint includes no § 706(1) claim to adjudicate.

16   **B.    The Complaint Fails to Satisfy the APA's Finality Requirement**

17   Plaintiffs fare no better on finality. The APA requires judicial review of only "final agency

18   action[.]" 5 U.S.C. § 704. Two conditions must be met for finality. First, the challenged action must mark

19   the "consummation" of the agency's decisionmaking process. *Bennett v. Spear*, 520 U.S. 154, 177-78

20   (1997). It may not be a "preliminary, procedural, or intermediate agency action or ruling[.]" 5 U.S.C.

21   § 704. Second, it "must be one by which rights or obligations have been determined, or from which legal

22   consequences will flow." *Bennett*, 520 U.S. at 178. The CFPB's November litigation statement was neither

23   a consummation of its decisionmaking process, nor one by which rights or obligations were determined,

24   or from which legal consequences flowed. Indeed, "later proceedings" can "clearly deprive [an agency

25

26   _____

     *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007).

27   [5] Plaintiffs' brief attacks statements in the "OLC memo" as violating § 706(2)(A). *E.g.*, Mot. 14.

28   But OLC is not a party to this action and the OLC memo is not a CFPB agency action.

action] of any finality that it may have enjoyed." *Pub. Citizen v. Bowen*, 833 F.2d 364, 366 (D.C. Cir. 1987). And as discussed above, the CFPB has now requested funding, making clear that any "decision not to request funding[,]" Compl. ¶ 64, had no "concrete impact" on the Plaintiffs, *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (explaining that courts must consider the "concrete impact the [agency action] had on [Plaintiffs]."); *see Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate ... effect on the day-to-day business' of the complaining parties").

### C. Plaintiffs Are Not Entitled to Judgment on Their Claim for a Mandatory Injunction Compelling Defendants to Request Funds from the Federal Reserve.

Plaintiffs seek an order "requiring Defendants to request funding from the Federal Reserve Board[.]" Compl., Prayer for Relief ¶ 3; *see* Mot. 25. Because the relief demanded would require the Acting Director to take a specific action, it constitutes a mandatory rather than prohibitory injunction. And "[w]hen the effect of a mandatory injunction is the equivalent of mandamus, it is governed by the same standard." *Or. Nat. Res. Council. v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995). And "[m]andamus may be granted when '(1) the plaintiff's claim is clear and certain; (2) the duty is 'ministerial and so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available.'" *Id.*[6] Plaintiffs fail to satisfy any of these required criteria.

#### 1. Section 5497(a)(1) Does Not Impose a Plainly Prescribed Duty on the Acting Director to Seek Funds from the Federal Reserve.

Start with the second factor. Plaintiffs have failed to establish that 12 U.S.C. § 5497(a)(1) imposes

---

[6] "[T]he discretionary relief of declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court. Such equivalence of effect dictates an equivalence of criteria for issuance." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.); *see Comm. on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (similar). Even if the claim were treated under § 706(1)—which would be improper absent an amended complaint—the APA "carried forward the traditional practice prior to its passage, when judicial review was achieved ... principally [by] writs of mandamus[.]" *SUWA*, 542 U.S. at 64.

a "crystal-clear legal duty" on the CFPB, *see In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022), to request funding from the Fed. "To determine if such a duty exists, [the Court] must analyze the [statutory] language[.]" *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986). Two issues preclude a conclusion that the statute plainly prescribes a duty that the Acting Director request funds from the Fed. First, Congress vested the Fed, not the CFPB Director, with the relevant statutory duty. Second, the statute could not contemplate a funding request when the Fed lacks combined earnings from which to draw.

### (i)    Section 5497(a)(1) Imposes Only One Duty on the CFPB Director, which He Has Satisfied for Fiscal Year 2026.

As OLC explains, "[o]n its face, Congress's instruction that 'the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law' is not directed at the CFPB" at all. Op. at *30-31 (quoting 12 U.S.C. § 5497(a)(1)). Rather, the statute imposes on "the Board of Governors" a duty to "transfer to the Bureau" certain sums of money. 12 U.S.C. § 5497(a)(1). To be sure, the statute implies that the Director must determine "the amount ... reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law[.]" *Id*. But even before the Acting Director's recent funding request, Plaintiffs could not have suggested that the Acting Director had failed to comply with that obligation. The Acting Director had made the required determination in the context of reports under 12 U.S.C. § 5497(e)(1)(B). *See* Dkt. 11-12, RJN Ex. D.[7]

It may well be that § 5497(a) implies that the Acting Director may not "make a determination of the amount of funding needed but lock it in a drawer," as Plaintiffs argue. Mot. 14. But that attacks a straw man because the Acting Director widely publicized his determination. He sent it to the chairs and ranking members of relevant congressional committees. Dkt. 11-12 (and materials attached to original filing). And he filed it on the public docket in federal court. *Id*. Plaintiffs provide no evidence, because there is none, that the Acting Director would not have provided the Fed with a copy of that document upon request, permitting the Fed to comply with any mandatory duty the statute imposes on that non-party. OLC had opined that Acting Director could not have issued an "instruction for the Federal Reserve to" "draw[] on

---

[7] Because Plaintiffs did not include the report that was attached to the Notice of § 5497(e) Report filed in *NTEU*, Dkt. 11-12, Defendants have provided it as RJN, Ex. D.

Treasury funds." Op. at *32. But it did not bar the Acting Director from communicating with the Fed or complying with an information request therefrom. Indeed, the CFPB would have been required to provide the Fed the report even if it was not widely publicized. *See* 5 U.S.C. § 552.

Plaintiffs complain that § 5497(a)'s plain language "allow[s] a CFPB Director to refuse to ask for funding for any reason at all, even after determining that funds were both available and necessary." Mot. 14. But the Acting Director's discretion to refuse to request funding flows directly from Congress's conscious decision to vest the Fed with the mandatory duty to transfer—placing the responsibility for ensuring that the Bureau Fund remains solvent in the Fed's hands—and not to vest the Acting Director with a clear statutory duty to seek funds. *See* 12 U.S.C. § 5497(a); *see CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422 (2024) ("Each year, the Bureau *may* requisition ...") (emphasis added)). Indeed, Plaintiffs admit as much in their Complaint. Compl. ¶ 47 ("The text assigns only one role to the CFPB Director: To determine the amount 'reasonably necessary to carry out the authorities of the Bureau ...'"). Again, Defendants are not suggesting that the agency would refuse, could refuse, or has refused to comply with information requests originating with the Fed regarding the amounts necessary to carry out the CFPB's authorities. Nor would any such information request have been needed for Plaintiffs to seek an order in the nature of mandamus—if they are proper plaintiffs—to compel the Fed to transfer funds. Plaintiffs are already armed with the Acting Director's determinations regarding the agency's funding needs for FY26. Dkt. 11-12 (and attachments in original filing).

Plaintiffs also complain that "it would be odd to assign responsibility for monitoring the Federal Reserve System's earnings to the CFPB." Mot. 14. But the fact that the Fed is in the best position to monitor its own earnings explains Congress's entirely rational decision to vest the Fed with the mandatory duty to transfer—and to seek any information needed to comply with that duty—rather than vest the Acting Director with a duty to make requests. 12 U.S.C. § 5497(a).

In sum, while an unsolicited letter issued by the CFPB Director to the Fed may be one avenue by which the Fed can learn of the Director's determination as to the funding needs of the CFPB, the statutory language itself does not plainly prescribe any such letter. The Fed is responsible for transferring funds and obtaining the information needed to comply with its duty. Any dispute as to a failure to act under the statute would have been more appropriately directed at the Fed, not the CFPB or the Acting Director.

1

2

    **(ii)**  **Plaintiffs Are Incorrect that the "Combined Earnings of the Federal Reserve System" Refers to Revenues Rather than Profits.**

3

  Section 5497(a) independently precludes mandamus against the Acting Director because the

4

statute does not contemplate a funding request when the Federal Reserve System lacks combined earnings

5

from which to draw. *See Fallini*, 783 F.2d at 1345 (The Court must look to "the entire Act in order to give

6

effect to the legislative intent."). Plaintiffs' claim for relief is premised on their disagreement with OLC's

7

reading of § 5497(a)(1). The Fed has a duty to transfer funds "from the combined earnings of the Federal

8

Reserve System[.]" 12 U.S.C. § 5497(a)(1). OLC construed the term "'combined earnings of the Federal

9

Reserve System'" as referring "to the Federal Reserve's profits, calculated by subtracting its interest

10

expenses from its revenues." Op. at *1. Thus, if the "Federal Reserve has no profits, it cannot transfer

11

money to the CFPB." *Id*. In contrast, Plaintiffs' view that "earnings" means "all the money" the Fed takes

12

in, Mot. 15, is inconsistent with other provisions of Dodd-Frank—when Congress wanted to talk about

13

"all the money" that an entity takes in, Op. at *10, in that statute, it used the word "revenues," not

14

"earnings." *See* Op. at *14-15. Despite nine invocations of the term "ordinary" meaning, Mot. 15-19,

15

Plaintiffs' core argument—that the Fed "earns" money by losing it—is far from ordinary. In ordinary

16

usage, earnings and losses are opposites.

17

  This same dichotomy is reflected by the Fed's use of the terms "net interest income" and "net

18

interest expense" as two sides of the same coin. Op. at *3. Both terms describe the yield from the Fed's

19

primary banking activities, calculated by subtracting interest expenses from interest income. *Id*. But "net

20

interest income" represents a positive yield, and "net interest expense" reflects a negative yield. *Id*. These

21

concepts correspond to the ordinary and accounting concepts of profit and loss, because interest expenses

22

are the cost at which the Fed generates interest income. *Id*. at *13. "If the Federal Reserve no longer paid

23

interest on reserve balances," or deposits, banks' desire to leave funds on deposit with the Fed would

24

"plummet." The Federal Reserve, Interest on Reserve Balances (IORB) Frequently Asked Questions

25

(Sept. 23, 2025), https://www.federalreserve.gov/monetarypolicy/iorbfaqs.htm. Banks would withdraw

26

deposits, and the Fed would need to make corresponding sales of its revenue-generating investments,

27

"shrink[ing] its balance sheet rapidly." *Id*. Thus, the Fed has publicly justified its interest expenses by

28

explaining that, "[w]hile the Federal Reserve pays interest on [deposits], it also receives interest income"

from investments made with and offered as security for those deposits. *Id*. This contradicts Plaintiffs' suggestion that the Fed's willingness and ability to absorb losses for the sake of monetary policy are relevant or that the concept of profit is not relevant to the Fed, Mot. 17-18. Rather, the Fed tracks the profitability of its primary banking activities by offsetting its interest expenses against its interest income and the profitability of its other activities in the "[o]ther items of income [or] loss" section of its income statement. *See* Op. at *3.

Plaintiffs' position is that, by engaging in financial transactions that cost far more than they yield, the Fed generates "earnings" it otherwise would not have. *See* Mot. 15-24. That position turns ordinary meaning on its head. They claim that the Fed earns money only because of the amount it takes in. *Id.* at 2. But in 2024, the Fed paid about $227 billion in interest to depositors and used that money to generate only about $159 billion in interest income. The Federal Reserve Banks, Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report at 4 (Mar. 12, 2025) ("2024 Financial Statements"). Plaintiffs are not claiming that the Fed earns money despite engaging in unprofitable transactions. Rather, they are claiming that the Fed can earn billions because of those unprofitable transactions. But losing money is not earning money.

In short, Plaintiffs' contention that the Fed earns money by losing it is unpersuasive. In contrast, OLC's opinion is supported by the traditional tools of statutory construction, including (i) the plain meaning at the time of enactment, (ii) statutory structure, (iii) the Fed's accounting practices, and (iv) consideration of Congress's policy aims. Op. at *9-21.

*First*, OLC's opinion is supported by the plain meaning at the time of enactment. *Id*. at *10-13. "Common dictionary definitions interpret 'earnings' to describe 'the balance of revenue after deduction of costs and expenses.'" *Id*. at *10 (quoting *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005)).[8] OLC also relied on *Webster's Third New International Dictionary* 714 (1993 ed.), and *The American Heritage Dictionary of the English Language* 561 (5th ed. 2016)). The ordinary meaning of the term "combined" is "'to unite into a single number or expression." *Id*. at *28 (quoting Merriam-Webster's Collegiate at 246). "Coupled with the word 'earnings,' the phrase 'combined earnings' in section

---

[8] OLC cites several other dictionary definitions in support of its reading. Op. at *13.

1    5497(a)(1) therefore refers to the collective profits ... of the Reserve Banks." *Id*.

2    Plaintiffs complain that OLC's opinion is not consistent with the definitions it cites because it

3    "defines the Federal Reserve's 'earnings' as revenue after deducting *some*" expenses. Mot. 17. But OLC

4    didn't cherry-pick random expenses. OLC believes that what 12 U.S.C. § 289 describes as "necessary

5    expenses" are what Dodd-Frank contemplates being deducted from revenue to calculate earnings. *See* Op.

6    at *14 ("In other words, 'net earnings' here are the Federal Reserve's earnings minus its operating

7    expenses—its equivalent of the accounting concept 'net income.'").

8    Plaintiffs emphasize that *Merriam Webster's Collegiate* and *Webster's Third New International*

9    do not list business profits as the first definition. Mot. 17. But both dictionaries disclaim the order of

10   entries bearing any meaning. *See* Merriam Webster's Collegiate Dictionary 20a (11th ed. 2020) ("The

11   order of senses within an entry is historical"); Webster's Third New International Dictionary 17a (1993)

12   (ordering "does not evaluate senses or establish an enduring hierarchy of importance among them.").

13   "The best sense" of any word "is the one that most aptly fits the context of an actual genuine

14   utterance." *See id*. Thus, it makes no difference that *The American Heritage Dictionary of the English

15   Language* (5th ed. 2016) places more common meanings first. *See id*. at xxiv. That dictionary's first

16   definition—salary or wages—has no application to this case because the Fed takes in no salary or wages.

17   *See id*. at 561. The very next definition—business profits—corresponds to OLC's interpretation. *See id*.

18   Although Plaintiffs argue that other dictionary definitions of "earnings" support reading

19   "combined earnings" in § 5497(a)(1) to mean "revenue," Mot. 16, "the weight of authority indicates that

20   'earnings' require offsetting at least some costs against revenue. Moreover, this interpretation comports

21   with the use of the term in the business and accounting context—which is the relevant context for

22   interpreting Dodd-Frank." Op. at *22. Indeed, Plaintiffs' reliance on CFPB's prior definition presented in

23   litigation, Mot. 16, is misplaced because CFPB's position was rooted in definitions regarding an

24   *individual's* earnings. Op. at *22-23. "The colloquial meaning of 'earnings' in the individual context is

25   not controlling ... and should not guide [the] statutory construction." Op. at *23.

26   Plaintiffs assert that courts have "applied ordinary means to terms in both the Federal Reserve Act

27   and the portions of the Dodd-Frank governing the CPFB" as opposed to one that considers the business

28   and financial context. Mot. 17. But the examples they offer are non-technical. *Id*. Plaintiffs do not explain

how "deceptive," *see CFPB v. CashCall, Inc.*, 35 F.4th 734, 746 (9th Cir. 2022), or the word "may," *Custodian Bank, Inc. v. Fed. Resv. Bd. of Governors*, 157 F.4th 1235, 1253 (10th Cir. 2025), or the word "engage," *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 908 (S.D. Ind. 2015), have special meanings in the accounting world. *See* Mot. 17. Giving non-technical meaning to non-technical terms is fully consistent with interpreting "earnings" in a way that is supported by ordinary dictionaries, accounting dictionaries, and the Fed's own usage both before and after Dodd-Frank. In any event, Plaintiffs' argument ignores the numerous definitions from non-technical dictionaries upon which OLC relies. Op. at *10.

Plaintiffs' criticisms of OLC's analysis because the Fed "differs from commercial entities in significant respects" are also unpersuasive. Mot. 18. The Fed may be unique in its willingness to absorb losses to control interest rates, but it does not follow that the Fed's interest expenses are unrelated to the money it earns. The statute uses the term "revenues," not "earnings," to refer to all the money a company takes in, *see* Op. at *14 n.22, and each Reserve Bank is a "body corporate[,]" 12 U.S.C. § 341.

*Second*, OLC's opinion is supported by statutory structure. Op. at *13-16. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (quoting *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015)). Thus, the term "earnings" in § 5497(a)(1) must be distinguished "from the use of the term 'revenues' elsewhere in Dodd-Frank[.]" Op. at *14. *See, e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 167(b)(2), 124 Stat. 1376, 1433 (2010) (codified at 12 U.S.C. § 5367(b)(2)) (referring to "revenues generated from [a specific] activity"); *id.* § 201(b), 124 Stat. at 1444 (codified at 12 U.S.C. § 5381(b)) (referring to "the consolidated revenues of such company from such activities" in relation to the definition of "financial company"); *id.* § 527(5)(C)(i)(II), 124 Stat. at 1592 (codified at 12 U.S.C. § 8206(5)(C)(i)(II)) (referring to the generation of "annual revenues"); *id.* § 1473(h)(2), 124 Stat. at 2195 (referring to "[i]ncremental revenues").

Plaintiffs argue that statutory context supports their reading because of how the term "earnings" is used elsewhere in the Dodd-Frank Act. Mot. 18 (citing 12 U.S.C. §§ 5390(n)(2), 5465(c), and 15 U.S.C. § 78u-6(g)(5)(D)). But, in their own specific contexts, many of these uses have a more specific meaning. Op. at *23-24. For example, one usage refers to "earnings from investments"—not earnings or combined earnings more generally. 12 U.S.C. § 5390(n)(2); *see* Op. at *23-24. OLC explains that these uses of

1   '"earnings' are most naturally understood as the difference between the value of an initial outlay [in this

2   case, the cost of an investment] against a later inflow that it was intended to yield—that is, that 'earnings'

3   account for costs and are not the equivalent of 'revenues.'" *Id*. at *24.

4          Plaintiffs are wrong to suggest that the Dodd-Frank Act's use of the term "profits" elsewhere

5   somehow supports their reading. Mot. 19 (citing 12 U.S.C. §§ 5390(c)(3)(B)(ii), 5390(s)(3)). The phrase

6   "lost profits[,]" *see* 12 U.S.C. § 5390(c)(3)(B)(ii), frequently arises in commercial litigation involving

7   damage calculations, as it is used in § 5490(c)(3)(B)(ii). *See* Mark C. Hansen and Ariela Migdal, Business

8   and Commercial Litigation in Federal Courts § 55:40 (5th ed. 2025) (describing "two commonly

9   recognized methods of proving lost profits"); *Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*,

10  No. 92-4228, 1993 WL 496946, at *2 (E.D. Pa. 1993) (declining to give weight to an individual's use of

11  the term "lost profits" because it was a "legal term[] of art"). So it is neither surprising that Dodd-Frank

12  invoked the term in § 5390(c)(3), which addresses damages claims, nor that Dodd-Frank did not use the

13  phrase in relation to the financial waterfall of the Fed.

14         Plaintiffs' argument that "operating expenses are a subset of 'all' the 'necessary expenses' that the

15  Banks incur" as the terms are used in 12 U.S.C. § 289, Mot. 20, cannot be reconciled with the way the

16  Fed uses the terms in financial statements at the time the statute was enacted. Op. at *16-17. Rather, in

17  those statements there is a line for total operating expenses, which the Fed "treats as its 'necessary

18  expenses' under" § 289. *Id*. at *17. Comparing the formula for transferring excess earnings to the Treasury

19  in § 289 and in the 2009 Financial Statement, for example, indicates that the term "Cost of Operations" in

20  the Fed's statements and "Necessary Expenses" in § 289 are equivalent:

21
| **2009 Financial Statement** | **12 U.S.C. § 289** |
| --- | --- |
22
| Earnings | Earnings |
23
| - "Cost of Operations" | - "Necessary Expenses" |
| - "Payment of Dividends" | - "Annual Dividend" |
24
| - "Reservation of Surplus" | - "Capped Surplus Funds" |
| = Transfer to Treasury | = Transfer to Treasury |

25  The Federal Reserve Banks, Combined Financial Statements as of and for the Years Ended December 31,

26  2009 and 2008 and Independent Auditors' Report 20 (Apr. 21, 2010) ("2009 Financial Statements").

27

28

1     Plaintiffs' contrary suggestion that "interest expenses" is part of "necessary expenses[,]" Mot. 20,

2     is belied by the 2009 Financial Statements. They make clear that the excess earnings transferred to the

3     Treasury reflect three deductions from earnings. 2009 Financial Statement at 20. Page 3 shows that each

4     of these deductions corresponds to a separate line item in the Federal Reserve's books—and that the three

5     deductions from earnings do not include interest expenses, which appear on a separate line item. *Id* at 3.

6     *Third*, the Op. explains that the context of the Dodd-Frank Act supports its interpretation. Op. at

7     *16-18. "[W]hile legislative history can never defeat unambiguous statutory text, historical sources can

8     be useful for [the] different purpose" of discerning "the law's ordinary meaning at the time of

9     enactment[.]" *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020). "[B]ackground presumptions can

10    inform the understanding of a word or phrase[.]" *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020). OLC explains

11    that "Congress legislated against the background of the Federal Reserve's accounting practices" and "the

12    Federal Reserve's financial statements—both today and in 2009 ... confirm [its] statutory construction."

13    Op. at *16. For example, the Fed has explained that "the Reserve Banks ... transfer excess earnings to the

14    Treasury ... after providing for the costs of operations, payment of dividends, and reservation of surplus

15    funds." *Id*. (quoting 2009 Financial Statement at 20)). By using the term "excess earnings" to describe the

16    funds that remain after operating expenses, dividend payments, and reserved surplus funds, the Federal

17    Reserve implicitly recognized that these three items are the difference between its earnings and its

18    remittances to Treasury. *Id*. at *17; *see Mozilla Corp. v. FCC*, 940 F.3d 1, 25 (D.C. Cir. 2019) (considering

19    statutory language that reflected "nearly verbatim" language from earlier consent decree); *Blitz v.

20    Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984) (presuming "that Congress was well aware that the pivotal

21    word[s] ... had been construed in similar contexts as a term of art."). Notably, interest expenses are not

22    among the outlays deducted from earnings, and must therefore be accounted for upstream from earnings

23    by deducting them from revenues. Op. at *17.

24    *Fourth*, the OLC Opinion explains how legislative history and Congress's policy aims support its

25    interpretation. Courts sometimes consider the "evolution of [a] statutory provision[]" as it made its way

26    through the Congress to support "further evidence [of] Congress['s] inten[t]." *Russello v. United States*,

27    464 U.S. 16, 23 (1983). OLC explains that the "original proposal would have provided the CFPB with a

28    mandatory payment of a fixed portion of the Federal Reserve's 'total system expenses' without limiting

1   this payment to any particular source of funds." Op. at *19 (citing H.R. 4173, 111th Cong.

2   § 4109(a)(1)11). That proposal "would have ensured that the CFPB would receive funding regardless of

3   the Federal Reserve's financial performance." *Id*. That original, unsuccessful proposal is essentially what

4   Plaintiffs contend Congress enacted into law.

5        Plaintiffs argue that there is no "evidence in the text or context that Congress has made a tradeoff."

6   Mot. 21. But after legislative proceedings, Congress ultimately restricted § 5497(a)(1) transfers such that

7   they came not from total system expenses of the Federal Reserve, but from its "combined earnings." 12

8   U.S.C. § 5497(a)(1). Plaintiffs argue that there is "no evidence that Congress intended the term 'combined

9   earnings' to convey the limitation OLC advances." Mot. 22. But Congress consciously rejected the

10  original proposal that the Fed fund the CFPB even when it is unprofitable, as Congress required of the

11  Fed for other entities. Op. *25-26. The Court should accord the difference in these provisions a difference

12  in meaning. *See id*. at *19. Indeed, Plaintiffs offer no alternative explanation.[9]

13       Indeed, Congress's decision to limit § 5497(a)(1) transfers to money from the combined earnings

14  of the Federal Reserve System reflects rational purposes. Plaintiffs argue that construing "combined

15  earnings" to mean revenues effectuates Congress's express aim "to establish a steady source of funding,

16  rather than funding through an annual appropriation[.]" Mot. 20-21. But the final statute reflects a

17  compromise that places limits on that interest by requiring funding to come from earnings. 12 U.S.C.

18  § 5497(a)(1). That compromise advances an interest in minimizing Fed losses if it might one day not run

19  at a profit—an interest that would not be advanced had the original language of H.R. 4173 § 4109(a)(1)

20  been signed into law. Op. at *20-21. Indeed, "limiting the transfer of funds to profits ensured that the

21  Federal Reserve would never have to create or increase a deferred asset to fund the CFPB in the never-

22  before-seen event that [the] Federal Reserve became unprofitable[.]" *Id*. at *20. Thus, Congress "str[uck]

23  a balance between providing stable CFPB funding and preserving the Federal Reserve's operational

24  independence," while also preserving its own role when the Fed is unable to provide funds. *Id*. at *21.

25

26       [9] Plaintiffs assert that "OLC ignores that the funding mechanism that Congress enacted was *not*

27  the proposal in th[e] House bill." Mot. 22. The point is that the legislators who proposed the House bill

28  were part of the same Congress that rejected their proposal and instead went with the Senate language.

In any event, Congress in 2010 may well have believed that limiting the source of § 5497(a)(1) funding to Federal Reserve System profits as opposed to total system expenses placed only a minimal burden on providing the CFPB a "stable funding source[.]" Mot. 20. After all, at the time the Dodd-Frank Act was signed into law, the Federal Reserve had a "century-long record of profitability"—through various interest-rate environments— indicating that "Federal Reserve profits" were likely "a reliable source of plentiful funds." Op. at *19. Indeed, the "Federal Reserve had over $39 billion of profits in 2008 and nearly $57.4 billion in 2009." *Id*. At the lower of these figures, the Federal Reserve's profits "were sufficient to cover the $242 million budget for the CFPB's first full year of operations more than 160 times over." *Id*. Whether "individual Federal Reserve Banks" had operated at a shortfall is not probative. Mot. 22. Congress chose to rely on the "combined" earnings of the System, which had a century-long record of profitability. Op. at *19

Although Plaintiffs raise workability issues with OLC's interpretation of the statute, Mot. 21 (enforcement "could start and stop"), *id*. at 23-24, nothing about their interpretation inherently avoids those concerns. In the future, the Fed may not take in enough money to exceed the cap under § 5497(a)(2). The volume of investments that the Fed may hold depends on a variety of factors that can fluctuate— including the interest it pays to depositors, its perceived strength as a central bank, and the perceived stability of the U.S. dollar. *Cf*. The Federal Reserve, Interest on Reserve Balances (IORB) Frequently Asked Questions ("If the Federal Reserve no longer paid interest on reserve balances, demand for reserves would plummet," and "[t]he Federal Reserve would shrink its balance sheet rapidly."). Because factors influencing the Fed's volume of investments can change significantly over time, the Fed's revenue is not a given. To the extent Plaintiffs are arguing that Congress would have assumed § 5497(a)(1) was workable because a shortfall in revenue is an exceedingly remote possibility, Mot. 23, this is essentially the same argument presented by OLC: when Dodd-Frank was passed, the Fed had a century-long record of profitability, so Congress would have also assumed that a shortfall in profits was an exceedingly remote possibility. OLC's opinion reflects the view that § 5497(a)(1) should not be interpreted counter to its plain meaning, counter to standard banking and Fed accounting practices, merely so that the reporting mechanism in § 5497(e)(1) works smoothly in a context that Congress would not have anticipated as a

likely possibility.[10]

The Court should reject Plaintiffs' arguments invoking "[r]ecent legislative" history. Mot. 23. "Such subsequent legislative history ... provides 'an unreliable guide to legislative intent.'" *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) (citations omitted); *see Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote.").

### 2.    Plaintiffs Fail to Satisfy the Remaining Criteria for Mandamus Relief.

Plaintiffs fail to satisfy the other criteria for mandamus relief. They cannot establish that their claim to relief "is clear and certain," *Harrell*, 52 F.3d at 1508, given that the Acting Director has already sought and received funding from the Fed in accordance with the *NTEU* injunction. Nor can Plaintiffs demonstrate that "no other adequate remedy is available." *Id*. Plaintiffs have an adequate remedy in the form of an action for mandatory injunctive relief directly against the Fed seeking to compel the Fed to transfer funds.[11] Plaintiffs already have the Acting Director's determination of the amounts necessary to carry out the authorities of the CFPB. Dkt. 11-12 (and attachments in original filing). To issue an order to compel one official to requisition another official to transfer funds when a Plaintiff can proceed directly against the second official would be inconsistent with courts' characterization of mandamus relief as an "extraordinary remedy[.]" *See Harrell*, 52 F.3d at 1508.

Moreover, Plaintiffs' argument that the Fed *does* have combined earnings under OLC's definition, Mot. 24-25, provides even further grounds to withhold mandamus relief against the Acting Director. "The extraordinary remedy of mandamus lies within the discretion of the trial court, even if the three elements

---

[10] Plaintiffs argue that "Defendants' approach would put the CFPB (not to mention any reviewing court) in the position of auditor of the Federal Reserve System." Mot. 24. This argument is hard to follow. Nothing about OLC's interpretation indicates that the CFPB would not defer to the Fed's statements regarding its combined earnings under OLC's definition.

[11] To be sure, such an action may face many of the same threshold and substantive barriers as Plaintiffs face here. But the point is that traditional principles would require the plaintiff to proceed directly against the entity that is responsible for the ultimate outcome.

1    are satisfied." *Id.* The Fed—not Plaintiffs, the CFPB, or the Court—is best positioned to opine on whether

2    it has combined earnings within the meaning of OLC's definition. Defendants' counsel has requested the

3    Fed's opinion on whether it has combined earnings as defined by OLC but has not yet received a response.

4    RJN, Ex. B. Even if the Acting Director was not already compelled by another court's order to continue

5    to seek funding from the Federal Reserve, therefore, mandamus relief should be withheld at least until the

6    Fed reports back. Although (absent a court order) OLC's opinion is binding on Executive Branch officials,

7    a report that the Fed has returned to profitability would mean that OLC's opinion would no longer restrain

8    the Acting Director's discretion to instruct the Fed. Additionally, if the Fed has returned to profitability,

9    it is far from clear why the Fed would not comply with its duties under § 5497(a)(1) given that the Acting

10   Director has already determined the amounts reasonably necessary to fund the CFPB for FY26.

11          **D.      Plaintiffs Fail to Show Prejudicial Error.**

12          The APA requires the Court to take "due account" of "the rule of prejudicial error[,]" 5 U.S.C.

13   § 706, and it is Plaintiffs' burden to show prejudice, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin.*

14   *Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023). Error is prejudicial if it "affect[ed] the [Plaintiffs'] substantial

15   rights." *Olin Indus. v. NLRB*, 192 F.2d 799, 799 (5th Cir. 1952). Here, any error had no impact on

16   Plaintiffs' substantial rights because the agency has requested funding from the Fed and, even before that,

17   the Acting Director had determined and publicized the amounts reasonably needed to fund the Bureau for

18   FY26.

19   **VII.   The Court Should Narrowly Tailor and Temporarily Stay Any Injunctive Relief.**

20          Should the Court enter an order that compels a funding request, that relief should be tailored to

21   any actual injury a Plaintiff with standing has demonstrated, and the Government respectfully requests

22   that the relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such

23   relief be administratively stayed for a period of seven days to allow an opportunity to seek expedited relief.

                                           **CONCLUSION**

25          For the foregoing reasons, Plaintiffs' Motion should be denied and this case dismissed.

26   DATED: January 16, 2026                          Respectfully submitted,

27

28                                                   */s/ Charles E.T. Roberts*
                                                     CHARLES E.T. ROBERTS
                                                     Counsel