Stephanie B. Garlock (admitted *pro hac vice*)
Allison M. Zieve (admitted *pro hac vice*)
Wendy Liu (admitted *pro hac vice*)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009-1001
Telephone:      (202) 588-1000
Email:          sgarlock@citizen.org
                azieve@citizen.org
                wliu@citizen.org

Michael W. Bien – 096891
Gay Crosthwait Grunfeld – 121944
Van Swearingen – 259809
Adrienne Spiegel – 330482
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:      (415) 433-6830
Facsimile:      (415) 433-7104
Email:          mbien@rbgg.com
                ggrunfeld@rbgg.com
                vswearingen@rbgg.com
                aspiegel@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RISE ECONOMY; NATIONAL COMMUNITY REINVESTMENT COALITION; and WOODSTOCK INSTITUTE,<br><br>          Plaintiffs,<br><br>     v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau; and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>          Defendants. | Case No. 5:25-cv-10481-EJD<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: Feb. 11, 2026<br>Hearing Time: 10:00 AM<br>Judge: Hon. Edward J. Davila<br>Place: Courtroom 4 – 5th Floor<br><br>Trial Date: None set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

    I.     There is no threshold barrier to granting Plaintiffs relief. ..................................... 1

          A.     Plaintiffs' claim is not moot. ................................................... 1

          B.     Plaintiffs have standing, and their claim is ripe. ........................................ 4

          C.     Joinder of the Federal Reserve is neither necessary nor ground for dismissal. ..................................................................... 6

          D.     The *NTEU* litigation does not warrant transfer or dismissal of this case. .................................................................................... 7

    II.    Plaintiffs are entitled to judgment as a matter of law. .............................................. 8

          A.     Plaintiffs state a claim for relief under § 706(2). ....................................... 8

          B.     The complaint challenges final agency action. ....................................... 10

          C.     Defendants' interpretation of the CFPB's funding statute is incorrect. ................................................................................... 10

    III.   The Court should grant Plaintiffs declaratory and injunctive relief. ................... 14

CONCLUSION ........................................................................................................................ 15

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## CASES

*100Reporters v. Department of State*,
    602 F. Supp. 3d 41 (D.D.C. 2022) ...................................................................9

*A.L. Mechling Barge Lines, Inc. v. United States*,
    368 U.S. 324 (1961) .........................................................................................4

*Agua Caliente Tribe of Cupeno Indians of Pala Reserve v. Sweeney*,
    932 F.3d 1207 (9th Cir. 2019) .......................................................................15

*Alliance to Save Mattaponi v. U.S. Army Corps of Engineers*,
    515 F. Supp. 2d 1 (D.D.C. 2007) .................................................................10

*Alltrade, Inc. v. Uniweld Products, Inc.*,
    946 F.2d 622 (9th Cir. 1991).........................................................................7

*American Federation of Government Employees v. Trump*,
    139 F.4th 1020 (9th Cir. 2025) ....................................................................15

*Behring Regional Center LLC v. Wolf*,
    No. 20-cv-09263, 2021 WL 1164839 (N.D. Cal. Mar. 26, 2021).................7

*Bennett v. Spear*,
    520 U.S. 154 (1997) .....................................................................................10

*Biden v. Texas*,
    597 U.S. 785 (2022) .......................................................................................9

*Building & Construction Department v. Rockwell International Corp.*,
    7 F.3d 1487 (10th Cir. 1993).........................................................................4

*California v. Department of Health & Human Services*,
    941 F.3d 410 (9th Cir. 2019),....................................................................2, 4

*Campaign for Accountability v. Department of Justice*,
    155 F.4th 724 (D.C. Cir. 2025) .....................................................................9

*Chafin v. Chafin*,
    568 U.S. 165 (2013) .......................................................................................1

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) .......................................................................................5

*Democratic National Committee v. Watada*,
    198 F. Supp. 2d 1193 (D. Haw. 2002) ..........................................................6

*El Centro Regional Medical Center v. Blinken*,
    No. 3:21-cv-00361, 2021 WL 3141205 (S.D. Cal. July 26, 2021) ...................................15

*Electronic Frontier Foundation v. Office of Director of National Intelligence*,
    No. 08-cv-01023, 2009 WL 10710750 (N.D. Cal. Oct. 7, 2009)...........................................15

*Federal Bureau of Investigation v. Fikre*,
    601 U.S. 234 (2024) .........................................................................................................2

*Federal Communications Commission v. Consumers' Research*,
    606 U.S. 656 (2025) .........................................................................................................3

*Franco v. U.S. Department of the Interior*,
    No. 09-cv-1072, 2012 WL 3070269 (E.D. Cal. July 27, 2012) ...........................................10

*Gardner v. GC Services, LP*,
    No. 10-cv-997, 2010 WL 2721271 (S.D. Cal. July 6, 2010) ..............................................7

*Hunt v. Imperial Merchant Services, Inc.*,
    560 F.3d 1137 (9th Cir. 2009).............................................................................................3

*Inland Empire Waterkeeper v. Corona Clay Co.*,
    17 F.4th 825 (9th Cir. 2021)................................................................................................6

*Kelly v. RealPage Inc.*,
    47 F.4th 202 (3d Cir. 2022)................................................................................................6

*Kohn Law Group, Inc. v. Auto Parts Manufacturing Mississippi, Inc.*,
    787 F.3d 1237 (9th Cir. 2015)............................................................................................7

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) .........................................................................................................8

*Lowry v. Barnhart*,
    329 F.3d 1019 (9th Cir. 2003)..........................................................................................15

*Makah Indian Tribe v. Verity*,
    910 F.2d 555 (9th Cir. 1990)..............................................................................................7

*Maldonado v. Lynch*,
    786 F.3d 1155 (9th Cir. 2015)............................................................................................3

*Network Optix Inc. v. Rubio*,
    No. 2:24-cv-06505, 2025 WL 1122358 (C.D. Cal. Feb. 14, 2025) ....................................9

*Northcoast Environmental Center v. Glickman*,
    136 F.3d 660 (9th Cir. 1998)..............................................................................................9

*Northwest Requirements Utilities v. Federal Energy Regulatory Commission*,
    798 F.3d 796 (9th Cir. 2015)..............................................................................................5

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ................................................................................10

*NTEU v. Vought,*
    774 F. Supp. 3d 1 (D.D.C. 2025) ......................................................1, 8

*NTEU v. Vought,*
    No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).................2

*NTEU v. Vought,*
    No. 1:25-cv-00381, 2025 WL 3771192 (D.D.C. Dec. 30, 2025)................................*passim*

*NWDC Resistance v. Immigration & Customs Enforcement,*
    No. 3:18-cv-5860, 2019 WL 12262490 (W.D. Wash. May 30, 2019) ................................7

*Oregon Natural Resources Council v. Harrell,*
    52 F.3d 1499 (9th Cir. 1995)...............................................................15

*Public Citizen v. Bowen,*
    833 F.2d 364 (D.C. Cir. 1987) ............................................................10

*Puget Soundkeeper Alliance v. Wheeler,*
    No. 15-cv-1342, 2018 WL 6169196 (W.D. Wash. Nov. 26, 2018) ......................4

*Rapp v. Disciplinary Board,*
    916 F. Supp. 1525 (D. Haw. 1996) ......................................................4

*Rosebrock v. Mathis,*
    745 F.3d 963 (9th Cir. 2014)................................................................2

*Santillan v. Gonzales,*
    388 F. Supp. 2d 1065 (N.D. Cal. 2005) ..............................................6

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .............................................................................6

*White v. U.S. Army Corps of Engineers,*
    659 F. Supp. 3d 1045 (N.D. Cal. 2023) ..............................................4

**STATUTES**

5 U.S.C. § 551(4) ...........................................................................................9

5 U.S.C. § 551(13) ......................................................................................8, 9

5 U.S.C. § 706(1) .........................................................................................10

5 U.S.C. § 706(2) ...........................................................................................9

12 U.S.C. § 289 .......................................................................................12, 13

12 U.S.C. § 5390(c)(3)(B)(ii) ................................................................................13

12 U.S.C. § 5390(n)(2) ..........................................................................................13

12 U.S.C. § 5390(s)(3) ..........................................................................................13

12 U.S.C. § 5497(a)(1) .....................................................................................*passim*

31 U.S.C. § 1342 ....................................................................................................5

**RULES**

Fed. R. Civ. P. 19(a)(1) ..........................................................................................7

**OTHER AUTHORITIES**

13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. Sept. 2025) ..........................2

*Black's Law Dictionary* (9th ed. 2009) .................................................................12

CFPB, *CFPB Notifies Court it Cannot Lawfully Draw Funds from the Federal Reserve* (Nov. 11, 2025) .........................................................................10

CFPB, *FFIEC Publishes 2023 Data on Mortgage Lending* (July 11, 2024) ...............................6

Defendants' Opposition to Motion to Clarify, *NTEU v. Vought*, No. 1:25-cv-00381 (D.D.C. Dec. 8, 2025) ...........................................................................4, 8

Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Nov. 6, 2025) ...........................................................5

Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Dec. 4, 2025) ...........................................................5

Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1* (Jan. 15, 2026) ...........................................................5

Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* (Apr. 21, 2010) .......................................................................................13

Notice of Funding Request and Confirmation of Receipt of Funding, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Jan. 15, 2026) .........................................2, 4, 10, 11

Notice of Potential Lapse in Appropriations, *NTEU v. Vought*, No. 1:25-cv-00381 (D.D.C. Nov. 10, 2025) ...........................................................9

Office of Legal Counsel, *Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at a Loss* (Nov. 7, 2025) .............7, 9

*Oxford English Dictionary* (2d ed. 1989)......................................................................................12

Reports to the President and Congress pursuant to 12 U.S.C. § 5497(e)(1)(B),
    Exhibits to Notice, *NTEU v. Vought*, No. 1:25-cv-00381 (D.D.C. Nov. 21,
    2025)....................................................................................................................9, 11

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Plaintiffs brought this action to challenge Defendants' decision not to request funding for the Consumer Financial Protection Bureau (CFPB) based on an incorrect reading of the statute governing the agency's funding, 12 U.S.C. § 5497(a)(1). In response, Defendants—the CFPB and Acting Director Rusell Vought—do not contest that they have adopted a novel reading of the phrase "combined earnings of the Federal Reserve System" in § 5497(a)(1). In fact, they have doubled down on their interpretation, even after another court determined that it was an "unsupported and transparent attempt to starve the CFPB of funding." *NTEU v. Vought*, 2025 WL 3771192, at *17 (D.D.C. Dec. 30, 2025). Responding to Plaintiffs' motion for summary judgment, Defendants primarily seek to avoid a ruling on the merits. They focus, instead, on a development since the filing of this case: On January 9, following the *NTEU* decision rejecting their interpretation of § 5497(a)(1), Defendants—under protest and to avoid violating a preliminary injunction in that case—requested funds to keep the CFPB open through March 31, 2026. That temporary reprieve, however, undermines neither the justiciability of this case nor the need for permanent declaratory and injunctive relief. The Court should reach the merits and grant Plaintiffs' motion.

# ARGUMENT

## I.    There is no threshold barrier to granting Plaintiffs relief.

### A.    Plaintiffs' claim is not moot.

"[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks omitted). Defendants cannot clear that high bar.

**1.** Defendants first contend that their recent request for one fiscal quarter of funding, made to comply with a court order in *NTEU*, moots Plaintiffs' claim. There, a different set of plaintiffs secured last April a preliminary injunction, now on appeal, preventing Vought from following through on threats he made last winter to shut down the CFPB. *See NTEU v. Vought*, 774 F. Supp. 3d 1 (D.D.C. 2025). Because Vought's recent reinterpretation of his statutory duty and consequent refusal to request funds could lead to noncompliance with the *NTEU* injunction, the plaintiffs in that case sought and received a clarification from Judge Jackson that the new interpretation was incorrect

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

and would not justify any violation of the injunction. *See NTEU*, 2025 WL 3771192, at *3. Thereafter, Vought requested three months of funding. *See* Defs. Ex. A at 7.

Neither Judge Jackson's opinion nor Vought's one-time request moots this case. "[N]o court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the same defendant." *California v. HHS*, 941 F.3d 410, 421 (9th Cir. 2019), *judgment vacated on other grounds* 141 S. Ct. 192 (2020). This unanimous view makes particular sense here, where existing injunctive relief is "of limited duration," *id.* at 423, and "subject to reopening or appeal," 13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. Sept. 2025). Moreover, the *NTEU* plaintiffs neither sought nor received the relief Plaintiffs seek here: a declaration that the new interpretation is contrary to law and an order requiring Defendants to comply with § 5497(a)(1). *See NTEU*, 2025 WL 3771192, at *3 (noting that the opinion clarifies defendants' obligations under existing injunction). Moreover, the preliminary injunction underlying Judge Jackson's opinion is on appeal, with argument scheduled for February 24, 2026. *See NTEU v. Vought*, 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025). There is thus no guarantee that Defendants will remain subject to that injunction at the end of this quarter, in just two months' time.

Defendants' funding request in response to Judge Jackson's opinion likewise does not moot this case. The voluntary cessation of challenged action "will moot a case only if the defendant" can satisfy the "formidable burden" of "show[ing] that the practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (internal citations omitted). For government policy, a court evaluating mootness will consider, among other things, whether the "change is evidenced by language that is broad in scope and unequivocal in tone," whether the government has operated under the new policy for a substantial period, and whether the "new policy … could be easily abandoned or altered in the future." *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014). Those factors weigh heavily against mootness here. While Defendants requested three months of funds following Judge Jackson's order, they expressly "disagree[d]" with her legal conclusion. Defs. Ex. A at 7. Defendants have thus made clear that they maintain their new reading of "earnings" and will not request future funding if the D.C. Circuit vacates the *NTEU* injunction. *See* Opp. 3–4.

1    Defendants' mootness argument rests on a mistakenly limited view of the scope of the

2 dispute. Defendants' decision not to request funds for the second quarter of fiscal year 2026

3 prompted Plaintiffs' request to expedite their motion, but the complaint is not limited to that one-

4 time application of Defendants' funding policy. Rather, Plaintiffs challenge Defendants'

5 determination to "starv[e] the CFPB of funding" based on "an erroneous interpretation of the

6 statutory provision creating a standing appropriation for the CFPB." Compl. ¶ 4. Plaintiffs also seek

7 relief that goes beyond a single funding cycle, including a "declar[ation] that Defendants'

8 determination not to request funding from the Federal Reserve Board of Governors is unlawful" and

9 a permanent injunction "requiring Defendants to request funding from the Federal Reserve Board."

10 *Id.* at 19; *see* Pls. MSJ 25. Construing Plaintiffs' claim as limited to the CFPB's refusal to request

11 funds for the second quarter of this fiscal year would potentially require Plaintiffs to file a new case

12 seeking expedited judgment every three months. In that circumstance, the exception to mootness for

13 disputes that are capable of repetition but evading review would plainly apply. *See FCC v.*

14 *Consumers' Rsch.*, 606 U.S. 656, 671 n.1 (2025) (applying the exception to a policy in place on a

15 quarterly basis because three months was "a period too short to complete judicial review").

16    **2.** Defendants also contend that the case is moot because, even under their new reading of

17 the statute, "the Fed appears to have returned to profitability," such that it may have earnings

18 available to support a CFPB funding request. *See* Opp. 3–4. But events that have not yet occurred

19 cannot moot a case. *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009). And

20 while Plaintiffs agree that the Fed currently has "earnings" under either side's definition, *see* Pls.

21 MSJ 24–25, the determination whether the Fed has earnings is not Defendants' to make—the statute

22 affords them no such authority. In any event, Defendants do not say that the Fed will have "earnings"

23 under their definition when it comes time to request funds at the end of this quarter. Their refusal to

24 do so highlights the continued risk to Plaintiffs and to the stability of financial regulation.

25    **3.** As a fallback, Defendants suggest that this case is prudentially moot. *See* Opp. 4–5. The

26 Ninth Circuit has never "adopted prudential mootness *per se*" and has applied it only once, in the

27 context of a bankruptcy case with an exhausted pot of funds. *Maldonado v. Lynch*, 786 F.3d 1155,

28 1161 n.5 (9th Cir. 2015). It thus "remains contested whether prudential mootness is a generally

applicable doctrine." *White v. U.S. Army Corps of Eng'rs*, 659 F. Supp. 3d 1045, 1052 (N.D. Cal. 2023). In any event, prudential mootness is discretionary and should be applied only "where it appears that a defendant, usually the government, has already changed or is in the process of changing its policies or where it appears that any repeat of the actions in question is otherwise highly unlikely." *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).

Here, Defendants have not abandoned their determination not to request funds when the Fed does not have "earnings" under their interpretation of § 5497(a)(1). *See* Defs' Ex. A at 7. That fact distinguishes the cases on which Defendants rely, where courts "placed importance on the fact that" an agency had "agreed to amend the challenged practice." *See Rapp v. Disciplinary Bd.*, 916 F. Supp. 1525, 1533 (D. Haw. 1996) (discussing *A.L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 331 (1961)). And it is not true that circumstances will invariably continue to change in a way that makes it "highly unlikely" that Defendants will continue refusing to request funding: They are appealing the injunction that prompted their recent request; the injunction is in any event "preliminary"; Defendants have argued that their policy on § 5497 is not even presented in that case, *see* Pls. Ex. W at 2; and the Fed may again operate in the red under Defendants' reading.

## B.    Plaintiffs have standing, and their claim is ripe.

**1.** Defendants' standing argument largely rehashes their mootness argument. They assert that, in light of subsequent events, Plaintiffs' standing now depends on a "speculative chain of causation": that 1) the *NTEU* preliminary injunction is vacated on appeal; 2) the Fed is then without "earnings" under Defendants' interpretation; and 3) Defendants, operating the CFPB without funding, fail to carry out the functions on which Plaintiffs rely. *See* Opp. 7. Defendants are wrong.

With respect to the *NTEU* order, Defendants cite no case for the proposition that temporary relief in one case, subject to ongoing litigation, eliminates a plaintiff's standing in a separate case. *Cf. Puget Soundkeeper All. v. Wheeler*, 2018 WL 6169196, at *7 n.5 (W.D. Wash. Nov. 26, 2018) (faulting defendants for citing no "legal authority standing for the proposition that the enjoining of an unlawful agency action by another court precludes this Court from vacating the" same action). As the Ninth Circuit has noted, "the mere possibility" that another court will enter *final* judgment protecting the plaintiffs is insufficient to affect justiciability. *See California*, 941 F.3d at 423.

As to whether the Fed will have ongoing "earnings" under Defendants' definition, Defendants could only speculate, as macroeconomic factors and monetary policy may have a variety of different effects on the Fed's revenues and expenses going forward. Indeed, though the Fed's deferred asset shrank overall between early November 2025 and mid-January 2026, by January it had ticked back up from its December low. *Compare* Pls. Ex. F at 10 ($243.818 billion deferred asset as of Nov. 5, 2025) *and* Pls. Ex. E at 10 ($243.18 billion deferred asset as of Dec. 3, 2025), *with* Defs. Ex. C at 10 ($243.7 billion deferred asset as of Jan. 14, 2026). Defendants also do not explain how or when they will evaluate the Fed's "earnings" in the future. They do not even concede that it has earnings *now. See* Opp. 6 (noting only a "likelihood of current profitability"). Under Defendants' approach to standing, then, a plaintiff seeking review of Defendants' determination not to seek funding when the Fed's revenues minus expenses related to interest are negative—which they have announced to Congress, the President, and several courts—would need to wait until the end of each quarter to see whether the CFPB will decide the Fed has "earnings." Standing doctrine does not require that kind of fire drill. "A future injury need not be 'literally certain'" to support standing, so long as there is a 'substantial risk' that it will occur." *Nw. Req'ts Util. v. FERC*, 798 F.3d 796, 805 (9th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Finally, Defendants offer a vague suggestion that critical, statutorily required work will continue going forward. Much of Defendants' argument, Opp. 6–7, relies on the *NTEU* injunction for the continued operation of critical services. But as Plaintiffs have explained, that injunction does not eliminate the possibility of imminent injury. Should that injunction no longer constrain Defendants' decisions, Defendants nowhere indicate that any of the consumer complaint services, information products, or regulatory work on which Plaintiffs rely implicate "emergencies involving the safety of human life or the protection of property" that can continue, absent appropriations, under the Antideficiency Act. 31 U.S.C. § 1342. As to the possibility of a new congressional appropriation supporting continued operations, it is again Defendants who rely on speculation.

**2.** Defendants' arguments as to informational injury fail, too. To begin, these arguments do not undermine Plaintiff Rise Economy's associational standing on behalf of members like Haven Services, which does not rely on an informational injury theory. *See* Pls. MSJ 12–13.

1    They are also unconvincing. Defendants say there is no imminent risk of a deprivation of

2    information, Opp. 7, yet the only reason Plaintiffs are not *already* suffering from lost or delayed

3    lending and consumer complaint data is a preliminary injunction that is on appeal. The fact that

4    some, but not all, of Plaintiffs' informational injury is linked to HMDA data does not alter the

5    prospect of imminent harm. While the CFPB generally releases HMDA data in March, Defendants

6    have not committed to releasing this year's data before current funding runs out. In addition, critical

7    HMDA work should continue after March. *See, e.g.*, Pls. Ex. X. Defendants also imply that Plaintiffs

8    must show that a statute "guarantee[s] information to organizations like theirs." Opp. 7. But under

9    Ninth Circuit law, "when a statute provides a right to information, the deprivation of which result[s]

10   in an informational harm, violation of the statute gives rise to a cognizable informational injury."

11   *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833 (9th Cir. 2021) (internal

12   quotation marks omitted). Finally, Defendants wrongly assert that "any alleged injury must bear a

13   likeness to a common-law injury" to establish informational standing. *See* Opp. 7. The case law

14   Defendants cite does not support such a requirement. At most, *TransUnion LLC v. Ramirez*, 594

15   U.S. 413 (2021), requires that a plaintiff establish that any deprivation of required information "led

16   to adverse effects or other downstream consequences." *Kelly v. RealPage Inc.*, 47 F.4th 202, 214

17   (3d Cir. 2022) (internal quotation marks omitted). Plaintiffs have done so here. *See* Pls. MSJ 10–12.

18   And contrary to Defendants' suggestion, the subject of the disclosure statute is not relevant to the

19   type of harm that must be shown. *Cf. TransUnion*, 594 U.S. at 441 (discussing standing linked to

20   "public-disclosure or sunshine laws that entitle all members of the public to certain information").

21   **3.** Defendants' ripeness argument rests on their January 9 request for a single quarter of

22   funding. Opp. 7. But "[r]ipeness is not affected by events occurring after a suit is filed," *Democratic*

23   *Nat'l Comm. v. Watada*, 198 F. Supp. 2d 1193, 1197 (D. Haw. 2002). "Claims do not de-ripen; they

24   become moot." *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1075 (N.D. Cal. 2005). As explained

25   above, this case is not moot.

26   **C.    Joinder of the Federal Reserve is neither necessary nor ground for dismissal.**

27   Defendants assert that the Fed is a necessary party under Federal Rule of Civil Procedure

28   19(a)(1) and that Plaintiffs' failure to name it requires dismissal. To begin, dismissal is appropriate

1  under Rule 19 only if the absent party "cannot be joined." *Makah Indian Tribe v. Verity*, 910 F.2d

2  555, 559 (9th Cir. 1990). Defendants, however, concede that joining the Fed is "feasible." Opp. 8.

3  More importantly here, joinder is unnecessary because the Court can afford "complete relief"

4  without participation of the Fed. *See* Fed. R. Civ. P. 19(a)(1). The Fed's transfer of funds to the

5  CFPB is mandatory on the CFPB Director's request, *see* 12 U.S.C. § 5497(a)(1), as Defendants

6  recognize. *See* Opp. 15; Pls. Ex. J at 29–30. They point to no instance in the history of the statute

7  when the Fed refused to do so. An order requiring Defendants to request funding, then, will result

8  in the outcome Plaintiffs seek: the transfer of funds to support the agency's work.

9      **D.      The *NTEU* litigation does not warrant transfer or dismissal of this case.**

10      Defendants suggest that the case should be transferred or dismissed because litigation

11  challenging Vought's efforts to shut down the CFPB dating back to February 2025 is pending in

12  district court in D.C. Neither the first-to-file rule nor 28 U.S.C. § 1404(a) supports this suggestion.

13      **1.**  The first-to-file rule governs whether "to decline jurisdiction when the same issues are

14  already pending before another federal court." *Behring Reg'l Ctr. LLC v. Wolf*, 2021 WL 1164839,

15  at *1 (N.D. Cal. Mar. 26, 2021). Courts analyze three factors under that rule: "chronology of the

16  lawsuits, similarity of the parties, and similarity of the issues." *Kohn L. Grp., Inc. v. Auto Parts Mfg.*

17  *Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015). "The most basic aspect of the first-to-file rule is

18  that it is discretionary." *Alltrade, Inc. v. Uniweld Prods., Inc*., 946 F.2d 622, 628 (9th Cir. 1991).

19  Here, although *NTEU* was filed first, the other two factors do not favor dismissal or transfer.

20      As to the parties, because the plaintiffs do not overlap at all, the first-to-file rule does not

21  apply. *See Behringer Reg'l Ctr.*, 2021 WL 1164839, at *2 (explaining that the court was "not aware

22  of any" cases "where a court transferred a case under the first-to-file rule when there was no overlap

23  in parties on one side of the 'v,' '" even where defendants overlapped). Prior overlap of counsel also

24  makes no difference. *See Gardner v. GC Servs., LP*, 2010 WL 2721271, at *5 (S.D. Cal. July 6,

25  2010); *NWDC Resistance v. ICE*, 2019 WL 12262490, at *4 (W.D. Wash. May 30, 2019).

26      As to the issues, "the allegations, the parties' claims, and the remedies sought" in the cases

27  do not "substantially overlap." *NWDC Resistance*, 2019 WL 12262490, at *5. Here, the allegations

28  and claims focus on Defendants' decision in November to adopt a new reading of § 5497 and their

resulting decision not to request funds to operate the CFPB. *See* Compl. ¶¶ 39–49, 63–69. By contrast, in *NTEU*, the claims focus on Defendants' decision in February 2025 to shut down the CFPB in violation of constitutional and statutory mandates. *See NTEU*, 774 F. Supp. 3d at 16–38, 55–58. Defendants themselves recognize the difference, arguing in *NTEU* that the issue of the CFPB's funding was "the equivalent of a *new* claim" in that case. Pls. Ex. W at 2. Plaintiffs here also seek declaratory and injunctive relief not sought in *NTEU*. *See supra* p. 2. Further, it is common for different plaintiffs to bring multiple cases challenging the same agency action. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 669 (2020) (discussing "spate of similar lawsuits" challenging agency rule); *see, e.g.*, *Tex. Bankers Ass'n v. CFPB*, No. 7:23-cv-144 (S.D. Tex.) (challenging CFPB § 1071 Rule); *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148 (E.D. Ky.) (same); *Revenue Based Fin. Coal. v. CFPB*, No. 1:23-cv-24882 (S.D. Fla.) (same).

**2.** Transfer under 28 U.S.C. § 1404(a) is likewise unwarranted. Here, Defendants largely repeat their duplication arguments, without discussing the § 1404(a) factors. The sole factor that Defendants address is respect for plaintiffs' choice of forum, which they mention only to assert that it "is owed little deference when that choice would waste judicial and party resources." Opp. 9. But they cite no cases for that proposition, and none of the cases that they *do* cite involve the transfer of an APA action brought by different plaintiffs challenging different (or even the same) agency action.

## II. Plaintiffs are entitled to judgment as a matter of law.

Plaintiffs have properly brought an APA challenge to Defendants' decision not to request funding based on an incorrect reading of § 5497, and they are entitled to judgment on that claim.

### A. Plaintiffs state a claim for relief under § 706(2).

Plaintiffs ask the Court to declare unlawful and set aside Defendants' determination that they will not request funding from the Fed when they decide that the Fed does not have "earnings" under their erroneous interpretation of § 5497(a)(1). That is not, as Defendants would have it, a challenge to abstract plans or statements made in the process of a deliberation. Rather, Defendants' refusal to request funds whenever they unilaterally determine that the Fed does not have "earnings" under their novel (and incorrect) interpretation falls neatly into the type of agency action reviewable under the APA. Agency action includes "the whole or a part of an agency rule." 5 U.S.C. § 551(13).

"Rule," in turn, means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4). Here, Defendants' policy is embodied in a statement of both general applicability and future effect—the legal opinion that Defendants solicited from OLC, Pls. Ex. J at 1, and that they have announced to courts, the President, and Congress, *see* Pls. Ex. I; Defs. Ex. D. Defendants' adoption of OLC's opinion as the statutory interpretation guiding their actions with respect to funding makes that opinion the "working law" of the agency. *See Campaign for Accountability v. DOJ*, 155 F.4th 724, 731, 738–39 (D.C. Cir. 2025). And an agency's "working law," embodied in documents that "implement an established policy of an agency," is not deliberative. *100Reporters v. Dep't of State*, 602 F. Supp. 3d 41, 61 (D.D.C. 2022). Contrary to Defendants' suggestion, Opp. 12 n.5, Plaintiffs need not sue OLC when Defendants have adopted OLC's conclusion as their own.

Defendants' reliance on *Biden v. Texas*, 597 U.S. 785 (2022), is also misplaced. There, the Supreme Court faulted the court of appeals for purporting to review an "abstract" policy decision to terminate a program, but not the two separate agency memoranda implementing and explaining the termination decisions. *Id.* at 809–10. The Court recognized that the APA allowed review of those discrete memoranda, but not background policy separate and apart from how the agency memorialized it. *See id.* Here, Plaintiffs do not challenge an abstract policy disconnected from agency pronouncements. Rather, they challenge a specific approach to § 5497(a)(1), embodied in the OLC opinion and subsequent agency statements adopting it.

Even viewing Plaintiffs' claim as Defendants do—as limited to challenging discrete, quarterly decisions not to request funds—that claim would be viable under § 706(2). Section 706(2) "provides for judicial review of agency actions," which "include[] the failure to act." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) (discussing 5 U.S.C. § 551(13)). "Put otherwise, the APA eschews any dispositive metaphysical distinction between agency action and *in*action, recognizing sensibly enough for administrative law that an agency's decision *not to act* can still be a reviewable action to be set aside if unlawful." *Network Optix Inc. v. Rubio*, 2025 WL 1122358, at *5 (C.D. Cal. Feb. 14, 2025). Defendants rely on *Norton v. Southern Utah Wilderness*

1   *Alliance* (*SUWA*), 542 U.S. 55 (2004), and an out-of-circuit district court case to argue that inaction

2   claims can be brought only to compel agency action under 5 U.S.C. § 706(1). *See* Opp. 10, 12. But

3   other courts—including in this Circuit—have rejected that reading of *SUWA*. *See Franco v. U.S.*

4   *Dep't of the Interior*, 2012 WL 3070269, at *10 (E.D. Cal. July 27, 2012); *All. to Save Mattaponi*

5   *v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 9–10 (D.D.C. 2007).

6          **B.      The complaint challenges final agency action.**

7          Plaintiffs likewise satisfy both prongs of the APA's finality requirement. The CFPB's

8   decision to not request funds when the Fed is without "earnings" under OLC's interpretation

9   "mark[s] the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S.

10  154, 178 (1997). The CFPB has announced that it is bound by the OLC opinion, *see* Pls. Ex. K, so

11  there is nothing tentative or interlocutory about whether Defendants will act based on it. The

12  challenged agency action is likewise one "by which rights or obligations have been determined, or

13  from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks

14  omitted). Defendants' adoption of OLC's approach to funding binds the agency to refuse to request

15  funds whenever they determine that the Fed does not have "earnings" under OLC's interpretation.

16  Defendants' one-time request for a single quarter of funding, to comply with a preliminary order in

17  another case, does not affect finality. Unlike the case on which Defendants rely, Opp. 12–13, which

18  involved an agency's express reconsideration of its policy, *see Pub. Citizen v. Bowen*, 833 F.2d 364,

19  366 (D.C. Cir. 1987), Defendants' January funding request reflects no such reconsideration. Rather,

20  Defendants stated clearly that they were requesting funds only to comply with the *NTEU* preliminary

21  injunction and would otherwise continue to follow OLC's opinion. *See* Defs. Ex. A at 7.

22         **C.      Defendants' interpretation of the CFPB's funding statute is incorrect.**

23         As Plaintiffs have explained, Defendants' new reading of their statutory obligation and

24  consequent refusal to request funding rest on two misinterpretations of § 5497. *See* Pls. MSJ 13–24.

25  Defendants do not respond to the point that the statute requires them only to determine the CFPB's

26  funding needs and gives them no authority to evaluate the Fed's earnings. And with respect to their

27  new reading of "combined earnings," Defendants' responses lack merit.

28         **1.** Section 5497(a)(1) requires the CFPB Director to "determine[]" the amount "reasonably

                                                10                        Case No. 5:25-cv-10481-EJD

necessary to carry out the authorities of the Bureau under Federal consumer financial law," such that the Federal Reserve Board can fulfill its separate statutory duty to transfer those funds to the CFPB. On this point, Defendants argue that the only statutory duty that flows to Defendant Vought is to determine the amount reasonably necessary in some form, and that he satisfied that duty by communicating the CFPB's funding needs to a variety of entities *not* mentioned in § 5497(a)(1)—including the President and Congress. But "the statute does not foresee a scenario in which the Bureau circumvents the process and notifies the President or the legislature of a shortfall when … no request has been lodged at all." *NTEU*, 2025 WL 3771192, at *15.

A closer look at Defendant Vought's communications makes clear why the statute cannot reasonably be read to place a burden on the Fed to monitor the CFPB Director's communications with other entities. In his letters to Congress and the President in December, Vought reported that the CFPB's "'funding need' for Fiscal Year 2026 [wa]s $279,566,358.82," though it would be "$677,493,173" if the CFPB remained subject to the injunction in *NTEU*. *See* Defs. Ex. D at 3–4. But when the CFPB requested a quarter of funds under the *NTEU* injunction, Vought asked for $145 million, Defs. Ex. A at 7—a number impossible to derive from the annual needs reported to Congress and the President. Defendants' only response is to suggest that the Fed could have asked for information about the CFPB's funding needs. But the Fed's responsibility is to pay the amount the CFPB determines is reasonably necessary; the statute does not demand that the Fed investigate the CFPB's determination as to that amount. Thus, until recently, the CFPB has consistently made the necessary requests to allow both entities to satisfy their roles under § 5497(a)(1).

**2.** Defendants' new interpretation of "combined earnings" is "unsupported" by plain meaning, statutory context, and congressional purpose. *NTEU*, 2025 WL 3771192, at *17.

**Plain meaning.** Under Defendants' reading, "earnings" in the context of § 5497(a)(1) means the Fed's "profits, calculated by subtracting" expenses related to interest payments—but no other expenses—"from its revenues." Opp. 16. Defendants identify no dictionary or technical source to support that conclusion. First, they discuss common usage definitions, which they say "require offsetting at least some costs against revenue" in the "business and accounting context." Opp. 18. But that is not true, as several dictionaries cited in Plaintiffs' motion clearly contemplate that

earnings may be the total amount a business takes in. *See, e.g.*, *Earnings*, *Black's Law Dictionary* (9th ed. 2009) ("Revenue gained … from the investment of capital, or from assets."); *Earning*, *Oxford English Dictionary* (2d ed. 1989) ("[T]he income produced by invested capital"). Nor can Defendants explain how ordinary dictionary definitions allow for the offsetting of some, but not all, costs to reach "earnings." Defendants offer the circular observation that their choice of offsetting expenses reduces (but does not eliminate) the obvious conflict between its reading of "earnings" and the statute governing the Fed's finances, 12 U.S.C. § 289, which refers to the Fed's "net earnings" as the amount left after deducting "necessary expenses." That observation, though, says little about how "earnings" is generally used, either in common parlance, or in business and accounting. *See also NTEU*, 2025 WL 3771192, at *14 (finding no "dictionary entry, accounting principle, or business practice that supports [Defendants'] unusual hybrid approach").

As to commercial business or accounting usages, Defendants have offered none that support their definition of "earnings," and such usages would be inapplicable in any event. *See* Pls. MSJ 17–18. As *amici* former Fed officials pointed out, the Reserve Banks "are not operated in the interest of shareholders," making "[t]he very concept of 'profit'" difficult to "translate neatly to the context of a central bank, since the primary purpose of a central bank is not to make money in the way a private business does." Br. of Former Fed Officials 6–7, ECF 30 (Fed Amicus). Indeed, the Fed's specialized accounting practices "do not track 'profit,' and neither that term nor that general concept are used in the annual audited financial statements of the Board of Governors or the Reserve Banks."[1] *Id.* at 7. In interpreting the term "earnings," "the Court cannot ignore the unique role the Federal Reserve plays in the American financial system." *NTEU*, 2025 WL 3771192, at *13.

---

[1] Defendants' discussion of the Fed's "net interest income," Opp. 16–17, is a non sequitur. Although that "net interest income" figure can be *used*, along with other information, to calculate the metric of "earnings" that Defendants put forward, it is not the equivalent of "earnings" under their proffered definition. Again, the fact that Defendants' "earnings" metric "is not tracked and reported by the Federal Reserve further demonstrates that this metric plays no meaningful role in the Fed's operations and is not what Congress meant[.]" Fed Amicus 8.

1      **Statutory context and structure.** Defendants' search for support in other parts of the Dodd-

2    Frank Act and the Federal Reserve Act fails. Plaintiffs have explained that Dodd-Frank's use of the

3    term "revenue" provides little help because the statute also uses the key terms "earnings" and

4    "profits." Pls. MSJ 18–19. And Defendants do not meaningfully distinguish those references. They

5    suggest that, by mentioning only certain types of earnings—"earnings from investments"—12

6    U.S.C. § 5390(n)(2) must be using a "more specific meaning" of "earnings." Opp. 19. "But if

7    anything, even this provision supports the notion that 'earnings' is a category of 'amounts received,'

8    rather than a net number derived after expenses are subtracted from revenue." *NTEU*, 2025 WL

9    3771192, at *14. The same problem arises when Defendants try to distinguish references to "profits"

10   in the statute. Opp. 20. While Defendants focus on the one provision using the phrase "lost profits,"

11   12 U.S.C. § 5390(c)(3)(B)(ii)—which is arguably a term of art—they ignore the section Plaintiffs

12   cited that refers to profits generally, *id.* § 5390(s)(3) (referencing "profits realized from [a] sale").

13      Responding to Plaintiffs' discussion of 12 U.S.C. § 289, Pls. MSJ 19–20, Defendants assert

14   only that Plaintiffs' approach—under which "interest expenses" and "operating expenses" are

15   among the "necessary expenses" deducted to calculate "net earnings"—"cannot be reconciled with"

16   the Fed's 2009 Financial Statement. Opp. 20. But the Fed's financial statements are not "drafted by

17   Congress" and cannot override statutory text. *NTEU*, 2025 WL 3771192, at *16 n.28. Defendants

18   also misread the document, equating "total operating expenses" with "necessary expenses under

19   § 289." Opp. 20. The cited paragraph in the 2009 Financial Statement in fact discusses a different

20   metric—"costs of operations"—even as the document mentions "operating expenses" elsewhere.

21   *See* Pls. Ex. Y at 3, 18, 20, 47. Moreover, Defendants' suggestion that Congress was legislating

22   against the backdrop of these statements cuts against their reading, as the Fed did not then and does

23   not currently track the metric of "earnings" that Defendants propose. *See supra* p. 12.

24      **Legislative history and purpose.** Dodd-Frank's drafting history provides no support to

25   Defendants. They are correct that Congress ultimately adopted the Senate version of the funding

26   mechanism (which uses "combined earnings") rather than the House proposal (which did not

27   expressly identify a source of funding for Fed transfers). But applying the ordinary meaning of

28   "earnings" (as the CFPB did for 14 years) would not, as Defendants have it, be akin to enacting into

1  law the House proposal. *See* Opp. 22. Rather, the Senate and House proposals operated entirely

2  differently. As Plaintiffs have explained, Congress's choice of the Senate proposal provides

3  sufficient explanation for how "combined earnings" became part of the law. *See* Pls. MSJ 22.

4      Defendants' response on legislative purpose is likewise unconvincing. They do not contest

5  that, in a direct response to the funding challenges that had hampered federal regulators before the

6  2008 financial crisis, Congress crafted the CFPB's funding mechanism to create a stable source of

7  funding. *See* Br. of Members of Congress 4–5, ECF 20-1 (Cong. Amicus). Rather, Defendants rely

8  entirely on the idea that limiting the Fed's obligation to fund the CFPB to times when the Fed was

9  profitable reflects a "compromise." Opp. 22. They offer no authority to support this theory. And

10  they ignore that their reading risks undermining the Fed's consumer protection activities and

11  requiring it to revamp its financial management practices, all in service of a small reduction in a

12  deferred asset that has no practical effect on Fed operations. *See* Fed Amicus 11–14.

13      Defendants downplay the serious workability concerns posed by their reading of the statute.

14  They do not contest, however, that their definition of "earnings" would make it difficult for the

15  CFPB, other financial regulators, consumers, and regulated entities to rely on or predict the

16  continuity of the CFPB's vital work. It is revealing that even Defendants are apparently unsure

17  whether the Fed *currently* has earnings under their definition. *See supra* p. 5. As *amici* members of

18  Congress—including former Senator Dodd and Representative Frank—observed, Defendants'

19  approach is "wholly at odds" with Congress's planned stability for the new agency, "subjecting the

20  Bureau to intermittent defunding based on unpredictable fluctuations in the Federal Reserve's

21  balance sheet." Cong. Amicus 3. And "this intermittent defunding would create disruptions and

22  instability at the expense of the Bureau's ongoing operations as a financial regulator," with

23  "disastrous" consequences. *Id.* at 8. The Court should not endorse that result.

24  **III.    The Court should grant Plaintiffs declaratory and injunctive relief.**

25      Finally, Defendants argue that the Court should refrain from granting relief—even if the

26  Court holds, as it should, that Defendants' decision is unlawful and harming Plaintiffs. The Court

27  should reject those arguments.

28      To start, Plaintiffs have satisfied each of the three requirements for mandamus relief. *See*

1  *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995). First, Plaintiffs' claim is "clear

2  and certain" because they have "legal entitlement to the relief sought." *El Centro Reg'l Med. Ctr. v.*

3  *Blinken*, 2021 WL 3141205, at *3 (S.D. Cal. July 26, 2021) (citing *Lowry v. Barnhart*, 329 F.3d

4  1019, 1021 (9th Cir. 2003)). As discussed above, there is no threshold barrier to granting mandamus.

5  *See supra* pp. 1–8. Second, the duty that § 5497(a)(1) places on Defendants is "ministerial and so

6  plainly prescribed as to be free from doubt," *Harrell*, 52 F.3d at 1508. *See supra* pp. 10–14. Third,

7  Plaintiffs have no other adequate remedy, as there is no unexhausted administrative procedure or

8  alternate mechanism for Plaintiffs to secure relief. *See Agua Caliente Tribe of Cupeno Indians of*

9  *Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019). Although Defendants suggest that an

10  action against the Fed would be an adequate remedy, Opp. 24, they ignore that the Fed's legal

11  obligation is to transmit the funding that the *CFPB* has determined is reasonably necessary. As

12  discussed above, the statute does not contemplate the Fed acting independently to seek out that

13  information. *See supra* pp. 10–11. It would make little sense to require a court to issue mandamus

14  against officials at the Fed when it is Defendants, not the Board, that failed to comply with § 5497.

15  Defendants argue briefly that "the rule of prejudicial error" precludes granting Plaintiffs

16  summary judgment because Defendants have now requested funding for the current quarter.

17  Defendants, however, requested funding to comply with a preliminary injunction in *NTEU*, and in

18  doing so, they were explicit that they have not abandoned their decision not to request funding going

19  forward based on an erroneous interpretation of § 5497(a)(1). As demonstrated above, there is a

20  substantial likelihood that this decision could harm Plaintiffs by shutting down the critical CFPB

21  functions on which they rely, in just two months' time. Defendants' error is thus prejudicial.

22  Finally, Defendants ask the Court to tailor and stay any injunctive relief. Defendants do not

23  identify what, if any, narrower relief they mean. And their request for a stay pending appeal is

24  premature, *Elec. Frontier Found. v. Off. of Dir. of Nat'l Intelligence*, 2009 WL 10710750, at *1

25  (N.D. Cal. Oct. 7, 2009), and does not discuss, let alone satisfy, the applicable standards, *see Am.*

26  *Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1029 (9th Cir. 2025).

27  **CONCLUSION**

28  The Court should grant Plaintiffs' motion for summary judgment.

1

DATED: January 23, 2026              Respectfully submitted,

2

3                                     PUBLIC CITIZEN LITIGATION GROUP

4                                     By:   */s/ Stephanie B. Garlock*
                                           Stephanie B. Garlock
5

6                                     Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28