1

2

3              UNITED STATES DISTRICT COURT

4              NORTHERN DISTRICT OF CALIFORNIA

5                    SAN JOSE DIVISION

6

7   RISE ECONOMY, et al.,              Case No.  5:25-cv-10481-EJD

8              Plaintiffs,             **ORDER GRANTING MOTION FOR**
                                       **SUMMARY JUDGMENT**
9        v.

10  RUSSELL VOUGHT, et al.,            Re: Dkt. No. 10

11             Defendants.

12         In a transparent attempt to "close down the agency,"[1] Acting Director of the Consumer

13  Financial Protection Bureau ("CFPB" or "Bureau"), Russell Vought ("Vought" or "Director"),

14  solicited and adopted a novel interpretation of 12 U.S.C. § 5497 from the Office of Legal Counsel

15  ("OLC").  For the first time since the enactment of the Dodd-Frank Act, the Director of the CFPB

16  took the position that he cannot request the funds necessary to operate the CFPB from the Federal

17  Reserve under § 5497(a) whenever the Director determines the Federal Reserve does not have the

18  "combined earnings" sufficient to fund it per the statute.  Plaintiffs, three nonprofit organizations

19  that rely on the services provided by the CFPB, argue Defendants' adoption of the OLC's

20  statutory interpretation is arbitrary, capricious, and contrary to law under the Administrative

21  Procedures Act ("APA").

22         Before the Court is Plaintiffs' motion for summary judgment, as well as two amicus briefs

23  filed in support by current and former members of Congress ("Congress Members Amicus") and

24  former Federal Reserve officials ("Former Federal Reserve Officials Amicus").  Mot., ECF No.

25

26  _____

[1] In his own words, Vought announced in October 2025 that he was working to "close down the
27  agency" and would "be successful" in doing so within a few months.  The Charlie Kirk Show,
    *Vice President Vance and the Trump Admin Honor Charlie* at 1:21:47–1:23:00 (Oct. 15, 2025)
28  (statement of Defendant Vought); *see also* Request for Judicial Notice 4, ECF No. 11.

United States District Court
Northern District of California

10; Opp'n, ECF No. 34; Reply, ECF No. 36; Congress Members Amicus, ECF No. 20-1; Former Federal Reserve Officials Amicus, ECF No. 30.  The Court held a hearing on February 11, 2026, and heard oral arguments from both parties.  ECF No. 41.  For the reasons explained below, the Court **GRANTS** Plaintiffs' motion.

## I.    BACKGROUND

The ultimate issue here is whether Defendants violated the APA by adopting the OLC's interpretation of 12 U.S.C. § 5497 and relying on that interpretation to determine whether to request funding from the Federal Reserve Board.  Foundationally, the Court will discuss in turn: (1) the language in § 5497; (2) the Federal Reserve's funding structure; (3) Vought's November 2025 decision to not request funds from the Federal Reserve; (4) the Office of Legal Counsel memo ("OLC Memo") which Vought adopted and relied; and (5) recent events following Plaintiffs' motion.

### A.    12 U.S.C. § 5497

Facing an unprecedented financial crisis in 2008, Congress responded to the financial peril facing the nation and established the CFPB through the Dodd-Frank Act to ensure that consumers have access to "fair, transparent, and competitive" markets for consumer financial products.  12 U.S.C. § 5511(a).  "Unlike most federal agencies, the Bureau does not rely on annual appropriations from Congress; rather, it 'receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments.'"  *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 3771192, at *11 (D.D.C. Dec. 30, 2025) (internal citations omitted) (quoting *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020)).  Section 5497 outlines this funding procedure:

> Each year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, **the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law**, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year).

12 U.S.C. § 5497(a)(1) (emphasis added to language at issue).

Case No.: 5:25-cv-10481-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
2

United States District Court
Northern District of California

United States District Court<br>Northern District of California

1     There is one statutory cap on the amount that can be transferred to the CFPB—it "shall not

2 exceed a fixed percentage of the total operating expenses of the Federal Reserve System." *Id.* §

3 5497(a)(2)(A).  Congress recently lowered the fixed percentage in July 2025 from 12% to 6.5%.

4 *See* ONE BIG BEAUTIFUL BILL ACT, PL 119-21, July 4, 2025, 139 Stat 72 (July 4, 2025).  If

5 the amount allowed by that cap is insufficient for the CFPB's needs, the CFPB Director may then

6 request additional funding from Congress by submitting a report explaining "the extent to which

7 the funding needs of the Bureau are anticipated to exceed" the statutory cap.  12 U.S.C. §

8 5497(e)(1).

9     **B.**    **Federal Reserve Funding Structure**

10     The Federal Reserve System is the central bank of the United States. Mot., Ex. A, Fed.

11 Reserve, *The Fed Explained: What the Central Bank Does* (11th ed. Aug. 2021) ("Ex. A"), ECF

12 No. 11-1.[2]  It is responsible for conducting the nation's monetary policy to promote maximum

13 employment and stabilize pricing.  *Id.*

14     Relevant here, the Federal Reserve System contains several components including: (1) the

15 Federal Reserve Board ("Board") and (2) twelve regional Federal Reserve Banks ("Reserve

16 Banks" or "Banks").  Mot., Ex. B, Fed. Reserve, *Federal Reserve Banks Combined Financial*

17 *Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors'*

18 *Report* ("Ex. B"), ECF No. 11-2.

19     The Board serves as the Federal Reserve System's governing and administrative body.  Ex.

20 A.  Its duties include receiving funding requests from the CFPB and levying assessments on the

21 Reserve Banks to fulfill those requests.  12 U.S.C. § 5497(a)(1).

22     The Reserve Banks are the Federal Reserve System's primary income-generating entities.

23 Ex. A.  They bring in revenue through fees for services to depository institutions and from interest

[2] Both parties filed unopposed Requests for Judicial Notice, requesting the Court take notice of primarily documents published by governmental agencies, public correspondences, and publicly available briefing in similar matters.  ECF Nos. 11, 35, 37.  The Court finds all cited materials judicially noticeable under Federal Rule of Evidence 201—they are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

on securities held in the Federal Reserve's "open market operations"—a tool the Federal Reserve uses to influence interest rates in the economy by buying and selling securities issued or guaranteed by the U.S. Treasury or U.S. government agencies.  Exs. A, B.  The Reserve Banks use their revenue to pay their necessary expenses, which include funding the CFPB.  Ex. A.  They also take on liabilities beyond these necessary expenses, the largest category being interest on the balances that financial institutions maintain with the Banks.  Ex. B.  The targeting of interest rates helps the Federal Reserve maximize employment and stabilize prices because changes in interest rates affect consumers' willingness to spend, invest, and save.  *Id.*

Statutes govern how the Federal Reserve System handles its finances.  Reserve Banks, "after all [their] necessary expenses . . . have been paid or provided for," must issue annual dividends to stockholders.  12 U.S.C. § 289(a)(1).  After issuing dividends, if "net earnings" remain, the Banks must place those earnings, up to a cap, in a surplus fund.  *Id.* § 289(a)(2)–(3).  And if the Banks have additional net earnings beyond the limit of their surplus funds, they must transfer those amounts to the Federal Reserve Board for remittance to the Treasury.  *Id.* § 289(a)(3)(B).  The Banks remit "excess earnings" to the Treasury weekly, pursuant to Federal Reserve accounting practices.  Mot., Ex. D, Fed. Reserve, *Financial Accounting Manual for Federal Reserve Banks* (May 2025) ("Ex. D"), ECF No. 11-4.  And when a Federal Reserve Bank's expenses exceed its income, the Bank stops making remittances and records a "deferred asset," essentially borrowing from itself the amount that its earnings failed to cover.  *Id.*  When a Reserve Bank begins earning more money than it spends again, it pays down its deferred assets before resuming remittances to the Treasury.  *Id.*  Relevant here, beginning in late 2022, the Federal Reserve raised interest rates to combat inflation, so the Reserve Banks' expenses began to exceed the funds generated and accruing deferred assets at that time.  Mot., Ex. C, Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023) ("Ex. C"), ECF No. 11-3.

### C.    CFPB Acting Director Vought

On February 7, 2025, President Trump designated Vought as Acting Director of the CFPB.  The following day, Vought sent a letter to the Federal Reserve Board pursuant to § 5497(a)(1)

United States District Court
Northern District of California

requesting $0 to fund CFPB's operations for the third quarter of fiscal year 2025, determining that the Bureau could remain operational using only the funds in its reserves. *See* Mot., Ex. H, Letter from Russell Vought to Jerome Powell (Feb. 8, 2025) ("Ex. H"), ECF No. 11-8. Several months later, during an interview in mid-October, Vought announced that he was working to "close down the agency" and would "be successful" in doing so within a few months. The Charlie Kirk Show, *Vice President Vance and the Trump Admin Honor Charlie* at 1:21:47–1:23:00 (Oct. 15, 2025) (statement of Defendant Vought); *see also* Request for Judicial Notice 4, ECF No. 11. Then in a litigation filing in November, Defendants announced that Vought would once again not request funding from the Federal Reserve. *See* Mot., Ex. I, Notice of Potential Lapse in Appropriations, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 10, 2025), ECF No. 145 ("Ex. I"), ECF No. 9. But this time, the lack of request was not because the CFPB continued to have sufficient funds in its reserves. *Id.* Vought acknowledged that the CFPB had spent down its reserves and required additional funding to continue operations but decided he would not seek funding from the Federal Reserve because the Federal Reserve did not have the "combined earnings" necessary to fund the CFPB under § 5497. *Id.* Instead, Vought bypassed the Federal Reserve and requested funding directly from Congress under § 5497(e), reporting to the President and congressional appropriations committees that the funds available under § 5497 would be insufficient to fund the CFPB. *See* Mot., Ex. L, Notice of Section 5497(e) Report, *NTEU v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C. Nov. 21, 2025), ECF No. 147 ("Ex. L"), ECF No. 12. Under this protocol, Congress would need to pass a new appropriations law to provide the funding required to operate the CFPB—and Defendants represented they did "not know whether and the extent to which Congress" would approve the funding. Ex. I.

### D.    OLC Memo

In deciding to depart from the practice of all former Directors to request funding from the Federal Reserve, Defendants relied on a November 7, 2025, opinion memo solicited from the OLC interpreting § 5497 ("OLC Memo"). *See* Mot., Ex. J, OLC, *Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the Federal Reserve System Under 12*

*U.S.C. § 5497 When the Federal Reserve System Is Operating at a Loss* (Nov. 7, 2025) ("OLC Memo").  The OLC Memo opined that the phrase "combined earnings of the Federal Reserve System" in § 5497(a)(1) "refers to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues."  *Id.* at 1.  The memo concludes that, because "the Federal Reserve has no profits" at present, "it cannot transfer money to the CFPB" under 12 U.S.C. § 5497(a)(1).  OLC Memo 1.  Defendants now take the position that they will only request funding from the Federal Reserve consistent with the OLC Memo—in other words, they will not request funding from the Federal Reserve any time they unilaterally determine the Federal Reserve does not generate "profits" as defined in the OLC Memo.

### E.    Events Following Plaintiffs' Motion for Summary Judgment

Defendants contend two events occurred after Plaintiffs filed the present motion that are relevant to the Court's discussion.

The first involves the case in the U.S. District Court for the District of Columbia before Judge Jackson, *National Treasury Employees Union v. Vought*, 25-cv-00381-ABJ ("*NTEU*").  The *NTEU* complaint was filed nearly one year ago on February 9, 2025, by the National Treasury Employees Union, CFPB Employee Association, and several nonprofit organizations.  *Id.*  They allege that Vought has been working to effectively shut down the CFPB since his first day in office by instructing staff to "immediately" stop all work; directing staff "not [to] perform any work tasks" or come into the office; cancelling third-party contracts; firing seventy employees; closing the CFPB's DC headquarters; and other similar conduct.  *Id.*, Am. Compl., at ECF No. 7.  The plaintiffs there allege that the Dodd-Frank Act imposes obligations on the CFPB that it cannot fulfill if Vought effectively dismantles the Bureau.  *Id.*  They seek an order declaring that these efforts to dismantle the CFPB are unlawful and enjoining the CFPB from ceasing their statutorily required activities and firing employees without congressional approval.  *Id.*

To this end, the plaintiffs sought, and received, a preliminary injunction on March 28, 2025.  *Id.*, Preliminary Injunction, at ECF No. 88.  After the court granted the preliminary injunction, Vought filed the notice in November announcing his decision to not request funding

from the Federal Reserve pursuant to the OLC Memo's new interpretation of § 5497. *Id.*, Notice

of Potential Lapse in Appropriations, at ECF No. 145. The *NTEU* plaintiffs subsequently filed a

motion for clarification, asking whether the preliminary injunction also prevented Vought from

using the lack of funding as an excuse to cease operations. *Id.*, Mot. to Clarify, at ECF No. 148.

This motion for clarification was pending when Plaintiffs filed their motion here. This Court

denied Defendants' request to hold Plaintiffs' motion for summary judgment in abeyance until

resolution of the motion for clarification. Order Setting Expedited Briefing Schedule, ECF No.

23.

On December 30, 2025, Judge Jackson granted the motion and clarified that the injunction

necessarily requires that Defendants request sufficient funds from the Federal Reserve to comply

with their obligations to operate the CFPB. *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-

0381 (ABJ), 2025 WL 3771192 (D.D.C. Dec. 30, 2025). Specifically, Judge Jackson held:

> The defendants' interpretation of the Dodd-Frank Act is contrary to
> the text and intent of the statute and the way it has been consistently
> interpreted by both the Federal Reserve and the CFPB; acting in
> accordance with the OLC's flawed reasoning would contravene the
> plain terms and implicit requirements of this Court's Order as it has
> been revised by the Court of Appeals; and making that finding does
> not require any modification of the preliminary injunction.

*Id.* at 3. This injunction remains in place pending an *en banc* proceeding in the D.C. Circuit,

which held oral argument on February 24, 2026. In compliance with the order clarifying the

preliminary injunction, on January 9, 2026, Defendants requested and received funding from the

Federal Reserve for the second fiscal quarter of 2026.

The second event is, according to Defendants, the Federal Reserve has returned to

"profitability" as defined in the OLC Memo—since early November, the Federal Reserve's

deferred assets shrunk from $243,818 million to $243,700 million. Opp'n, Ex. C, *Federal Reserve*

*Balance Sheet: Factors Affecting Reserve Balances* - H.4.1 (Jan. 15, 2026), ECF No. 35-3. Given

the return to "profitability," Defendants contend that the Federal Reserve now has enough

"combined earnings" to fund the CFPB.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    LEGAL STANDARD

In a district court action challenging an administrative agency's decision under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review." *Gill v. Dep't of Just.*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017) (citation omitted), *aff'd sub nom. Gill v. United States Dep't of Just.*, 913 F.3d 1179 (9th Cir. 2019). That is, although the parties and the Court characterize the pending motion as seeking summary judgment, the motion is not brought pursuant to Federal Rule of Civil Procedure 56, and the question before the Court is not whether the movant has shown that there is no genuine dispute as to any material fact. *See id.* at 1267–68; *see also, e.g., Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) ("'Summary judgment' is simply a convenient label to trigger this court's review of the agency action."). "In other words, the district court acts like an appellate court, and the entire case is a question of law." *Gill*, 246 F. Supp. 3d at 1268 (internal quotation marks omitted).

## III.   DISCUSSION

### A.    Justiciability and Threshold Issues

The Court begins by addressing Defendants' several threshold arguments regarding: (1) mootness; (2) standing; (3) joinder of the Federal Reserve; and (4) the *NTEU* litigation.

#### 1.    Mootness

First, Defendants contend that two recent events moot this case—their request for and receipt of funding for the second fiscal quarter of 2026 in compliance with the *NTEU* preliminary injunction; and the Federal Reserve's return to "profitability" as defined by the OLC Memo.[3]

---

[3] The Court finds the proper framework for examining these recent events is the doctrine of mootness, not the doctrine of ripeness. "The distinction matters because the Government, not petitioners, bears the burden to establish that a once-live case has become moot." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022). Given that Defendants' arguments concern events occurring *after* the filing of this case, the doctrine of ripeness is inapplicable—"[c]laims do not de-ripen; they become moot." *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1075 (N.D. Cal. 2005); *see also Democratic Nat'l Comm. v. Watada*, 198 F. Supp. 2d 1193, 1197 (D. Haw. 2002) ("Ripeness is not affected by events occurring after a suit is filed.").

Case No.: 5:25-cv-10481-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Federal courts are restricted to hearing "cases" and "controversies," meaning "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477 (1990). This excludes courts from deciding "questions that cannot affect the rights of litigants in the case before them" or giving "opinion[s] advising what the law would be upon a hypothetical state of facts." *Id.* Even if a case or controversy existed at the time a suit was filed, "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party"— "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks omitted).

According to Defendants, because they have already requested and received funding for the current fiscal quarter pursuant to the temporary injunction in *NTEU*—and represent they will continue to request funding so long as the Federal Reserve continues to be "profitable," as defined in the OLC Memo—it is impossible for a court to grant any effectual relief to Plaintiffs, and any future failure to request funding is hypothetical.[4]

The Court disagrees. As an initial matter, compliance with the temporary *NTEU* order alone does not moot this case. It has been long established that a temporary injunction in one case does not generally deprive courts of jurisdiction over a dispute seeking similar equitable relief. *California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421 (9th Cir. 2019), *judgment vacated on other grounds* 141 S. Ct. 192 (2020) ("[N]o court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of

---

[4] Defendants also argue in the alternative that these events render Plaintiffs' claims *prudentially* moot. But the Ninth Circuit has never "adopted prudential mootness per se"—it has applied it only once, in the context of a bankruptcy case with an exhausted pot of funds. *Maldonado v. Lynch*, 786 F.3d 1155, 1161 n.5 (9th Cir. 2015). And to the extent that Defendants argue the similarities between these two cases risk wasting judicial resources or creating inconsistent rulings, "the attempt to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result has always been a prudential concern, not a jurisdictional one." *California*, 941 F.3d at 422 (internal quotation marks omitted).

United States District Court
Northern District of California

subject matter jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the same defendant."). Though similar, the relief Plaintiffs seek here differs in material respects from the relief sought in *NTEU*. Plaintiffs base their claims on Defendants' decision in November 2025 to adopt the OLC Memo and not request funding from the Federal Reserve any time they determine its "combined earnings" are insufficient; and they seek a declaration that the OLC's new statutory interpretation violates the APA and an order requiring Defendants comply with § 5497(a)(1). Whereas the *NTEU* plaintiffs base their claims on different internal agency actions to dismantle the CFPB beginning February 2025; and they seek an order declaring that Defendants' internal efforts to cease CFPB operations are unlawful under the APA and Constitution and enjoining them from dismantling the CFPB and firing employees without congressional approval. The differences in the agency actions challenged and the relief sought sufficiently distinguishes these cases such that the temporary injunction in *NTEU* does not deprive this Court from entering judgment here.

Defendants' determination that the Federal Reserve "appears to have returned to profitability" as defined in the OLC Memo, also does not render this case moot. One issue central to Plaintiffs' claim is whether Defendants have the authority to unilaterally determine the "profitability" of the Federal Reserve,[5] in which case Defendants' insistence of the Federal Reserve's "profitability" at present is of no relevance.

Moreover, Defendants' temporary cessation of the conduct alleged does not moot this case. The Supreme Court has long held that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. A controversy may

---

[5] As the Court finds below, they do not. *See infra* Section III.B.3.b.

remain to be settled in such circumstances, e.g., a dispute over the legality of the challenged practices.") (internal citations omitted).  The requirement for a defendant to "prove no reasonable expectation remains that it will return to its old ways" applies equally to governmental defendants and private ones.  *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (internal quotation marks omitted) (cleaned up).  When the defendant is a government entity, courts also inquire whether the "change is evidenced by language that is broad in scope and unequivocal in tone"; whether the government has operated under the new policy for a substantial period; and whether the "new policy . . . could be easily abandoned or altered in the future."  *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014).

Here, Plaintiffs' complaint seeks funding not only for the current fiscal quarter, but funding for every quarter moving forward.  The complaint specifically challenges Defendants' determination to "starv[e] the CFPB of funding" based on "an erroneous interpretation of the statutory provision creating a standing appropriation for the CFPB."  Compl. ¶ 4.  It also requests a "declar[ation] that Defendants' determination not to request funding from the Federal Reserve Board of Governors is unlawful" and a permanent injunction "requiring Defendants to request funding from the Federal Reserve Board."  *Id.* at 19.  Defendants have maintained that their interpretation of § 5497 is correct, and they will not request funding from the Federal Reserve when they determine it has insufficient "combined earnings" pursuant to the OLC Memo.  Indeed, they still "vigorously defend[] the legality of such an approach," *West Virginia*, 597 U.S. at 720 (internal quotation marks omitted)—during oral arguments, Defendants again explicitly represented that they would request funding *only* to the extent that it is consistent with the OLC's opinion.  And though Defendants represent at this time that the Federal Reserve is once again "profitable," the end of second 2026 fiscal quarter rapidly approaches, and they have provided no assurances that they will seek funding from the Federal Reserve again.

Finally, even if Defendants are correct that the complaint only seeks funding for the current fiscal quarter, the exception to mootness when a controversy is "capable of repetition, yet evading review" would apply.  *Spencer v. Kemna,* 523 U.S. 1, 17 (1998).  This doctrine applies

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "only in exceptional situations," where (1) "the challenged action [is] in its duration too short to be

2   fully litigated prior to cessation or expiration," and (2) "there [is] a reasonable expectation that the

3   same complaining party [will] be subject to the same action again." *Kingdomware Techs., Inc. v.*

4   *United States*, 579 U.S. 162, 170 (2016); *see also Brach v. Newsom*, 38 F.4th 6, 15 (9th Cir.

5   2022). This case is one such exceptional situation. As discussed above, though Defendants

6   represent at this time they believe the Federal Reserve "may" once again be "profitable," there is a

7   reasonable expectation—indeed, an assurance—that Defendants will subject Plaintiffs to the same

8   conduct whenever they next determine the Federal Reserve is not "profitable." Given the

9   quarterly funding scheme implemented by the CFPB, this would potentially require Plaintiffs to

10  file a new case seeking expedited judgment every three months. *See Fed. Commc'ns Comm'n v.*

11  *Consumers' Rsch.*, 606 U.S. 656, 671 n.1 (2025) (applying the exception to a policy in place on a

12  quarterly basis because three months was "a period too short to complete judicial review").

13        The Court therefore finds this case still presents a live controversy. [6]

14               2.    **Standing**

15        Defendants also challenge Plaintiffs' Article III standing, arguing their theory of

16  "informational injury" is deficient.[7]

17        To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact

18  that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

19  defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*

20  *v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–

21  561 (1992)). The Ninth Circuit has "repeatedly recognized that failure to provide statutorily

22

23  ─────────────
    [6] Defendants also conclude their mootness section with the following argument: "To the extent
24  Plaintiffs still seek relief regarding future requests, this Court should not be drawn into such
    'abstract propositions,' *Cantrell*, 241 F.3d at 678, especially regarding an agency's 'day-to-day
25  operations.' *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990)." However, not only is
    *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001), unhelpful to their position—the
26  Ninth Circuit there found a NEPA claim not moot despite completion of the action challenged—
    but even more notably, the issue of mootness was not before the Supreme Court in *Lujan*.
27  [7] Defendants also re-raise ripeness arguments here, but as the Court discussed above, "[r]ipeness is
    not affected by events occurring after a suit is filed." *Democratic Nat'l Comm.*, 198 F. Supp. 2d at
28  1197.
    Case No.: 5:25-cv-10481-EJD
    ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    required information can give rise to Article III injury on the part of private plaintiffs." *Inland*

2    *Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833 (9th Cir. 2021).  A plaintiff may

3    allege a cognizable informational injury "when a statute provides a right to information, the

4    deprivation of which 'result[s] in an informational harm.'" *Id.* (quoting *Wilderness Soc., Inc. v.*

5    *Rey*, 622 F.3d 1251, 1259–60 (9th Cir. 2010)); *see also TransUnion LLC v. Ramirez*, 594 U.S.

6    413, 442 (2021) ("An asserted informational injury that causes no adverse effects cannot satisfy

7    Article III.") (internal quotation marks omitted).

8         Here, Plaintiffs allege that they will be deprived of information guaranteed by at least two[8]

9    statutes if the CFPB loses funding.  First, the Home Mortgage Disclosure Act ("HMDA") requires

10   the publication of certain mortgage lending data to "provide the citizens and public officials of the

11   United States with sufficient information to enable them to determine whether depository

12   institutions are fulfilling their obligations to serve the housing needs of the communities and

13   neighborhoods in which they are located."  12 U.S.C. § 2801(b).  The HMDA requires the CFPB

14   to "provide staff and data processing resources" to support the publication of that data.  *Id.* §

15   2809(b); *see also* 12 C.F.R. § 1003.5.  Plaintiff Rise Economy contends that it uses HMDA data to

16   inform its members about banks' lending practices, understand patterns of disinvestment,

17   formulate proposals for reform, and monitor compliance among banks.  Gonzalez-Brito Decl.,

18   ECF No. 10-2.  Plaintiff Woodstock Institute also relies on HDMA data to inform its advocacy

19   work with policymakers and financial institutions, as well as operate its proprietary Community

20   Lending Data Portal using HMDA data.  Mendez Decl., ECF No. 10-5.  Much of Woodstock

21   Institute's funding assumes that it will be able to obtain HMDA data from the CFPB.  *Id.*

22        Second, the Dodd-Frank Act requires that the CFPB maintain and make public certain

23

24   ───────────────

25   [8] Plaintiffs also allege informational injury under a new section of the Dodd-Frank Act that
     requires the CFPB collect and disseminate public information to facilitate fair-lending laws and
     address the "needs and opportunities of women-owned, minority-owned, and small businesses."
26   15 U.S.C. § 1691c-2(a).  This section has not yet been implemented.  *See* Small Business Lending
     Under the Equal Credit Opportunity Act (Regulation B), 90 FR 50952-01.  The Court need not
27   address injury pursuant to this statute given the Court's finding that Plaintiffs have established
     standing pursuant to the HMDA and 12 U.S.C. § 5496.

28

information from its consumer complaint process.  12 U.S.C. §§ 5496, 5534.  Specifically, the statute instructs the CFPB to maintain complaints in a "central database" and report to Congress regularly an "analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year."  *Id.* § 5496(c)(4).  Plaintiffs Rise Economy and National Community Reinvestment Coalition ("NCRC") rely on data from this database to understand consumers' risk and inform their advocacy—Rise Economy relied on this data in recent comments to federal regulators considering a bank-merger proposal.  Gonzalez-Brito Decl.; Van Tol Decl., ECF No. 10-4.

In addition to informational harm, Plaintiffs contend that Rise Economy has standing to sue based on injuries to its members under *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  One member, Haven Services, is a financial and housing counseling agency with a mission of improving the community's financial health and housing security.  Toriz Decl., ECF No. 10-3.  Haven Services represents that it relies on the CFPB's consumer response function in conducting that work.  *Id.*

Defendants primarily contend that Plaintiffs cannot demonstrate any *imminent* loss of access to this information because the CFPB is currently funded to provide it.  Regarding HMDA mortgage-lending data, Defendants highlight that this information is published on March 31 each year, and they represent that they will be able to publish this information through at least March 31, 2026, given their current funding.  They also highlight that reports regarding the consumer complaint process are based on complaints received during the *preceding* year—because the CFPB was funded last year, the CFPB has already collected that data; and the date to publish the data at the next semi-annual congressional committee hearings is not yet set.

The Court is not persuaded that these circumstances render the risk of harm insubstantial.  *See Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 805 (9th Cir. 2015) ("A future injury need not be 'literally certain'" to support standing, so long as there is "a 'substantial risk' that it will occur.") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).  Although Defendants anticipate that the HMDA data will be released in March 2026, as Plaintiffs highlight,

the CFPB has ongoing duties beyond the initial publishing of that data.  Mot., Ex. X, CFPB, *FFIEC Publishes 2023 Data on Mortgage Lending* (July 11, 2024) ("Ex. X"), ECF No. 37-1.  For example, the CFPB is required to continue working with financial institutions to check the accuracy of the data and conduct work to publish cleaned and aggregated data.  *Id.*  Given their continued insistence on relying on the OLC Memo, the risk that Defendants will not fulfill these ongoing obligations remains substantial regardless of the CFPB's current funding status.  The Court also notes Defendants' representation during the hearing that they "anticipate" HMDA data will be released does not assuage the Court's concerns—indeed, their briefing notably stops short of committing to releasing this year's data before current funding runs out.  Opp'n 6 ("The first, Home Mortgage Disclosure Act data, Plaintiffs admit is published on 'March 31' each year, *i.e.*, during the period covered by the agency's recently fulfilled funding request.").  Defendants have similarly made no representation that they will in fact publish the consumer complaint process data, even if the data is being collected while the Bureau is funded.[9]

Defendants' remaining arguments are similarly unpersuasive.  Their contention that Plaintiffs must be the explicit intended recipient of the information to establish informational harm is unsupported by any cited authority, and courts have long held that the type of disclosure statute is not significant to the analysis.  *See TransUnion*, 594 U.S. at 441–42 (recognizing long history of laws giving general public right to information).   And their general contention that informational harm does not "bear a likeness to a common-law injury" is similarly unsupported, particularly given the extensive line of cases recognizing informational injuries such as Plaintiffs'.  Opp'n 7 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–41 (2016), *as revised* (May 24, 2016); *TransUnion*, 594 U.S. at 414; *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009)).

The Court ultimately finds Plaintiffs have met their burden to establish sufficient informational harm for purposes of Article III standing.  Plaintiffs have shown that the HMDA and Dodd-Frank Act provide the public with a right to information regarding lending data and

---

[9] Given the sufficiency of standing based on these two statutes, the Court need not examine whether the deprivation of Section 1071 lending data is imminent.

consumer complaints; that they rely on this information to operate and fulfill their missions; and that Defendants' refusal to request funds from the Federal Reserve in reliance on the OLC Memo presents a serious risk that CFPB will undergo periods of closure whereby Plaintiffs will be deprived of this information.

The Court therefore finds Plaintiffs have satisfied Article III standing.

### 3.    Joinder of Federal Reserve

Defendants next argue that Plaintiffs' claim should be dismissed under Rule 19 because Plaintiffs are required to join the Federal Reserve.  Rule 19 requires mandatory joinder when "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19 (a)(1); *see In re Cnty. of Orange*, 262 F.3d 1014, 1022 (9th Cir. 2001); *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004).  Defendants argue the Federal Reserve is a required party because the relief Plaintiffs seek—funding from the Federal Reserve—can only be accomplished if the Federal Reserve transfers the funds to the CFPB.

The Court finds Defendants' argument misplaced.  As Plaintiffs highlight, dismissal under Rule 19 is appropriate only if the absent party "cannot be joined," *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir. 1990), but Defendants concede that joinder of the Federal Reserve is "feasible."  Opp'n 4.  Joinder is also unnecessary here because the Court can afford "complete relief" without participation of the Federal Reserve.  The Federal Reserve's transfer of funds to the CFPB in an amount below the statutory cap is mandatory upon the Director's request under 12 U.S.C. § 5497(a)(1), and the Court has no reason to believe the Federal Reserve would breach this duty.  Indeed, Defendants cannot cite a single instance in the history of the Dodd-Frank Act when the Federal Reserve did not fulfill a funding request from the CFPB.

Accordingly, Plaintiffs' failure to join the Federal Reserve does not doom their claim.

### 4.    *NTEU* Litigation

The final threshold issue involves a continued discussion of the *NTEU* litigation.  In addition to the arguments regarding mootness discussed above, Defendants also contend that the Court should use its discretion to dismiss Plaintiffs' claim because "the same issue is pending" in

1    *NTEU*,[10] Opp'n 8 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967) *abrogated*

2    *by Califano v. Sanders*, 430 U.S. 99 (1977)); or alternatively, the Court should transfer this case to

3    the D.C. district court in the interest of justice under 28 U.S.C. § 1404(a).

4        This is generally known as the "first-to-file rule." *Kohn L. Grp., Inc. v. Auto Parts Mfg.*

5    *Mississippi, Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015). Under this rule, courts may use their

6    discretion to dismiss or transfer a suit after examining three factors: "chronology of the lawsuits,

7    similarity of the parties, and similarity of the issues." *Id.* at 1240; *see also Harris Cnty., Tex. v.*

8    *CarMax Auto Superstores Inc.*, 177 F.3d 306, 319 (5th Cir. 1999) ("[W]hile a district court *may*

9    dismiss an injunction suit if duplicative litigation is pending in another jurisdiction, it is not

10   *required* to do so.") (emphasis in original).

11        The Court finds these circumstances do not warrant dismissal or transfer under the first-to-

12   file rule. The plaintiffs do not overlap; prior overlap of counsel is irrelevant; and, although the

13   issues are similar, for all the reasons discussed in the Court's examination of the mootness

14   doctrine, there is also no "substantial overlap." The Court therefore sees no reason to dismiss or

15   transfer this suit.

16                                    * * *

17        Accordingly, the Court finds no threshold barrier to granting Plaintiffs' relief.

18   **B.    Merits**

19        Having found Plaintiffs' claims justiciable, the Court now turns to the merits. The Court

20   will discuss in turn disputes regarding: (1) whether Plaintiffs' claim should be brought pursuant to

21   5 U.S.C. § 706(2) or § 706(1); (2) whether there is a final agency decision; and (3) the correct

22   interpretation of § 5497, including (a) the requirement to request funds, (b) the authority to

23   determine the definition and amount of "combined earnings," and (c) the definition of "combined

24   earnings."

25

26   ───────────────

27   [10] Although notably, Defendants in the *NTEU* litigation argued that the issue of CFPB's funding
     was "the equivalent of a new claim" in that case. Mot., Ex. W, Defendants' Opposition to Motion
     to Clarify, *NTEU v. Vought*, No. 1:25-cv-0038 (D.D.C. Dec. 8, 2025), ECF No. 37-1.

28   Case No.: 5:25-cv-10481-EJD
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                                    17

### 1.    Agency "Action" Under § 706(2) or "Inaction" Under § 706(1)

Defendants first contend that Plaintiffs' claim does not involve an agency "action" under § 706(2) because the decision not to request funding from the Federal Reserve is not a rule, order, license, sanction, or relief, as defined by the APA.  Instead, they argue that Plaintiffs' claim should be brought under § 706(1), which resolves agency *inaction*.

The Court finds this argument without merit.  As an initial matter, Plaintiffs' claim does arise from an agency "action"—Plaintiffs allege that Defendants "acted" when they relied on the OLC Memo's interpretation of their duties under § 5497 and circumvented the Federal Reserve's funding scheme by affirmatively requesting funding directly from Congress.  And regardless, as Defendants concede, the APA defines the term "agency action" to include a "failure to act," 5 U.S.C. § 551(3), and courts in the Ninth Circuit have generally rejected the idea that inaction claims can only be brought under § 706(1).  *See Northcoast Env't  Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) (finding § 706(2) "provides for judicial review of agency actions," which "include[] the failure to act"); *Network Optix Inc. v. Rubio*, No. 2:24-CV-06505-SK, 2025 WL 1122358, at *5 (C.D. Cal. Feb. 14, 2025) ("[T]he APA eschews any dispositive metaphysical distinction between agency action and in action [sic], recognizing sensibly enough for administrative law that an agency's decision not to act can still be a reviewable action to be set aside if unlawful."); *Franco v. U.S. Dep't of the Interior*, No. CIV S-09-1072 KJM, 2012 WL 3070269, at *10 (E.D. Cal. July 27, 2012) ("The APA defines 'agency action' to include both affirmative acts such as issuing or denying 'an agency rule, order, license, sanction [or] relief' as well as an agency's 'failure to act.'").

Accordingly, the Court finds Plaintiffs may bring their claim under § 706(2).

### 2.    "Final" Agency Action

Next, Defendants argue that the CFPB has not made any "final" agency decisions.  As Defendants highlight, two conditions must be met to establish finality: (1) the challenged action must mark the "consummation" of the agency's decision-making process, not a preliminary, procedural, or intermediate agency action or ruling; and (2) it must be one by which rights or

1    obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*,

2    520 U.S. 154, 177–78 (1997). Defendants contend their November 2025 statement indicating that

3    they would not request funds from the Federal Reserve was not a consummation of its decision-

4    making process, and it had no concrete impact on Plaintiffs given that the CFPB has now acquired

5    that funding.

6         The Court disagrees. A final agency action includes "the whole or a part of an agency

7    rule," and "rule" means "the whole or a part of an agency statement of general or particular

8    applicability and future effect designed to implement, interpret, or prescribe law or policy or

9    describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §§

10   551(4), (13). In other words, APA claims are not limited to challenging only rules published in

11   the Federal Register. Here, Defendants expressly adopted the OLC Memo's interpretation of §

12   5497 when they stated they are "bound by the OLC Memo." Mot., Ex. K, CFPB, *CFPB Notifies*

13   *Court it Cannot Lawfully Draw Funds from the Federal Reserve* (Nov. 11, 2025) ("Ex. K"), ECF

14   No. 11-11. Defendants reiterated this commitment during oral argument, representing that they

15   would request funding *only* to the extent that it is consistent with the OLC Memo. The OLC

16   Memo is thus the "working law" of the agency and constitutes a final agency decision. *See*

17   *100Reporters v. United States Dep't of State*, 602 F. Supp. 3d 41, 61 (D.D.C. 2022) (noting an

18   agency's "working law" includes "opinions and interpretations which embody the agency's

19   effective law and policy") (internal quotation marks omitted) (quoting *N. L. R. B. v. Sears,*

20   *Roebuck & Co.*, 421 U.S. 132, 153 (1975)).

21        The Court therefore finds the finality requirement met.

22              **3.    Interpretation of 12 U.S.C. § 5497**

23        Now moving to the substance of Plaintiffs' claim, three primary questions arise from

24   Defendants' interpretation[11] of § 5497: (1) whether the CFPB Director has the duty to request

25   funds from the Federal Reserve; (2) whether the CFPB Director has the authority to determine

26

27   [11] Because Defendants have expressly adopted the OLC Memo as the working law of the Bureau,
     the Court considers the OLC Memo's interpretation of § 5497 as their own.

28   Case No.: 5:25-cv-10481-EJD
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                                                19

1  whether the Federal Reserve has the "combined earnings" to fund the CFPB; and (3) the definition

2  of "combined earnings."[12]

3                                   **a.    Duty to Request Funds**

4           The OLC Memo advises that § 5497 does not contain any "instruction . . . directed at the

5  CFPB."  OLC Memo 30–31.  Rather, the statute imposes on "the Board of Governors" a duty to

6  "transfer to the Bureau" certain sums of money.  12 U.S.C. § 5497(a)(1).  While Defendants

7  concede that the statute implies the Director must *determine* "the amount reasonably necessary to

8  carry out the authorities of the Bureau under Federal consumer financial law," Opp'n 14—and

9  acknowledge that a letter sent by the CFPB Director to the Federal Reserve is the traditional

10 avenue by which the Federal Reserve has learned of the Director's determination, *id.* at 15—the

11 OLC Memo concludes that there is no requirement for the Director to *affirmatively communicate*

12 that need to the Federal Reserve.  OLC Memo 29–30.  Defendants also argue that Vought fulfilled

13 his duty to determine the CFPB's funding needs in November 2025 before Plaintiffs filed their

14 complaint, and he made his determination public through his letters to the President and Congress.

15 In other words, Defendants' position is that Vought never technically refused to provide that

16 information to the Federal Reserve; they just never asked for it.  It follows, according to

17 Defendants, that any claim alleging a failure fund the CFPB would have been more appropriately

18 directed to the Federal Reserve.

19          Plaintiffs agree that the language in § 5497(a) does not explicitly require that the Director

20 affirmatively send a letter to the Federal Reserve with its funding determination.  However, as

21 Plaintiffs highlight, it also does not unambiguously require that the Federal Reserve Board ask the

22 CFPB how much funding it might require.  The statute provides distinct roles. The CFPB Director

23 must determine the amounts reasonably necessary, and the Federal Reserve Board must transfer

24 funds in that amount out of the "combined earnings of the Federal Reserve System."  But the

25 express language in § 5497(a) leaves a gap as to who must contact whom to ensure the CFPB

26

27 _____

   [12] The Court need not reach the final issue regarding whether the Federal Reserve does in fact
   have sufficient "combined earnings" to fund the CFPB at this time.

28

1  receives the funding it needs.

2          In the face of this gap, the Court finds the best reading of § 5497 puts the requirement on

3  the CFPB Director.  As Defendants conceded during oral argument, it is the CFPB Director, not

4  the Federal Reserve Board, that has a duty to ensure the Bureau is thriving and able to carry out its

5  statutory functions.  That duty necessarily and inherently includes the duty to ensure the CFPB is

6  funded.  Historically, every Director prior to Vought has recognized and fulfilled their duty as

7  Director to request funding to continue the congressional mandated operations and functions of the

8  CFPB pursuant to § 5497(a). [13]  And regardless, even if the statute did not contemplate a scheme

9  whereby the Director affirmatively informs the Federal Reserve of the CFPB's funding needs, it

10 certainly did not contemplate the CFPB Director going directly to Congress before giving the

11 Federal Reserve an opportunity to determine whether the amount requested exceeds the statutory

12 cap.  Such a practice explicitly contradicts the procedures outlined in § 5497(e)(1).  There is also

13 no support for Defendants' alternative argument that Vought fulfilled his duty to request CFPB

14 funding by publicizing his funding determination in letters to the President and Congress.  This

15 would not only contradict § 5497(e)(1) but would also invite chaos—the Federal Reserve and

16 Congress may act simultaneously, issue conflicting funding amounts, or await decisions from the

17 other creating uncertainty in the critical work of the CFPB.  As discussed in detail below, such a

18 disordered system is irreconcilable with Congress's intent to create a stable source of funding for

19 the CFPB.  *See infra* Section III.B.3.c.iii.

20

21  ─────────────────────

22  [13] In response to Defendants' oral argument that an implied duty to request funds based on past practice is insufficient to establish a "clear and certain duty" necessary for mandamus relief, the Court clarifies that the duty to ensure the Bureau has the funding needed to operate as Congress

23  intended was not implied *through* this past practice.  Past practices merely support the most obvious interpretation of the statute—that requesting funding from the Federal Reserve is essential

24  to their role as Director and to the CFPB's continued operations.  The Court also observes that Defendants did not raise this argument in their briefing.  Their opposition argued only that

25  Plaintiffs' relief is not "clear and certain" because Vought has already sought and received funding from the Federal Reserve.  *See California River Watch v. Fluor Corp.*, No. 10-CV-05105-WHO,

26  2015 WL 5139341, at *2 (N.D. Cal. Sept. 1, 2015) (citing *Makaeff v. Trump Univ., LLC,* 2014 WL 2743244, at *4 n.2 (S.D. Cal. June 17, 2014) ("[T]he Court need not consider issues raised for the

27  first time during oral argument")).

28  Case No.: 5:25-cv-10481-EJD
    ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                                    21

1    The Court therefore finds the best reading of § 5497 requires the CFPB Director to both

2    determine the funds reasonably necessary to carry out its operations and request that funding from

3    the Federal Reserve.

4                    **b.    Authority to Determine "Combined Earnings"**

5        The OLC Memo also advises that there is no obligation for the CFPB to draw funds from

6    the Federal Reserve after the CFPB Director "determin[es] that no 'combined earnings' are

7    available." OLC Memo 30. Before even reaching the definition of "combined earnings," this

8    raises a threshold question the OLC Memo does not appear to address—does the Director even

9    have the authority to make that determination?

10       The Court finds it does not. Neither their opposition nor the OLC Memo provides any

11   authority that would allow a director from a different agency, with no financial expertise or

12   familiarity with the Federal Reserve System, to tell the Federal Reserve how to define their

13   "combined earnings" and calculate what those combined earnings are. As stated best by the

14   Former Federal Reserve Officials Amicus, such a system "reflects no respect for the expertise or

15   independence of the Federal Reserve or the ways its interpretation could implicate ongoing

16   Federal Reserve operations." Former Federal Reserve Officials Amicus 12. Indeed, it appears

17   Defendants recognize this, conceding in another section that "[t]he Fed—not Plaintiffs, the CFPB,

18   or the Court—is best positioned to opine on whether it has combined earnings within the meaning

19   of OLC's definition." Opp'n 25.

20       This is a crucial gap in Defendants' position. Given that the Director has no authority to

21   define or calculate the Federal Reserve's "combined earnings," Defendants' entire basis for not

22   requesting funding from the Federal Reserve crumbles.

23                    **c.    Meaning of "Combined Earnings"**

24       Even if Defendants presented any credible argument to persuade the Court that the Dodd-

25   Frank Act vested the CFPB Director with the authority to define and calculate the Federal

26   Reserve's "combined earnings," the Court also finds they got it wrong.

27       The Dodd-Frank Act does not define "combined earnings." The OLC Memo defines the

28   Case No.: 5:25-cv-10481-EJD
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                                    22

United States District Court
Northern District of California

term as "the Federal Reserve's profits—that is, the amount remaining after deducting the Federal Reserve's interest expenses from its revenues."  OLC Memo 9.  And Plaintiffs argue the best interpretation is all the money generated by the Federal Reserve System, without reductions for expenses.[14]

To determine the meaning of "combined earnings" in the absence of express language, the Court will examine in turn: (1) the ordinary meaning of "combined earnings"; (2) the language and design of the statute; and (3) the Dodd-Frank Act's history and purpose.

### i.    Ordinary Meaning

The OLC begins by citing dictionary definitions to argue that its interpretation aligns with the ordinary meaning of "combined earnings."  It first cites to common dictionary definitions that interpret "earnings" as "the balance of revenue after deduction of costs and expenses," or "business profits."  OLC Memo 10 (citing *Merriam Webster's Collegiate Dictionary* 391 (11th ed. 2005); *Webster's Third New International Dictionary* 714 (1993 ed.); *The American Heritage Dictionary of the English Language* 561 (5th ed. 2016)).  It then argues that these definitions are consistent with technical dictionaries and usages in the business and accounting context, to which it assigns "particular weight."  *Id.* at 10–11 (citing Virginia B. Morris & Kenneth M. Morris, *Standard & Poor's Dictionary of Financial Terms* 64 (2007); *Oxford Dictionary of Accounting* 161 (4th ed. 2010); SEC, Non-GAAP Compliance & Disclosure Interpretation No. 103.01 (Dec. 13, 2022)[15]).

The Court disagrees with Defendants' characterization of "combined earnings."  As an initial matter, the OLC Memo's cherry-picking of common dictionary definitions is notable—as

---

[14] Notably, the CFPB took this same position in other litigation as recently as 2024—arguing in the wake of *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024), that the "plain meaning" of "combined earnings . . . refers to the System's income."  *See* Mot., Ex. P, Opp. to Mot. Dismiss at 6–7, *CFPB v. Purpose Fin., Inc.*, No. 7-24-cv-3206 (D.S.C. Oct. 3, 2024).
[15] In an attempt to argue that their definition of "combined earnings" comports with definitions used by other federal agencies, Defendants noted during oral argument that the OLC Memo also cites to the SEC's definition of "earnings" as "net income."  But as Plaintiffs highlighted in response, the OLC Memo references a document titled Non-GAAP Compliance & Disclosure Interpretation, which discusses a private business regulated by the SEC, not the SEC's own balance sheet.

Case No.: 5:25-cv-10481-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
23

United States District Court
Northern District of California

Plaintiffs highlight, the same dictionaries in existence at the time the Dodd-Frank Act was passed in 2010 also define "earnings" as wages, income, or other revenue generated from labor, services, or investments.  Mot. 16 (citing *Earnings, Black's Law Dictionary* (9th ed. 2009); *Earnings, Webster's New Dictionary* (2005); *Earning, Oxford English Dictionary* (2d ed. 1989)).  But more importantly, the Court is persuaded by Plaintiffs' argument that definitions of "combined earnings" in the business and financial contexts are inapplicable given the unique context of the Federal Reserve's public function.  As the nation's central bank, the Federal Reserve plays a unique role incomparable to private banks or other profit-maximizing enterprises—it is responsible for implementing the nation's monetary policy, ensuring the safety and soundness of the banking system, containing risk in financial markets, and promoting consumer protection and community development.  *See* Former Federal Reserve Officials Amicus 5–6.  Unlike private institutions, when the Federal Reserve's expenditures exceed its income, it stops remittances to the Treasury and records a "deferred asset" on its balance sheet. *Id.* at 5, 11.  Having a "[n]egative net income and the associated deferred asset do[es] not affect the Federal Reserve's conduct of monetary policy or its ability to meet its financial obligations." *Id.* at 11.  In other words, while "earnings" in the context of private businesses may mean "profit," the Federal Reserve is not a profit-maximizing organization, and its deferred assets do not impact its operations.  Thus, the definitions used in private financial institutions carry little, if any, weight.

When examining the common dictionary definitions outside of the private financial industry and in the context of the Federal Reserve's unique public structure, the Court agrees with Plaintiffs that the ordinary meaning of "earnings" is "revenue," without consideration of "profits" or "losses." *See City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) (cleaned up) (holding that courts must "read the specific words with a view to their place in the overall statutory scheme").  Common dictionaries published at the time Congress enacted the Dodd-Frank Act define "earnings" as "something (as wages) earned," "something (as wages or dividends) earned as compensation for labor or the use of capital," and "salary or wages." *Earnings, Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005); *Earnings, Webster's Third New*

United States District Court
Northern District of California

1    *Int'l* 714 (1993 ed.); *Earnings, The American Heritage Dictionary of the English Language* 561

2    (5th ed. 2016).  The Court finds these definitions fit best into the context of the Federal Reserve's

3    public function and unique ability to operate even in times of "loss."  But regardless, even if

4    Defendants were to persuade the Court that the ordinary meaning of "earnings" in this context is

5    "profits," the OLC Memo still creates a bespoke measure of "profits" that subtracts from the

6    Federal Reserve's revenues only *interest expenses*,[16] rather than *all expenses*.  Defendants have

7    failed to persuade the Court that the deduction of only certain expenses fits into any understanding

8    of "profits."

9                        **ii.      Language and Design of the Statute as a Whole**

10            The OLC Memo next turns to the language and design of the Dodd-Frank Act.  It contends

11    that the term "earnings" in § 5497(a)(1) must be distinguished from the term "revenues" used

12    elsewhere in the statute, citing 12 U.S.C. §§ 5367(b)(2)) (referring to "revenues generated from [a

13    specific] activity"); 5381(b) (referring to "the consolidated revenues of such company from such

14    activities" in relation to the definition of "financial company"); and 8206(5)(C)(i)(II) (referring to

15    the generation of "annual revenues").

16            Plaintiffs, in turn, argue that "earnings" is used in other sections to refer to "revenues,"

17    with no consideration of any "losses," citing 12 U.S.C. §§ 5390(n)(2) (directing the Federal

18    Deposit Insurance Corporation to deposit "[a]mounts received," including interest and other

19    earnings from investments, into the Orderly Liquidation Fund); 5465(c) (authorizing Reserve

20    Banks to "pay earnings on balances maintained by or on behalf of" certain financial entities); and

21    15 U.S.C. § 78u-6(g)(5)(D) (requiring the SEC report annually to Congress on the amount of

22    "earnings on investments" made from its Investor Protection Fund).

23            The Court ultimately finds little guidance from the language in other sections of the Dodd-

24    Frank Act.  Both parties offer support for their respective definitions; but considering the Court's

25

26    ─────────────────────

27    [16] Plaintiffs also contend that this measure of profits further puts the Federal Reserve's independence at risk—perhaps the Federal Reserve would be slower to raise interest rates if it meant that the CFPB would interpret deferred assets as losses and refuse to seek funding.

28    Case No.: 5:25-cv-10481-EJD

      ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

                                25

*United States District Court*
*Northern District of California*

1   analysis of the ordinary meaning of "combined earnings" and the history and purpose of the Dodd-

2   Frank Act, the Court need not examine this issue further.

3                           **iii.        History and Purpose**

4        The OLC Memo concludes that the legislative history and context of the Dodd-Frank Act

5   support its interpretation because "Congress legislated against the background of the Federal

6   Reserve's accounting practices" and "the Federal Reserve's financial statements."  OLC Memo

7   16.  The memo specifically cites to a 2009 financial statement to support its position that

8   "combined earnings" means "profits."  *Id.* at 13.  In this statement, the Federal Reserve explained

9   that the Reserve Banks transfer *excess earnings* to the Treasury *after* providing for the costs of

10  operations, payment of dividends, and reservation of surplus funds.  *Id.*  The OLC Memo also

11  relies on the Dodd-Frank Act's drafting history, highlighting that Congress ultimately adopted the

12  Senate version of the funding mechanism, which uses "combined earnings," rather than the House

13  proposal, which did not expressly identify a source of funding for transfers.  *Id.* at 25–26.

14  Defendants contend that the House proposal would have ensured the CFPB would receive funding

15  regardless of the Federal Reserve's profits, and Congress's rejection of that proposal is a rejection

16  of Plaintiffs' position.

17       The Court reaches a different conclusion.  When reviewing evidence of congressional

18  intent and the Federal Reserve's practices at the time of the Dodd-Frank Act, the Court finds the

19  OLC Memo's definition of "combined earnings" is irreconcilable with the history and purpose of

20  the Dodd-Frank Act.

21       Purpose of the Dodd-Frank Act

22       When Congress created the CFPB, they intentionally sought to establish a steady source of

23  income that would not be subject to the uncertainties of funding through annual appropriations or

24  cycles of "profits."  *See Seila Law LLC*, 591 U.S. at 206 (examining history and purpose of the

25  Dodd-Frank Act).  After studying the financial crisis, Congress found that the fragmented

26  apportionment of authority among federal agencies, and the lack of consistent funding for federal

27  financial regulators, led to government delay in responding to mortgage abuses.  Congress

28  Case No.: 5:25-cv-10481-EJD
    ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Members Amicus 1.  Congress sought to meet this challenge by establishing the CFPB and providing it with all federal consumer-protection responsibilities that were previously spread across seven agencies and a steady source of funding from the Federal Reserve.  *Id.* at 2.

Under this funding scheme, Congress intended appropriations to be used only as a "backstop," *id.* at 5, if the CFPB's Director determines that "the funding needs of the Bureau are anticipated to exceed" the statutory cap.  12 U.S.C. § 5497(e)(1).  Otherwise, Congress intentionally insulated CFPB's funding from "review by the Committees on Appropriations of the House of Representatives and the Senate."  *Id.* § 5497(a)(2)(C); Congress Members Amicus 5.  In drafting this section, the Senate Committee on Banking, Housing, and Urban Affairs specifically emphasized how the year-to-year appropriations cycle can deprive financial regulators of the funds needed to perform their duties.  Congress Members Amicus 4.  The Committee stressed that "the assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator."  *Id.* (internal quotation marks omitted).

As recently as May 2025, it appears Congress understood that a achieving a stable funding source requires that the Federal Reserve provide funding regardless of its "profits."  When legislating the new 6.5% funding cap, the Congressional Budget Office ("CBO") indicated that the proposed cap "would take effect at the beginning of 2026," and that the new, lower maximum transfer would be reflected in the Federal Reserve's finances beginning in 2026—even as it understood that the Federal Reserve System was at the time largely still operating without sufficient excess earnings to send remittances to the Treasury.  Mot., Ex. U, CBO, *Reconciliation Recommendations of the House Committee on Financial Servi*ces (May 7, 2025).  The understanding that the Federal Reserve would continue providing funding regardless of its "profits" was also recently recognized during a hearing before the Senate Committee on Banking, Housing, and Urban Affairs, where the Federal Reserve Chair Jerome Powell testified to Congress that it was "very clear on the law and legislative history that [federal reserve is] still required to make those payments" to fund the Bureau so long as it had positive revenue.  *The Semiannual*

*Monetary Policy Report to the Congress: Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:25:50–1:26:02 (Feb. 11, 2025) (statement of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.)).

Against this backdrop, the Court finds unpersuasive Defendants' reliance on one 2009 financial statement which, according to Defendants, "interest expenses" and "operating expenses" are among the "necessary expenses" deducted to calculate "net earnings."  The Court also finds the drafting history highlighted in the OLC Memo of little consequence.  Congress's rejection of the House version of the bill does not indicate a rejection of Plaintiffs' definition of "combined earnings"—it indicates a rejection of an entirely different funding structure based on a fixed percentage rather than the CFPB's actual needs.  *Compare* H.R. 4173, 111th Cong., § 4109 ("[T]he Board of Governors shall transfer funds *in an amount equaling 10 percent of the Federal Reserve System's total system expenses* (as reported in the Budget Review of the Board of Governors most recent Annual Report to Congress) to the Director for the purposes of carrying out the authorities granted in this title . . . . ") (emphasis added), *with* S. 3217, 111th Cong., § 1017 ("[T]he Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law . . . [unless it exceeds the statutory cap].").

Ultimately, the Court finds it clear from the legislative history that Congress, in creating the CFPB and recognizing the critical importance of its continued uninterrupted work, intended to create a steady stream of funding to the CFPB, insulated from partisan politics in Congress. Adopting Defendants' new definition of "combined earnings" would not only destroy the CFPB's independence from the appropriations process by forcing it back to Congress to request funding, but would also subject the CFPB to intermittent defunding based on unpredictable fluctuations in the Federal Reserve's balance sheet—where the CFPB would likely be deprived of its funding in times of nationwide economic upheaval, exactly when the need for its regulatory and consumer-protection functions is most urgent.  *Id.* at 8–9.

Case No.: 5:25-cv-10481-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
28

United States District Court
Northern District of California

United States District Court
Northern District of California

Federal Reserve Practices

The Federal Reserve's historical practices at the time Congress enacted the Dodd-Frank Act are also telling, given that Congress legislated within the context of these practices. As highlighted in the Former Federal Reserve Officials Amicus, there are at least three longstanding practices that the Federal Reserve would need to change if Defendants' interpretation of "combined earnings" was correct.

First, the twelve Reserve Banks separately report on their financial conditions and remit any excess earnings to Treasury on a weekly basis. Former Federal Reserve Officials Amicus 12. If Defendants' view is that "combined earnings" can be calculated only at the end of each quarter or year (based on how often the CFPB Director chooses to request funds), that view disregards the fact that the Reserve Banks remit excess earnings to Treasury every week. *Id.* at 13. The Reserve Banks may generate substantial profits in some weeks but record losses in others; but the OLC Memo does not address what amount, if any, of those "combined earnings" could be transferred to the CFPB. *Id.* While the OLC Memo acknowledges the existence of the Federal Reserve's "[weekly] settlement schedule," it makes no effort to square its interpretation of "combined earnings" with that longstanding practice. *Id.*

Second, the Federal Reserve does not actually track and report out the measure of "earnings" that the OLC Memo uses—i.e., "total interest income" minus "total interest expense" plus "the sum of non-interest income or losses." *Id.* at 8. That measure is not provided in either the Federal Reserve's Audited Annual Financial Statements or its weekly balance sheets. *Id.* While it can be calculated from the Federal Reserve's financial statements, the fact that it has never been tracked and reported by the Federal Reserve further demonstrates that this metric plays no meaningful role in Federal Reserve operations, and it is not what Congress intended by "combined earnings." *Id.*

And third, the Federal Reserve Board has continually and lawfully transferred funds to the CFPB over the several years that the Federal Reserve did not run a "profit." *Id.* at 12. This teaches that the Federal Reserve has never shared the OLC's view that the Federal Reserve

System's "combined earnings" are its "profits"—a fact made clear, again, by Chairman Powell's testimony that the Federal Reserve had "very carefully" considered the question of whether it could continue to transfer funds to the CFPB and concluded that "it's very clear on the law and the legislative history that we're still required to make those payments." *Id.* (quoting *The Semiannual Policy Report to the Congress: Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:24:50–1:26:02 (Feb. 11, 2025) (testimony of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.)).

It would make no sense for Congress to adopt a definition of "combined earnings" that would require the Federal Reserve to change the timeframe in which they report their financial conditions, cause it to create a new system to track and report "profits" and "losses," and contradict its understanding that "losses" as defined by Defendants does not impact its ability to fund the CFPB from its "combined earnings."

* * *

Accordingly, the Court finds Defendants' definition of "combined earnings" as the "profits" that remain "after deducting the Federal Reserve's interest expenses from its revenues" is incorrect. In the context of relevant dictionary definitions, the purpose of the Dodd-Frank Act, and the Federal Reserve's historical practices, the Court finds the record supports Plaintiffs' definition of "combined earnings" as "revenue."

## IV.    CONCLUSION

Based on the foregoing, the Court finds Defendants acted arbitrarily, capriciously, and contrary to law by adopting the OLC Memo's statutory interpretation of 12 U.S.C. § 5497 and refusing to request funding from the Federal Reserve Board based on that interpretation. Vought's plan to "shut down" the CFPB using this clearly erroneous interpretation of § 5497 frustrates Congress's intent to insulate the Bureau's funding stream from this exact transparent display of partisanship. The purpose of this Order is to ensure the CFPB operates as Congress intended— fully funded and able to ensure that consumers have access to "fair, transparent, and competitive" markets for consumer financial products, 12 U.S.C. § 5511(a); not subject to ever-changing

Case No.: 5:25-cv-10481-EJD

United States District Court
Northern District of California

1  Director fiat.

2       Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment pursuant to 5

3  U.S.C. § 706(2)(A).[17]   The Court **DECLARES** that Defendants' reliance on the OLC Memo is

4  arbitrary, capricious, and in violation of law, and **ORDERS** Defendants to continue requesting the

5  amount determined by the Director to be reasonably necessary to carry out the authorities of the

6  CFPB from the Federal Reserve, consistent with their obligations under § 5497.

7       **IT IS SO ORDERED.**

8  Dated: March 13, 2026

9

10

11                                   EDWARD J. DAVILA
                                     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24  _____
[17] Defendants briefly request that, should the Court enter an order that compels the CFPB to
25  request funds from the Federal Reserve, the relief be stayed pending the disposition of any appeal,
    or at a minimum that it be administratively stayed for seven days to allow an opportunity to seek
26  expedited relief.  However, as Plaintiffs highlight, Defendants' request for a stay pending appeal is
    premature, and they do not discuss, let alone satisfy, any applicable standard.  *See Elec. Frontier*
27  *Found. v. Off. of Dir. of Nat'l Intel.*, No. C 08-01023 JSW, 2009 WL 10710750, at *1 (N.D. Cal.
    Oct. 7, 2009); *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1029 (9th Cir. 2025).
28  Case No.: 5:25-cv-10481-EJD
    ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
                             31